## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GLADYS SEARCY, individually and on behalf of all others similarly situated, | ) ) ) ) | NO. 08 C 00985 |
| Plaintiff, | ) ) ) | JUDGE KOCORAS |
| vs. | ) ) | MAGISTRATE JUDGE COX |
| eFUNDS CORPORATION, et al., | ) ) | CLASS ACTION COMPLAINT |
| Defendants. | ) ) | JURY DEMAND |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

STEWART, ESTES & DONNELL, PLC

By: s/ Martin D. Holmes
    M. Reid Estes, Jr., TN Bar #9043
    Martin D. Holmes, TN Bar #12122
    Fifth Third Center, Suite 1401
    424 Church Street
    Nashville, TN 37219
    (615) 244-6538

*Lead Attorneys for Plaintiffs*

PRETZEL & STOUFFER, CHARTERED

By: s/ Scott L. Anderson
    Edward H. Nielsen (IL Bar 0252296)
    Scott L. Anderson (IL Bar 6269332)
    One South Wacker Drive, Suite 2500
    Chicago, IL 60606
    (312) 346-1973

*Co-Counsel for Plaintiffs*

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................ ii

I.    Overview of Plaintiff's Claims Under the FCRA ........................................... 1

II.   Facts Surrounding Plaintiff's File Disclosure Requests .................................. 2

III.  Nature of Defendants' Business Operations .................................................... 3

IV.   Law and Argument

    A.   Overview of the FCRA and Relevant Statutory Provisions ................... 6

    B.   Summary of Defendants' Argument ...................................................... 8

    C.   Each File Disclosure is a Separate and Distinct Act Under the FCRA .... 9

    D.   TRW, Inc. v Andrews, Relied Upon by Defendants, Holds That Each
        Disclosure is a Separate and Distinct Violation ................................. 16

    E.   Plaintiff Does not Utilize a "Continuous" or "Serial" Violation Theory
        Thus the Case Law Cited by Defendants is Inapposite ....................... 17

Conclusion ......................................................................................................... 20

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Acton v. Bank One Corp.*, 293 F.Supp.2d 1092 ................................................................. 13, 14

*Alexander v. Moore & Associates, Inc.*, 553 F.Supp. 948 ................................................. 6

*American Pipe & Construction Co. v. Utah*, 414 U.S. 538 ................................................ 8

*Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439 ............................................................. 17

*Estiverne v. Sak's Fifth Avenue*, 9 F.3d 1171 ................................................................. 6

*Greenway v. Information Dynamics, Ltd.*, 524 F.2d 1145 ................................................. 6

*Hyde v. Hibernia Ntl. Bank in Jefferson Parish*, 861 F.2d 446 ....................................... 10

*Jaramillo v. Experian Information Solutions, Inc.*, 155 F.Supp.2d 356 ..................... 11, 12

*Kaplan v. Assetcare, Inc.*, 88 F.Supp.2d 1355 ................................................................. 20

*Lawrence v. Trans Union LLC*, 296 F.Supp.2d 582 ......................................................... 12

*McCorriston v. L.T.W. Inc.*, 536 F.Supp.2d 1268 ............................................................. 20

*National RR Passenger Corp. v. Morgan*, 536 U.S. 101 ................................................ 17

*Philbin v. Trans Union Corp.*, 101 F.3d 957 ................................................................... 11

*Pinner v. Schmidt*, 805 F.2d 1258 ................................................................................... 7

*Pittman v. J.J. MacIntyre Co. of Nev., Inc.*, 969 F.Supp. 609 .......................................... 20

*Sierra v. Garbus*, 48 F.Supp.2d 393 ............................................................................... 19

*TRW v. Andrews*, 534 U.S. 19, 122 S.Ct. 441, [151 L.Ed.2d 339] ............................ 8, 16

*Whitesides v. Equifax Credit Information Services*, 125 F.Supp.2d 807 ......................... 12

*Wilhelm v. Credico, Inc.*, 455 F.Supp.2d 1066 ................................................................ 18

### STATE CASES

*Peasley v. TeleCheck of Kansas*, 637 P.2d 437 ................................................................ 6

ii

## DOCKETED CASES

*Sammons v. eFunds, et al*, Dkt. No. 3-07-0656 ...................................................8

## FEDERAL STATUTES

15 U.S.C. §1681a(d) ...................................................6

15 U.S.C. §1681a ...................................................6

15 U.S.C. §1681e ...................................................10, 16

15 U.S.C. §1681g ...................................................5, 16

15 U.S.C. §1681g(a) ...................................................1, 5

15 U.S.C. §1681i ...................................................8, 10

15 U.S.C. §1681j ...................................................7

15 U.S.C. §1681m ...................................................4

*15 U.S.C. §1681p* ...................................................8, 13

15 U.S.C. §1681s-2 ...................................................10

15 U.S.C. §1692e ...................................................18

16 C.F.R. §610.1 ...................................................7

16 C.F.R. §610.3 ...................................................7

## UNREPORTED CASES

*Campbell v. Chase Manhattan Bank, USA*, 2005 WL 1514221 ...................................................14

*Larson v. Ford Credit*, 2007 WL 1875989 ...................................................14, 15

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| GLADYS SEARCY, | ) | |
| individually and on behalf of all | ) | NO. 08 C 00985 |
| others similarly situated, | ) | |
| | ) | JUDGE KOCORAS |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE COX |
| vs. | ) | |
| | ) | CLASS ACTION COMPLAINT |
| eFUNDS CORPORATION, et al., | ) | |
| | ) | JURY DEMAND |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

### I.    OVERVIEW OF PLAINTIFF'S CLAIMS UNDER THE FCRA

In this putative class action, Plaintiff sues Defendants for their willful violations of the consumer file disclosure provisions contained in the Fair Credit Reporting Act ("FCRA"), which unambiguously require that, upon request, a consumer reporting agency must "clearly and accurately disclose" to the consumer:

> 1) *all* information in the consumer's file *at the time of the request* - 15 U.S.C. §1681g(a)(1)(emphasis added);
>
> 2) the sources of the information – 15 U.S.C. §1681g(a)(2); and
>
> 3) the identity of all persons (including businesses), who procured a consumer report from the consumer reporting agency during the twelve-month period *preceding the consumer's request for a file disclosure* 15 U.S.C. §1681g(a)(3)(emphasis added).

Despite these unambiguous statutory requirements, when responding to consumers' requests for file disclosures pursuant to the FCRA, Defendants utilize a standardized "Consumer File Disclosure Report" containing only "negative" information, such as current or past "bounced checks" and closed bank accounts. The proof will establish that Defendants deliberately flaunt the clear requirements of §1681g(a)(1) – (3), in willful violation of the FCRA

## II.    FACTS SURROUNDING PLAINTIFF'S FILE DISCLOSURE REQUESTS

On three separate occasions, in January and September of 2005 and again in October of 2006, Gladys Searcy's checks were declined at local merchants for reasons unknown to Ms. Searcy. On each occasion, the merchant provided Ms. Searcy with contact information for SCAN. *Searcy Decl., Paras. 2, 10 & 15.* After each decline, Ms. Searcy promptly contacted SCAN and requested a file disclosure under the FCRA in an effort to determine what information SCAN maintained in its files regarding her, including anything that would have caused her checks to be declined. *Searcy Decl., Paras. 4, 6, 11 & 16.*

In response, Ms. Searcy received a "Consumer File Disclosure Report" from Defendants on three (3) separate occasions: 1) January 21, 2005; 2) September 15, 2005; and 3) October 12, 2006. *Searcy Decl., Exhs. 1 & 2; Weber Decl., Exh. 1.* Significantly, *none* of the "SCAN CONSUMER FILE DISCLOSURE REPORTS" provided Ms. Searcy with: 1) any information regarding the reasons for her check declines; 2) the sources of information that had been provided to SCAN; or 3) the identity of merchants who obtained consumer reports from SCAN during the 12-month period preceding Searcy's request for each file disclosure. Consequently, Ms. Searcy was unable to identify which merchants had accessed SCAN's files to process her checks during the twelve month preceding her file disclosure requests in January and September 2005, and October 2006. *Weber Decl., Exh. 1*; Searcy *Decl., Exhs. 1 & 2; Searcy Decl., Paras. 8, 9, 13, 14, 18 & 19.*

Ms. Searcy has absolutely no idea what information Defendants' files contain related to her or the checks that she may (or may not) have written to merchants using Defendants' products, SCAN or SCAN OnLine, given the legally deficient nature of the "SCAN CONSUMER FILE DISCLOSURES." Ms. Searcy is understandably concerned about identity theft and is equally concerned that Defendants may have mistakenly confused her with another consumer, either of which could have serious adverse consequences on her credit rating and future check writing abilities. *Searcy Decl., Para. 20.* Congress enacted the FCRA to protect consumers by requiring consumer reporting agencies such as Defendants to provide information

essential to allay the very concerns harbored by Ms. Searcy; yet, to this day, Ms. Searcy does not know why her checks were declined in January and September 2005, or in October 2006. *Searcy Decl., Para. 21.*

## III.   NATURE OF DEFENDANTS' BUSINESS OPERATIONS

Defendants provide check verification services to merchants nationally through two (2) products – SCAN (acronym for "Shared Check Authorization Network") and SCAN OnLine.[1] *Defs. Memo. MSJ, p. 2.* Simply put, SCAN is an electronic "bad check" list, containing bank account and driver license numbers associated with closed bank accounts or previously unpaid items, commonly known as bounced checks. *Id.* Merchants who subscribe to SCAN receive an updated electronic file from Defendants daily, containing information regarding current unpaid items (bounced checks) and closed bank accounts. The merchants then, in turn, incorporate this electronic file into their own internal systems and use it when processing checks presented by consumers. *Id.*

By contrast, SCAN OnLine offers the same electronic "bad check" list, however, the electronic file is not sent to the merchant, but instead is hosted on-line by Defendants. In addition to offering the SCAN "negative" database, SCAN OnLine also offers other risk management tools associated with merchants' acceptance of checks. *Id.* For example, the risk management tools monitor the frequency or number of checks written by a consumer in a given time frame, as well as the cumulative dollar amount of the checks written by a consumer; as the number and amounts of checks written by a consumer increase in a given time frame, the likelihood of a check decline also increases based on risk parameters established for the merchant by Defendants.

Defendants update their electronic files on a daily or near-daily basis. Procedurally, merchants who pay for SCAN or SCAN OnLine furnish information to Defendants on a regular

---

[1]   According to el-unds' SEC filings, as of December 31, 2006, nine (9) of the twenty (20) largest retailers in the United States use Defendants' SCAN check verification service. *Doc. No. 1, Compl., Para. 32; Doc. No. 15, Answer, Para. 32.*

basis regarding returned checks, as well as the consumer's payment of a returned check. For example, when a merchant receives a returned check, the merchant furnishes this information to Defendants, who enter it into the SCAN database based on the consumer's bank account and/or driver license numbers. This information then becomes part of Defendants' electronic "bad check" list that is transmitted daily to SCAN merchants, and is also incorporated into the SCAN OnLine database for merchant access. Once a consumer "makes good" on the returned check, the merchant reports the item as "paid" to Defendants; Defendants then update the information in their files and no longer report the check as an outstanding, unpaid item on SCAN or SCAN OnLine. Defendants, however, still keep and maintain records of previously unpaid items.

With respect to the processing of a consumer's check at the point of sale, when the consumer presents the check to a merchant utilizing SCAN, the merchant inputs the consumer's primary identifiers (driver license and/or bank account number), which are then run against SCAN's electronic bad check list. When a consumer attempts to use the same checking account or driver license number which is associated with an outstanding, unpaid item or closed bank account in SCAN's files, the merchant is provided with this negative information. Although Defendants argue that the merchant may "opt" to decline a check based on negative information contained in SCAN's files, as a practical matter, merchants typically decline such checks.[2] By contrast, if there is no negative information associated with the bank account or driver license in SCAN's files, the merchant is advised of this positive information and according to Defendants, usually will then permit payment by check. *Defs. Memo. MSJ, p. 3.*

If the merchant declines the consumer's check, the merchant provides the consumer with contact information[3] so they can contact Defendants to obtain information about the source and amount of their outstanding debt. After the debt is resolved with the merchant at issue and this

---

[2]  A check decline is an "adverse action" as defined by the FCRA, entitling the consumer to a free file disclosure from the consumer reporting agency pursuant to §1681g.

[3]  Under the FCRA, this is referred to as an "adverse action notice." If a check decline is based on information received by a consumer reporting agency, the merchant is required to provide this contact information to the consumer under 15 U.S.C. §1681m(a).

information is provided to Defendants, the SCAN files are updated accordingly. *Defs. Memo.*
*MSJ, pp. 2-3*

With respect to the SCAN product, Defendants forward the updated electronic file to
merchants on a daily basis. Defendants admittedly refuse to maintain a record of when
merchants access the SCAN file when processing a consumer's check. In refusing to do so, it is
impossible for Defendants to comply with the unambiguous provisions of 15 U.S.C.
§1681g(a)(3), which expressly require that a consumer reporting agency provide the consumer
with the identity of all persons (including businesses) who procured a consumer report from the
consumer reporting agency during the twelve-month period preceding the consumer's request for
a file disclosure. It is clear that when the merchants access the SCAN electronic "bad check"
list, Defendants are providing such merchants "consumer report" as defined by the FCRA.

With respect to the SCAN OnLine product, Defendants do maintain records reflecting *all*
check transactions processed by the merchants since Defendants actually host the on-line
databases accessed by the merchants. In other words, Defendants maintain records reflecting the
date, check number, check amount and whether an approval or decline code was issued for each
transaction processed by a merchant through SCAN OnLine. Despite possession of this
information, Defendants nevertheless refuse to provide such information to consumers in its
standardized "SCAN CONSUMER FILE DISCLOSURE REPORT" as required by the FCRA.
Instead, Defendants *only* provide information related to outstanding negative items (such as
current, unpaid bounced checks) and information related to items that have been "cleared" or
paid in full. In-so-doing, Defendants violate 15 U.S.C. §1681g(a) by willfully refusing to
provide: 1) *all* information in the consumer's file at the time of the request; 2) the sources of the
information; and 3) the identity of all persons (including businesses) who procured a consumer
report from the consumer reporting agency during the twelve-month period preceding the
consumer's request for a file disclosure.

Aside from the fact that the FCRA unambiguously requires disclosure of each item listed
above, it is important for consumers to know which checks appear in Defendants' files related to

them, as well as the details related to such checks. This is because Defendants admit that prior *approved* checks, as well as *unapproved* checks, are utilized as part of Defendants' risk management tools, which monitor the number and dollar amounts of checks written by a consumer in a given time frame. Thus, under Defendants' SCAN OnLine risk management system, even the number and amounts of "positive" checks written over a given time frame can have a negative effect on future check writing, resulting in check declines. Thus, it is important for consumers to receive this information – which Defendants have readily on-hand and/or are required by law to maintain - as part of consumer file disclosures under the FCRA.

## IV.    LAW AND ARGUMENT

### A.    Overview of the FCRA and Relevant Statutory Provisions

Defendants are consumer reporting agencies[4] and provide consumer reports[5] to merchants. Each time a merchant accesses SCAN or SCAN OnLine in processing a consumer's check, Defendants provide a "consumer report" to the merchant which is then used as a factor in accepting or declining the check. Courts have consistently held that check verification/guarantee companies, such as Defendants, are consumer reporting agencies and provide consumer reports. *See Alexander v. Moore & Associates, Inc.*, 553 F. Supp. 948 (D.C. Hawaii 1982); *Estiverne v. Sak's Fifth Ave.*, 9 F.3d 1171 (5th Cir. 1993); *Greenway v. Information Dynamics, Ltd.*, 524 F.2d 1145 (9th Cir. 1975); *Peasley v. TeleCheck of Kansas*, 637 P.2d 437 (Kan. App. 1981).

---

[4]   15 U.S.C. 1681a(f) defines a consumer reporting agency as "any person which, for monetary fees, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."

[5]   A consumer report is "any written, oral or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" that is "used or collected in whole or in part for the purpose of serving as a factor establishing the consumer's eligibility for credit or insurance, employment purposes or any other purpose authorized under 15 U.S.C. § 1681b." 15 U.S.C. § 1681a(d)(1). Under §1681b(a)(3)(F)(i), a consumer report may be furnished to a person (i.e. a merchant) having a legitimate business need "in connection with a business transaction that is initiated by the consumer."

The FCRA was designed to protect consumers from inaccurate information in consumer reports which can adversely affect consumers' creditworthiness, and to establish procedures governing the utilization, correction, and updating of information maintained on consumers *Pinner v. Schmidt,* 805 F.2d 1258, 1261 (5th Cir.1986). When first enacted in 1970, the FCRA only required consumer reporting agencies to provide consumers with the "nature and substance" of their file. In 1996, Congress strengthened the FCRA by requiring consumer reporting agencies to provide consumers with a copy of their file *at any time upon request,* capping the fee at $8.00. More importantly, the FCRA was amended to mandate that consumer reporting agencies such as Defendants provide consumers with a *free* copy of their files following an "adverse action," such as after the three (3) check declines which Ms. Searcy experienced in this case.[6]

With the passage of the FACT Act in 2003, Congress took steps to arm consumers with the power to protect their creditworthiness by encouraging them to obtain file disclosures regularly, and by requiring that consumer reporting agencies provide consumers with one free copy of their file annually, upon the consumer's request.[7] With the dramatic rise in identity theft, a consumer's right to know what is contained in his or her consumer file is paramount. According to the GAO, identity theft may strike as many as 500,000 — 700,000 consumers annually, costing the average American 175 hours attempting to repair the damage inflicted by identity-theft criminals. Moreover, without access to the transactional information which the FCRA mandates that consumer reporting agencies such as Defendants maintain, consumers are

---

[6] A study by the United States General Accounting Office (GAO) noted that 84% of the consumer file disclosure requests followed an adverse action and only 5 percent of disclosures were requested by people out of curiosity. *Addressing Measures to Enhance the Operation of the Fair Credit Reporting Act: Hearing on H.R. 2622 Before the Senate Comm. on Banking, Housing and Urban Affairs,* 108th Cong. 6 (2003) (statement of Richard J. Hillman, Director, Financial Markets and Community Investment

[7] This provision of the FACT Act was codified in 15 U.S.C. §1681j(a). Pursuant to §1681j(a), the FTC prescribed regulations establishing a streamlined process for consumers to request consumer file disclosures which includes the establishment of a toll-free telephone number by the consumer reporting agency for such requests. The FTC established regulations governing nationwide consumer reporting agencies in 16 C.F.R. §610.1 and §610.2 (copies attached) and nationwide specialty consumer reporting agencies in 16 C.F.R. §610.3 (copy attached).

powerless to dispute inaccurate or adverse credit information, thwarting Congressional intent. Under 15 U.S.C. §1681i, a consumer has the right to dispute any inaccurate item in his or her file and the consumer reporting agency (and the furnisher of the information to the consumer reporting agency) are under a duty to reinvestigate and take corrective action, if needed.

In addition to encouraging consumers to obtain file disclosures annually, Congress also broadened the statute of limitations under the FCRA. Prior to December 2003, the FCRA provided that an action to enforce any liability created under the Act must be brought "within two years from the date on which the liability arises," except in cases involving a defendant's willful misrepresentation, as to which the action must be brought within two years after the consumer's discovery of the misrepresentation. Following the Supreme Court decision in *TRW v. Andrews*, 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001), which held that the general discovery rule did not apply, Congress amended 1681p, providing that an action to enforce any liability under the Act shall be brought, "not later than the earlier of-- (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs." *15 U.S.C. §1681p.*

### B.    Summary of Defendants' Argument

Ms. Searcy filed this action on February 15, 2008, seeking to recover statutory and punitive damages based on Defendants' willful violations of §1681g involving Defendants' deficient consumer file disclosures sent to her on September 15, 2005 and October 12, 2006. Searcy filed suit well within two (2) years of her October 12, 2006, file disclosure and asserts that the statute of limitations was tolled as to the September 15, 2005, file disclosure by virtue of the prior class action case of *Sammons v. eFunds, et al*, Dkt. No. 3-07-0656 (M.D. Tenn.), which was filed on June 18, 2007, well within two (2) years of the September 15, 2005, file disclosure.[8]

---

[8]    Although Defendants tepidly challenge whether tolling applies to preserve Ms. Searcy's claim related to the September 15, 2005, file disclosure, this is not the subject of the present Motion. Plaintiff disagrees with Defendants' claim that the statute of limitation was not tolled since such as claim conflicts with oracular Supreme Court precedent. *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974)("commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class...") Not surprisingly, Defendants only raise this argument in passing

In summary, Defendants argue that because Ms. Searcy requested and received an earlier consumer file disclosure on January 21, 2005, that is arguably time-barred by the two-year statute of limitations, all claims that she may have for *any* subsequent non-compliant consumer file disclosures involving the same *type* of statutory violation are likewise time-barred. This self-serving "absolution" from violations of the FCRA would, according to Defendants, include not only the consumer file disclosures provided to Ms. Searcy on September 15, 2005 and October 12, 2006, but any and all future file disclosures as well.

Defendants' argument is contrary to authoritative case law interpreting the FCRA, which clearly holds that *each* file disclosure that violates the FCRA is a separate and distinct statutory violation, subject to its own statute of limitations period. Additionally, Defendants' argument is illogical and would undermine Congressional intent since the adoption of such as position would forever insulate consumer reporting agencies for repeated and intentional violations of the FCRA, and in fact *encourage* non-compliant behavior. For example, under Defendants' analysis, if Ms. Searcy receives a file disclosure from Defendants in the year 2015 (or the year 2050 for that matter) which violates the FCRA in the same manner as the previous file disclosures she received (i.e. does not contain all file information as of the time of the request, does not provide the sources of information, and does not identify the merchants who procured consumer reports in the preceding twelve months), her claim for the violation in 2015 is automatically time-barred based on the file disclosure sent to her ten years earlier in January 2005. Defendants' position is contrary to the intent and purpose of the FCRA and perversely encourages consumer reporting agencies to repeatedly engage in illegal conduct specifically outlawed by Congress.

## C.    Each File Disclosure is a Separate and Distinct Act under the FCRA

Defendants argue that "Plaintiff urges the Court to apply the continuing violation doctrine" as a basis to revive an otherwise time-barred claim. *Defs. Memo. MSJ, p. 1.* This is categorically false. Instead, Plaintiff claims that *each* file disclosure provided to Plaintiff (and each putative class member) constitutes a *separate* and *distinct* violation for purposes of the

FCRA statute of limitations period. Hence, *all* consumers who received one or more file disclosures from Defendants during the two year period preceding the filing of the *Sammons* class action thru the present are proper class members in this action.

Courts have held consistently that each act which violates the FCRA is a separate and distinct cause of action, even though it involves the same *type* of violation. First, in the context of actions against consumer reporting agencies for inaccurate consumer reports provided to users (such as lenders) under 15 U.S.C. §1681e(b),[9] courts have held that the triggering event is the date when the consumer reporting agency provides the inaccurate consumer report to the user. Second, in the context of claims for failing to properly reinvestigate a disputed item arising under 15 U.S.C. §1681i,[10] liability arises when the consumer reporting agency allegedly violates its duty under the FCRA to reinvestigate. The FCRA also creates a right of action against a furnisher of information who fails to properly investigate a disputed item,[11] which likewise arises when the furnisher allegedly violates its duty to investigate under the FCRA.

In *Hyde v. Hibernia Ntl. Bank in Jefferson Parish*, 861 F. 2d 446 (5th Cir.) 1988), *cert denied*, 491 U.S. 910 (1989), the Fifth Circuit held that each transmission of the same inaccurate credit report is a separate and distinct tort to which a separate statute of limitation applies under the FCRA. In *Hyde*, plaintiff received a credit report from CBS in November 1983 reflecting a written-off bad debt on a commercial loan from Hibernia National Bank that was inaccurate. Hyde contacted CBS and told them about the inaccuracy and was told to put his dispute in writing. Hyde failed to do so. In 1986, Hyde applied for a credit card and was declined. Hyde contacted CBS again, disputing the information provided by Hibernia Bank. Hyde requested another copy of his credit report, which he received in December 1986. The December 1986

---

[9] 15 U.S.C. §1681e(b) provides that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

[10] Under §1681i(a), if the completeness or accuracy of any item of information contained in a consumer's file is disputed by the consumer, the consumer reporting agency shall conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate. If inaccurate, the consumer reporting agency is under an obligation to remove this information from the file.

[11] *See* 15 U.S.C. §1681s-2(b).

report contained the same inaccurate information about the Hibernia Bank loan. Hyde filed suit in July 1987 for violations of the FCRA. Defendants filed for summary judgment, arguing that Hyde's claims were barred by the statute of limitations. The district court held that under the "occurrence rule," plaintiff's claims were time-barred because the alleged wrongful report was issued more than two years before suit was filed. Under the alternative "discovery rule," the district court held that Hyde's claims were time-barred because they were brought more than two years after discovery. On appeal, the Fifth Circuit reversed, holding that *each transmission* of the same inaccurate credit report constituted a separate and distinct tort to which a separate statute of limitation applied under the FCRA.

The Third Circuit reached a similar result in *Philbin v. Trans Union Corp*, 101 F.3d 957 (3rd Cir. 1996). In *Philbin*, plaintiff was denied credit at Macy's in July 1990, Household International in February 2002, and four (4) different credit agencies in November 2002, all whom had obtained consumer reports from Trans Union, which contained an inaccurate item regarding a tax lien not belonging to Philbin. Philbin sued Trans Union in April 2003 for violations of § 1681e(b). Trans Union argued that Philbin's claims were barred by the statute of limitations because the first consumer report containing the inaccurate information was provided to Macy's in July 1990, almost three (3) years prior to suit. The court held that although Philbin did not have claims arising from the reports sent by Trans Union to Macy's in July 1990 and Household International in February 2002, Philbin's claims based on the consumer reports sent to the four (4) credit agencies in November 2002 were not time-barred.

Several district courts have ruled in a similar fashion. In *Jaramillo v. Experian Information Solutions, Inc*, 155 F. Supp. 2d 356 (E.D. Pa. 2001), Jaramillo sued Experian and National City Bank ("NCB") for violations of §1681i based on their failure to properly conduct an investigation and remove inaccurate information. Jaramillo disputed the same inaccurate item in his file with Experian and NCB in March 1998, May 1998, January 1999 and April 1999. Jaramillo filed suit on November 17, 2000, more than two (2) years after his March and May 1998 disputes, but less than two (2) years after his January and April 1999 disputes. Jaramillo

conceded that any claims related to the March and May 1999 disputes were time-barred, but NCB argued that disputes on or after November 17, 1998, were time-barred as well because Jaramillo was disputing *the same item.* The Court rejected NCB's "single publication" argument, holding that "[e]ach transmission of the same credit report is a separate and distinct tort to which a separate statute of limitations applies. The failure of the consumer to mitigate his damages by filing suit when he is first injured, thus permitting a more widespread circulation of the credit information should have a 'bearing [only] on the [calculation of] damages.'" 155 F. Supp. at 360 (*quoting Hyde, supra,* 861 F. 2d at 450).[12]

In *Whitesides v. Equifax Credit Information Services,* 125 F.Supp.2d 807 (W.D. La. 2000), plaintiff discovered that she had been the victim of credit card fraud in August 1996, when she received a delinquent notice from Home Depot on an account that she had never opened. Whitesides obtained a copy of her credit report from TRW, which revealed several other delinquent accounts. She immediately started to contact the respective vendors to report the problem. Later, Whitesides discovered another fraudulent account when she received an overdue invoice from Bank of Louisiana ("BOL") on December 15, 1996. She immediately advised BOL and the major consumer reporting agencies (TRW, Trans Union and Equifax) that the account was fraudulent. While BOL changed the account to reflect a zero balance in April 1997, it continued to appear on her credit reports as "seriously past due" and "written off as a loss." In February 1997, Whitesides applied for a credit card with Citibank which was denied due to "delinquent credit obligations." On March 10, 1998, Citibank again rejected Whitesides' application for the same reasons. On December 10, 1998, Whitesides was denied a student loan because her credit report reflected a "charge off account."

Whitesides filed suit in January 1999. BOL argued that Whiteside's claims were time-barred, claiming that Whitesides was aware of all of the circumstances surrounding the fraud and the impact of reporting the delinquent accounts by mid-1996. The Court rejected this argument,

---

[12] The Eastern District of Pennsylvania reached a similar result in *Lawrence v. Trans Union LLC,* 296 F. Supp. 2d 582 (E.D. Pa. 2003), which involved claims under both §1681e(b) and §1681i.

holding that each transmission of the same credit report is a separate and distinct tort to which a separate statute of limitations applies, and therefore, each time a potential creditor requested Whitesides' credit report and each time credit was denied based upon the incorrect information, the statute of limitations began to run anew. Thus, the two Citibank denials of credit in February 1997 and March 1998, and the denial of the student loan in December 1998, were all separate claims even though they involved identical inaccurate information.

In *Acton v. Bank One Corp.*, 293 F.Supp.2d 1092 (D. Az. 2003), a mortgage broker obtained Acton's consumer report from Equifax containing incorrect information, claiming that Acton had made late payments on a Bank One credit account. Acton disputed the item with Equifax on April 30, 1999, requesting its removal. After investigation, Equifax sent a letter to Acton on June 4, 1999, indicating that the investigation was complete and Equifax would delete the Bank One item. Despite this, Acton obtained file disclosures from Equifax on June 14, 1999 and September 17, 1999, still containing the erroneous information.

Acton filed a lawsuit against Bank One on April 25, 2001, for violations of the FCRA and amended his complaint on June 4, 2001, adding Equifax as a defendant for violations of §1681e(b) and §1681i. Equifax filed for summary judgment, claiming that Acton's claims were barred by the two-year statute of limitations contained in 15 U. S. C. §1681p. Under § 1681e(b), the court held that liability arose when Equifax issued an inaccurate consumer report and under §1681i, the court held that liability arose when Equifax or Bank One allegedly violated their duties under the FCRA to reinvestigate. *Acton*, 293 F.Supp.2d at 1097 (*citing Barron v. Trans Union Corp.*, 82 F.Supp.2d 1288, 1293 (M.D. Ala. 2000)). The court further held that Acton's claim under § 1681e(b) arose on April 20, 1999, the date the consumer report was issued to the mortgage broker. With respect to Acton's claim under §1681i, the court held that the statute of limitations started to run when Equifax's 30-day deadline to reinvestigate expired on June 5, 1999. Accordingly, the court held that Acton had until June 5, 2001, to file suit and that his claim under §1681i was not time-barred. *Acton*, 293 F.Supp.2d at 1098.

Although *Acton* involved the issuance of only a single consumer report to the mortgage

broker, the court recognized that "each transmission of the same credit report is a *separate and distinct tort to which a separate statute of limitations applies.*" *Acton*, 293 F.Supp.2d at 1098 (*citing Whitesides v. Equifax Credit Info Services, Inc., supra,* and *Hyde v. Hibernia Nat'l Bank in Jefferson Parish, supra*).[13]

Most recently, in *Larson v. Ford Credit*, 2007 WL 1875989 (D. Minn. 2007)(copy attached), Larson reviewed her credit report in January 2004, containing inaccurate information of a purported "charged off" Ford Credit account that Larson had actually paid in full. Larson contacted Ford Credit and the consumer reporting agencies regarding the inaccuracy, sending three (3) letters on January 5, April 26, and May 5, 2004. Despite Larson's efforts, Ford Credit continued to report the inaccurate information as late as March 15, 2005. Larson continued to dispute the entry, speaking to a Ford Credit representative by phone on May 17, 2005.

On May 16, 2006 (364 days after the phone call), Larson filed suit against Ford Credit under §1681s-2 for failure to investigate and remove inaccurate information from her consumer report. Larson also sued for credit defamation under Minnesota law.

Ford Credit moved to dismiss Larson's complaint, claiming it was time-barred. Ford Credit urged the court to apply the "single publication rule," used in defamation cases, to Larson's FCRA claim, arguing that the statute of limitations commenced on the date that Ford Credit *first* reported the incorrect information. The Court rejected defendant's arguments, holding that "the FCRA makes providers of credit information liable for *each report* of erroneous information." *Larson*, at *3 (emphasis added). The Court, following the "multiple-publication rule," held that "each publication of the same falsehood by the same defamer is a separate cause of action, thus starting the limitations clock anew." *Id.* at *2 (citations omitted). The Court further held that "[i]n the FCRA context, this means each transmission of erroneous information is a *separate* FCRA violation." *Id.* (citations omitted)(emphasis added). The court

---

[13]   The District Court of New Jersey reached a similar result in *Campbell v. Chase Manhattan Bank, USA*, 2005 WL 1514221 (D.N.J. 2005) (copy attached), holding that "each transmission of the same credit report is a separate and distinct tort to which a separate statute of limitation applies." 2005 WL 1514221 at *11, fn 5 (*quoting Lawrence v. Trans Union LLC, supra*).

further held that the "confidential nature of a credit report necessarily means that each new issuance results in a separate and distinct injury." *Id.* at *2 (*citing Hyde, supra,* 861 F.2d 446, 450 (5th Cir. 1988)). Thus, the Court found that each re-report of inaccurate information and each failure to conduct a reasonable investigation in response to a dispute was a separate FCRA violation subject to its own statute of limitations. *Id.* at *2.

Finally, the court rejected a similar argument advanced by Defendants in this case. In *Larson,* Ford Credit argued that since plaintiff admitted that she discovered the existence of her cause of action prior to May 16, 2004, her claim was barred by the two-year limitations period. *Id.* at * 7.[14] The court held that "each time a furnisher of information receives a report of a credit inaccuracy and fails to conduct a reasonable investigation of that inaccuracy, that failure constitutes a *new* violation of 15 U.S.C. § 1681s-2(b), *even if* the report addresses the same credit inaccuracy issue that has previously been reported to the furnisher of information." *Id.* at *8 (emphasis added). The court noted:

> At this point in the proceedings, the Court is constrained to accept plaintiff's contention that she discovered the erroneous charge-off on her credit report as early as January, 2004. If that erroneous report were the only alleged violation of FCRA, her claim would arguably be untimely. But she alleges additional violations--specifically, that Ford Credit, on successive occasions and after notice, repeatedly failed to properly investigate her later communications, and that it continued to report the error after May 16, 2004. Accordingly, each of these successive failures to comply with the law is subject to the two-year limitations period, from the date each violation of the FCRA occurred.

*Id.* at *4.

Defendants in the case at bar case even take their erroneous argument one step further by arguing that Searcy's claims are time-barred because she previously requested a file disclosure *of a similar format.* While the court in *Larson* held that failure to remove the *same inaccurate information* after each successive request constituted separate violations of the FCRA, in the case

---

14    By plaintiff's own admission, she had discovered the inaccurate information in January 2004 and wrote Ford Credit on January 5, April 26 and May 5, 2004, disputing the entry. All of these dates were beyond the two-year period given that suit was filed on May 16, 2006. The court held that because her last dispute with Ford Credit occurred by telephone on May 17, 2005, her claim was not time-barred.

at bar, Searcy's three (3) file disclosure requests are even more distinct by operation of statute. 15 U.S.C. §1681g requires disclosure of all information in the file "at the time of the request" and the identity of the merchants procuring consumer reports "during the 1-year period preceding the date on which the request [by the consumer] is made." Thus, while each file disclosure by Defendants violates the FCRA in the same manner, the information contained in each disclosure should be different given that it is time-dependent on when the consumer makes the request.

**D.    TRW, Inc. v. Andrews, Relied Upon by Defendants, Holds That Each Disclosure is a Separate and Distinct Violation**

The only FCRA case cited by Defendants is *TRW v. Andrews*, 534 U.S. 19 (2001). The *Andrews* case, however, actually supports Plaintiff's position. In *Andrews*, plaintiff sued TRW on October 21, 1996 for improperly furnishing her consumer report to requesting companies in connection with a credit applications by an imposter in violation of §1681e(a),[15] as well as violations of §1681e(b). According to the facts, an imposter had wrongfully procured Andrews' name and Social Security number and attempted to open credit accounts. On July 25, September 27, and October 28, 1994, and on January 3, 1995, TRW furnished copies of Andrews' credit report to companies from which the impostor sought credit. Andrews did not learn of these disclosures until May 31, 1995, when she sought to refinance her home and in the process received a copy of her credit report reflecting the impostor's activity.

TRW moved for partial summary judgment, arguing that the statute of limitations had expired on Andrews' claims stemming from TRW's *first two* disclosures only, which were provided on July 25 and September 27, 1994, because both occurred more than two years before Andrews filed suit on October 21, 1996. In an attempt to revive the earlier time-barred claims, Andrews argued that the limitations period on those claims did not commence until she discovered the disclosures, arguing that the court should apply the discovery rule to her claims.

---

[15]   15 U.S.C. §1681e(a) requires that a consumer reporting agency maintain "reasonable procedures" to avoid improper disclosures of consumer information and to provide consumer reports only when permitted by statute.

The Supreme Court rejected Andrews' argument, holding that the general discovery rule did not apply to toll the statute of limitations on "improper disclosure" claims under the FCRA until such time as consumer discovered the improper disclosure.[16]  Instead, the statute of limitations began to run on the date of the improper disclosure by the consumer reporting agency to the unauthorized person, regardless of when the consumer discovered the improper disclosure.

Although Defendants rely on *Andrews*, it actually undermines the Defendants' position. In *Andrews*, TRW disclosed Andrews' information on *four separate occasions*, each involving the same imposter's misappropriation of Andrews' identifying information.  Although claims arising out of the first two improper disclosures were time-barred, the latter two were not.  Thus, the Supreme Court treated each of these as *distinct* and *separate* violations of the FCRA even though they involved the *same common conduct* by TRW — failure to maintain reasonable procedures to avoid improper disclosure.

### E.    Plaintiff Does Not Utilize a "Continuous" or "Serial" Violation Theory, Thus the Case Law Cited by Defendants is Inapposite

Defendants incorrectly argue that Ms. Searcy attempts to apply the "continuing violation" doctrine, most commonly advanced in employment discrimination cases, to revive an otherwise untimely claim.  As stated in *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 446 (7th Cir. 1994), "the purpose of permitting a plaintiff to maintain a cause of action on the continuing violation theory is to permit the inclusion of acts whose character as discriminatory acts was not apparent at the time they occurred."  Even in the area of employment law, the "continuing violation" doctrine was largely eliminated by the Supreme Court in *Nat'l RR Passenger Corp. v Morgan*, 536 U.S. 101 (2002).  In *Morgan*, the Supreme Court clearly defined discrete acts of discrimination, each subject to their own statute of limitations period.  For example, an employer could deny the same employee the same position on three separate occasions and under *Morgan*, the employee could not assert a continuing violation theory to revive an otherwise time-barred

---

[16]  *Andrews* was decided in 2001, prior to the 2003 amendment to §1681p, adding discovery language to the statute of limitations.

claim. This does not mean, however, that an employee could not bring an action based upon the *last* denial of a promotion, if a charge of discrimination was timely filed as to the last act, simply because the employee did not file a charge of discrimination as to the *earlier* denials.

Similarly, each file disclosure issued by Defendants in this case are separate, discrete acts constituting separate violations of the FCRA. It is Defendants, not Plaintiff, who misapply the continuing violation theory to this case in order to concoct an invalid statute of limitations argument which would convert Ms. Searcy's timely claims to untimely claims, simply because she did not file a lawsuit based on the January 2005 file disclosure.

Defendants cite several cases interpreting the statute of limitations under the Fair Debt Collection Practices Act ("FDCPA") and attempt to apply these to the FCRA case at bar. Initially, the Court should not consider these because they are interpreting a completely different statute, but as discussed below, these cases do not support Defendants' argument in any event.

In *Wilhelm v. Credico, Inc.*, 455 F.Supp.2d 1066 (D.N.D. 2006), Wilhelm sent a letter to the debt collector on December 10, 2003, disputing a debt. The debt collector continued to report the debt to consumer reporting agencies without noting that it was disputed until March 2005. Wilhelm filed suit against the debt collector on October 3, 2005, for violation of 15 U.S.C. §1692e(8).[17] Wilhelm argued that the debt collector's actions were "serial violations," meaning that each day that the debt collector failed to note the debt was in dispute constituted a new and separate violation of the FDCPA, starting the statute of limitations anew. According to Wilhelm, the "serial violations" continued until March 2005, when the debt collector ceased to report the debt without failing to note it was in dispute. The Court rejected this argument and held that the statute of limitations accrued shortly after December 10, 2003 – the date Wilhelm

---

[17]  15 U.S.C. §1692e provides that a "debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt," which includes "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false, including the failure to communicate that a disputed debt is disputed." 15 U.S.C. §1692e(8).

first sent a letter disputing the debt.

In the case at bar, Ms. Searcy does not make a similar claim for a "serial violation." Instead, Ms. Searcy sues for two (2) subsequent file disclosures in September 2005 and October 2006, which were separate and independent requests made by her under the FCRA, followed by separate and independent file disclosures that did not contain: 1) all information contained in the file *at the time of the request*; 2) the sources of the information contained in the file *at the time of the request*; or 3) the identity of all merchants who obtained a consumer report about Searcy during the twelve (12) month period *preceding her request*.

Defendants also cite the case of *Sierra v. Garbus*, 48 F.Supp.2d 393 (S.D.N.Y. 1999). In *Sierra*, the creditor hired a law firm to collect on a debt. The law firm sent a demand letter to Sierra on April 26, 1997, which included $507.92 in attorneys' fees. Sierra entered into a settlement agreement on June 5, 1997 to repay the debt in monthly installments, including the attorneys' fees. After several payments, Sierra stopped making payments and suit was filed against Sierra on January 21, 1998, to collect on the debt based on the settlement agreement.

Sierra filed his FDCPA action on November 13, 1998, claiming that the addition of attorneys' fees was an unfair and deceptive collection practice. Defendants moved for summary judgment, arguing that Sierra's FDCPA claim was time-barred. Sierra argued that this was part of a "continuing violation," which included the filing of the lawsuit against Sierra on January 21, 1998. The Court rejected this argument, however, and noted:

> This is not a case where defendants have sent a series of threatening letters, each of which violate the FDCPA and only some of which are time-barred. Here, Sierra's assertion of a violation is the "unfair and illegal" attorneys' fees authorized by the June 5, 1997 agreement, which Sierra breached when he ceased making payments. This suit, filed on November 13, 1998 is therefore time-barred, and plaintiff's state law claims are dismissed for lack of pendent subject matter jurisdiction.

48 F.Supp.2d at 395.

Even the Court in *Sierra* recognized that a debt collector can send a series of letters which violate the FDCPA and although they each violate the FDCPA in the same manner, some

can be time-barred while others are not. This is supported by other courts as well, which have concluded that just because one FDCPA claim falls outside the statute of limitations, it does not follow that other discrete claims are time-barred as well. *See e.g. McCorriston v. L.T.W. Inc.*, 536 F.Supp.2d 1268, 1272 (M.D. Fla. 2008)(the fact that defendants sent a dunning letter outside the limitations period does not render plaintiff's FDCPA claim time-barred, where plaintiff has alleged another discrete violation within the limitations period); *Kaplan v. Assetcare, Inc.*, 88 F.Supp.2d 1355, 1360 (S.D. Fla. 2000)(allowing claims based on dunning letters within statute of limitations period, although some were outside); *Pittman v. J.J. MacIntyre Co. of Nev., Inc.*, 969 F.Supp. 609, 611 (D.Nev.1997) (same)).

## CONCLUSION

Under the FCRA, each file disclosure constitutes a separate and distinct act which creates a separate cause of action under the FCRA. Given that each file disclosure is a separate and distinct a cause of action, a separate statute of limitations applies to each. Accordingly, Searcy has filed suit within two (2) years of the October 2006 file disclosure and the Court should deny Defendants' Motion for Summary Judgment. The Plaintiff submits that the Court should reserve ruling on the September 2005 file disclosure until the parties have fully briefed the tolling issue as it relates to the filing and dismissal of the *Sammons* case discussed above.

Respectfully submitted,

STEWART, ESTES & DONNELL, PLC

By: s/ Martin D. Holmes
    M. Reid Estes, Jr., TN Bar #9043
    Martin D. Holmes, TN Bar #12122
    Fifth Third Center, Suite 1401
    424 Church Street
    Nashville, TN 37219
    (615) 244-6538

    *Lead Attorneys for Plaintiffs*

PRETZEL & STOUFFER, CHARTERED

By: s/ Scott L. Anderson
        Edward H. Nielsen (IL Bar #0252296)
        Scott L. Anderson (IL Bar #6269332)
        One South Wacker Drive
        Suite 2500
        Chicago, IL 60606
        (312) 346-1973

        *Co-Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of June, 2008, a true and exact copy of the foregoing has been served upon filing users through the Electronic Filing System and to all parties not served through the Electronic Filing System via U.S. Mail to:

David R. Esquivel, Esq.
Jeffrey P. Yarbro, Esq.
BASS, BERRY & SIMS, PLC
AmSouth Center, Suite 2700
315 Deaderick Street
Nashville, TN  37238-3001

David L. Hartsell, Esq.
MCGUIREWOODS LLP
77 West Wacker Drive
Suite 4100
Chicago, IL  60601-1818

*Attorneys for Defendants*

        /s/ Martin D. Holmes
        Martin D. Holmes