**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GLADYS SEARCY,** | ) | |
| **individually and on behalf of all** | ) | **NO. 08 C 00985** |
| **others similarly situated,** | ) | |
| | ) | **JUDGE KOCORAS** |
| **Plaintiff,** | ) | |
| | ) | **MAGISTRATE JUDGE COX** |
| **vs.** | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| **eFUNDS CORPORATION et al.,** | ) | |
| | ) | **JURY DEMAND** |
| **Defendants.** | ) | |

---

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

---

David R. Esquivel
Jeffrey P. Yarbro
BASS, BERRY & SIMS PLC
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238
(615) 742-6285 Phone
(615) 742-0405 Fax

David M. Schultz (Ill. Bar No. 6197596)
Peter A. Walsh (Ill. Bar No. 6186464)
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street, Suite 300
Chicago, Illinois 60601-1081
(312) 704-3000 Phone
(312) 704-3001 Fax
dschultz@hinshawlaw.com
pwalsh@hinshawlaw.com

*Counsel for eFUNDS CORPORATION and*
*DEPOSIT PAYMENT PROTECTION*
*SERVICES, INC.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 2

I.      HOW SCAN WORKS ................................................................................................. 2

II.     CONSUMER DISCLOSURES ................................................................................... 6

III.    PLAINTIFF'S CHECKWRITING HISTORY ........................................................... 7

IV.    PLAINTIFF'S DISCLOSURE REQUESTS ............................................................. 9

        A.      January 18, 2005 SCAN Disclosure Request ......................................... 9

        B.      September 13, 2005 Disclosure Request ................................................ 10

        C.      October 26, 2006 Disclosure Request ................................................... 11

ARGUMENT ........................................................................................................................ 11

I.      PLAINTIFF'S CLAIMS ARE LIMITED TO ALLEGED VIOLATIONS OF 15
        U.S.C. § 1681g(a)(3). ................................................................................................ 11

II.     CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFF'S
        PROPOSED CLASS DEFINITION IS OVERBROAD. ........................................... 14

        A.      The proposed class includes a great number of people whose disclosures could not
                conceivably have violated the FCRA because they did not maintain checking
                accounts.................................................................................................. 14

        B.      Without individualized fact inquiries, the proposed class would likely include a
                significant number of people whose disclosures did not violate the FCRA. ........ 16

III.    CLASS CERTIFICATION SHOULD BE DENIED BECAUSE INDIVIDUAL
        ISSUES PREDOMINATE OVER COMMON ISSUES. ........................................... 19

IV.    **CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFF IS AN INADEQUATE REPRESENTATIVE.**........................................................................ 23

    A.    Plaintiff's lack of credibility regarding her interactions with SCAN and her checking account abuse render her an inadequate class representative................ 24

    B.    Plaintiff's checking account abuse demonstrates that she would be an inadequate representative. ..................................................................................................... 26

**CONCLUSION** ...................................................................................................................... 27

**CERTIFICATE OF SERVICE** .............................................................................................. 28

# **TABLE OF AUTHORITIES**

**Cases**

*Brider v. Nationwide Credit, Inc.*, 1998 U.S. Dist. LEXIS 16532 (N.D. Ill. 1998) ...............24, 26

*Davidson v. Citizens Gas & Coke Utility*, 238 F.R.D. 225 (S.D. Ind. 2006).................................23

*Folding Cartons, Inc. v. American Can Co.*, 79 F.R.D. 698 (N.D. Ill. 1978) ..............................23

*Gillespie v. TransUnion Corp.*, 482 F.3d 907 (7th Cir. 2007)..................................................11, 12

*Gustafson v. Polk County*, 226 F.R.D. 601 (W.D. Wis. 2005) .................................................14, 15

*Ibrahim v. Old Kent Bank*, 2000 U.S. Dist. LEXIS 2676 (N.D. Ill. Feb. 24, 2000)………………2

*Kaplan v. Pomerantz*, 132 F.R.D. 504 (N.D. Ill. 1990).........................................................24, 26

*Kohen v. Pac. Inv. Mgmt. Co.* LLC, 571 F.3d 672 (7th Cir. 2009) .........................................14, 19

*Pope v. Harvard Banc-Shares, Inc.*, 240 F.R.D. 383 (N.D. Ill. 2006) ...................................23, 27

*Reed v. Advocate Health Care*, 2009 U.S. Dist. LEXIS 89576 (N.D. Ill. Sep. 28, 2009)............14

*Romberio v. UnumProvident Corp.*, 2009 U.S. App. LEXIS 695 (6th Cir. 2009).......................17

*Rose v. Saginaw County*, 232 F.R.D. 267 (E.D. Mich. 2005) .......................................................20

*Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672 (7th Cir. 2001)...................................................13

*Webb v. Local 73*, 2003 U.S. Dist. LEXIS 3662 (N.D. Ill. Mar. 13, 2003)...................................20

*Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377 (D.N.J. 1998)...........................................24

*Williams-Ellis v. MT Hair Salons and Day Spas*, 2008 U.S. Dist. LEXIS 24408 (N.D. Ill. Mar.
27, 2008)...................................................................................................14, 19, 20, 21

**Statutes**

15 U.S.C. § 1681a(d)(1)........................................................................................................12, 20

15 U.S.C. § 1681g(a) et seq. .......................................................................7, 11, 12, 13, 17, 18

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GLADYS SEARCY,** | ) | |
| **individually and on behalf of all** | ) | **NO. 08 C 00985** |
| **others similarly situated,** | ) | |
| | ) | **JUDGE KOCORAS** |
| **Plaintiff,** | ) | |
| | ) | **MAGISTRATE JUDGE COX** |
| **vs.** | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| **eFUNDS CORPORATION et al.,** | ) | |
| | ) | **JURY DEMAND** |
| **Defendants.** | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

## <u>INTRODUCTION</u>

Plaintiff moves to certify a class of "[a]ll persons who received a 'SCAN Consumer File Disclosure Report' from June 18, 2005 to July 20, 2008." Pl.'s Mot. for Class Cert. at 1. Although the exact number is not known, the proposed class would likely include approximately 180,000 people across the nation. Plaintiff attempts to justify this expansive class definition on the basis that the consumer disclosures at issue were generated according to a uniform practice and procedure. What Plaintiff fails to acknowledge, however, is that the generation of consumer disclosures pursuant to uniform procedures did not result in disclosures that would uniformly violate the Fair Credit Reporting Act ("FCRA") in the manner alleged in Plaintiff's complaint.

For a large portion of the proposed class, SCAN generated disclosures pursuant to its uniform procedures that unquestionably complied with the pertinent requirements of the FCRA. The proposed class is fatally overbroad, therefore, because it includes a great number of people

who suffered no violation under the FCRA, even under the expansive liability theory proffered by Plaintiff's complaint.[1]

For those proposed class members who arguably suffered a FCRA violation, their claims hinge upon fact-specific inquiries into their particular checkwriting histories. As a result, individualized fact-finding is necessary for those proposed class members to demonstrate a potential FCRA violation, with substantial differences in the evidence and arguments necessary to ultimately prove their claims at trial. Because these individual issues predominate over the questions that may be common to the proposed class, Plaintiff's motion to certify a class should be denied.

Finally, a class cannot be certified because Plaintiff is not an adequate class representative. The evidence obtained in discovery seriously calls into question Ms. Searcy's credibility regarding her checkwriting history and requests for consumer disclosures, the facts at the heart of this dispute. Likewise, throughout the relevant time period, Ms. Searcy engaged in what can only be described as serial check fraud. These questions about Plaintiff's credibility on issues central to her claims render her unable to bring this lawsuit on a classwide basis. For all these reasons, the Court should deny Plaintiff's motion for class certification.

## STATEMENT OF FACTS

### I. HOW SCAN WORKS

The Shared Check Authorization Network ("SCAN") operated by Defendant Deposit Payment Protection Services ("DPPS") began in 1985 as an electronic "bad check" list,

---

[1] In a hearing before Magistrate Judge Cox several months ago, Plaintiff's counsel acknowledged the class definition proposed in this motion may be overly broad. *See* Ex. 1, Transcript of Hearing (July 14, 2009) at 10-17 (setting forth three alternative class definitions in response to the argument that the class alleged in the Amended Complaint was overly broad). Plaintiff has abandoned the alternative class definitions identified by her counsel in July in favor of the much larger class definition from the Amended Complaint. In no event should Plaintiff be allowed to pursue class definitions for the first time in a reply memo, which would constitute a "patently improper pleading practice." *Ibrahim v. Old Kent Bank*, 2000 U.S. Dist. LEXIS 2676, at *3 n.1 (N.D. Ill. 2000).

providing merchants a tool to help determine whether to accept a consumer's check.[2]  To create

the bad check list, SCAN accumulated driver's license and checking account numbers used by

consumers whose checks were returned to merchants unpaid.  SCAN also received a list of

checking account numbers from financial institutions when those accounts were closed with a

negative balance or otherwise were subject to account abuse.

The comprehensive, electronic list of consumer identifiers was known as the negative

database.  It consisted of two separate files: the checking account file (also known as the MICR

file) and the driver's license file.  Most SCAN customers received only a portion of the files in

the negative database.  For example, SCAN merchants could contract to receive only the MICR

file, only the driver's license file, or both.  *See* Ex. 2, Lopez Dep. at 23.[3]  Merchants could also

arrange to receive only a regional set of identifiers, rather than a national set.  *Id.* at 21, 120.

Accordingly, the fact that a consumer's identifiers were contained in the negative database did

not mean the consumer's identifiers were provided to all merchants that contracted to use SCAN.

When a merchant first became a SCAN customer, it received an initial file containing the

portion of the negative database it had contracted to receive.  *See* Ex. 3, R. 30(b)(6) Dep. at 18.

Each day thereafter, SCAN sent the merchant an update to the file that included new information

SCAN had obtained regarding negative check information, as well as positive information about

items that had been paid by consumers.  *Id.* at 21-22.  This update file contained a list of

---

[2] In 2007, DPPS's parent (eFunds Corporation) merged with Fidelity National Information Services, Inc. ("FIS"). One of FIS's subsidiary companies is Certegy Check Services, Inc. ("Certegy"), a competing check verification service.  With respect to changes in the SCAN disclosure format in July 2008, the record testimony is clear that these changes were made to ensure consistency between the SCAN and Certegy procedures.  *See* Ex. 3, R. 30(b)(6) Dep. at 129-30; Ex. 4, Woods Dep. at 111.  They were not undertaken, as Plaintiff suggests in her Motion, "in an effort to comply with the clear and explicit requirements of § 1681g(a)(3)."  Pl.'s Mot. for Class Cert. at 7.
[3] Exhibits referenced in this memorandum are contained in a separate appendix of exhibits.  Because the majority of exhibits contain confidential consumer data, the complete appendix has only been provided in the hard copies hand-delivered to chambers and mailed to opposing counsel.

identifiers to add to, or delete from, the initial file. *See* Ex. 4, Woods Dep. at 88-89. The initial file and the daily "add/delete" update files were known as each merchant's "distributed file."

Most SCAN merchants during the alleged class period used the SCAN distributed file in combination with other check verification processes. These merchants often used SCAN in conjunction with similar services offered by competing check verification companies. *See* Ex. 5, Weber Dep. at 186. Many merchants also relied on their own, internal tracking of bad checks when they decided whether to accept a consumer's check. *Id.* These internal mechanisms also may have linked identifiers together in a way that combined information provided by SCAN with information provided by another source. *Id.* at 212-13.

Merchants did not track and report to SCAN whether or how they used the data in the distributed file. *See* Ex. 2, Lopez Dep. at 73. Neither did merchants track and report to SCAN the identifiers related to each check they considered for payment. *See* Ex. 4, Woods Dep. at 49. It is easy to understand why they did not. During the alleged class period, for example, Wal-Mart and Target were among SCAN's customers that received the distributed file. The technology resources required to track and retain the identifiers related to every check presented to every Wal-Mart and Target store would be immense. Merchants like Wal-Mart never provided this information to SCAN because SCAN had no legitimate business use for such an immense volume of data, and it had no beneficial use to consumers. Indeed, it is reasonable to believe that consumers would have opposed SCAN's accumulation of their check transaction data when SCAN had no need or use for it. Accordingly, each merchant would have to consult its own internal records to determine, in connection with any particular consumer transaction, whether the consumer's identifiers (1) were presented to the merchant; (2) were queried against

the SCAN distributed file; and (3) matched any of the identifiers contained on that merchant's SCAN distributed file. *See* Ex. 4, Woods Dep. at 66.

Beginning in 1998, SCAN also offered a service known as SCAN On-Line. Merchants that received the SCAN On-Line service accessed the same negative database available through the traditional SCAN distributed file but did so through an internet-based system hosted by SCAN itself. In other words, for the SCAN On-Line service, SCAN hosted the negative database rather than the merchant. SCAN On-Line also had the capability to incorporate other information, such as the frequency of a consumer's check writing at a particular merchant, although few merchants utilized that capability. *See* Ex. 4, Woods Dep. at 35-37.

During the alleged class period, SCAN provided SCAN On-Line service to approximately 20 customers, which were usually smaller merchants. *See* Ex. 4, Woods Dep. at 67-68. The traditional SCAN product served a much larger number of customers during the relevant period, approximately 130 merchants, including large retail chains. *Id.* Gross revenues from the SCAN On-Line product in 2008 were only approximately $950,000. *See* Ex. 3, R. 30(b)(6) Dep. at 212-13. Gross revenues from the traditional SCAN product in 2008 were approximately $23 million. *Id.*

SCAN required merchants that declined a consumer's check on the basis of information in the SCAN distributed file to present the consumer with an "adverse action" notice. *See* Ex. 2, Lopez Dep. at 95-96. This notice provided the consumer with SCAN's contact information and informed the consumer that SCAN could help determine why a check was declined and how to resolve the situation. *See* Ex. 2, Lopez Dep. at 100-101. By calling or writing SCAN, consumers could learn which identifiers appeared in the SCAN negative database and which prior transactions caused them to appear there. *Id.* Because most merchants used multiple check

verification systems in processing checks, however, consumers were sometimes provided a SCAN adverse action notice when the decline was actually based on information provided by the merchant's internal system or another check verification company. *See* Ex. 5, Weber Dep. at 186-87.

## II.     CONSUMER DISCLOSURES

The FCRA requires consumer reporting agencies to provide disclosures to consumers under a variety of circumstances. When a consumer suffers an adverse action, she has the right to obtain a free consumer disclosure if she requests a disclosure within 60 days of receiving notice of the adverse action. In addition, since 2003, every person has the right to receive a free annual disclosure, regardless of whether that person has suffered any adverse action.

Consumers requested consumer disclosures from SCAN by mail, fax, or phone call. *See* Ex. 5, Weber Dep. at 134, 164-65. During the alleged class period, consumers were able to visit the SCAN consumer website and download a blank SCAN Consumer Report Order Form (the "Order Form"). *See* Ex. 6, Blank Order Form. The Order Form asked consumers for a few items of pertinent information, including their checking account number, driver's license number, and location where the consumer's check was declined (if the cause for seeking a disclosure was a declined check). *Id.* The completed form could be sent to SCAN by mail or fax. SCAN would then use the identifiers provided by the consumer to generate and send out a consumer disclosure. In discovery, SCAN produced the approximately 6,400 Order Forms it received between August 2006 and November 2008, the time period in which those forms were segregated from other imaged documents in SCAN's computer database.

SCAN's consumer disclosures always included all negative information from SCAN's database associated with the identifiers provided by consumers that requested a copy of their

disclosures. In other words, the disclosures provided all the information contained in the distributed files sent to merchants. The disclosures also included information about any negative information that was subsequently remedied by the consumer, which appeared on the disclosure as a "closed" item. Accordingly, if a consumer was declined by a merchant, the disclosure permitted the consumer to identify the reason for the decline and how to remedy the situation.

## III.    PLAINTIFF'S CHECKWRITING HISTORY

An examination of Plaintiff's account records reveals an unusual and troubling history of checking account abuse. The relevant period of inquiry into Plaintiff's check-writing is September 2004 to October 2006.[4] During this period of just over two years, Plaintiff had three separate checking accounts, each of which was in use for only a couple of months or less, each of which quickly accrued a negative balance, and each of which was closed by the bank.

Plaintiff utilized a checking account with the U.S. Employees Credit Union for a two-month period in early 2005. After opening an account at the beginning of the year, Plaintiff made her initial deposit on February 4, 2005. *See* Ex. 7, at USEMP-000004-05. By April 8, 2005, account activity had ceased and Plaintiff had accumulated a negative balance of $1,154, which was written off as a loss by the bank in June 2005. *Id.* at USEMP-000009, 000011. Plaintiff's next checking account, with Washington Mutual Bank, was not active until September 13, 2005. *See* Ex. 8, at WashMut-000016. She made an initial deposit into this account on September 13, but essentially ceased activity in the account by December 2, having already accumulated a significant negative balance. *Id.* at WashMut-000021-24. Before the Washington Mutual account closed, Searcy opened a third account with JP Morgan Chase in which she made

---

[4] In her Amended Complaint, Plaintiff alleges she received deficient disclosures in September 2005 and October 2006. Because each disclosure implicates the check-writing activity for the twelve-month period preceding the disclosure request, 15 U.S.C. § 1681g(a)(3), the relevant periods of inquiry are September 2004 to September 2005 and October 2005 to October 2006.

an initial deposit on December 12, 2005. *See* Ex. 9, at JPMorgan-000007. Searcy used this account for just over three weeks before accumulating a significant negative balance. She made her final deposits and withdrawals on January 3, 2006, and the checking account was written off by the bank with a negative balance on February 28, 2006. *Id.* at JPMorgan-000013-14, 000025.

An examination of the records for these three accounts, as well as other accounts outside the relevant time period, demonstrates that Plaintiff serially engaged in check kiting. Plaintiff repeatedly wrote checks to "Cash" from previously closed or currently overdrawn accounts and deposited those checks into her active checking account through ATMs. Searcy would then make cash withdrawals that were unsupported by actual funds.

By way of illustration, a little more than two months after opening her account with Washington Mutual Bank, Plaintiff began depositing phony checks into that account. On November 25, 2005, Plaintiff deposited a $300 check written to "Cash" from her account at TCF Bank, which had been closed by TCF Bank with a negative balance *more than four years earlier*. *See* Ex. 10, at TCF-00004; Ex. 8 at WashMut-000103. Over the course of the next week, Plaintiff deposited at least three more phony checks from the closed TCF Bank account into her Washington Mutual accounts. *See* Ex. 8, at WashMut-000104-106. All told, Plaintiff made over $1,000 in fraudulent deposits and withdrawals, oftentimes withdrawing cash from the same ATM immediately after making the fraudulent deposit. *Id.* at WashMut-000010-12, 000021-22.

Plaintiff's final phony deposits to Washington Mutual occurred on December 2, 2005. Five days later, Plaintiff opened new checking and savings accounts with JP Morgan Chase. *See* Ex. 9, at JPMorgan-000003, 000005. Plaintiff's December 2005 Washington Mutual statements showed negative balances for both her checking and savings accounts, reflecting a deficit of over $1,000. *See* Ex. 8, at WashMut-000012, 000021. Despite these negative balances, Plaintiff

8

made five separate deposits from her Washington Mutual checking account into her new JP Morgan Chase accounts between December 23 and December 29, 2005. *Id.* at WashMut-000092-96; Ex. 9, at JPMorgan-000013-17. Once again, Plaintiff regularly withdrew cash from the JP Morgan Chase account using the same ATM where she had just made unsupported deposits. *See* Ex. 9, at JPMorgan-000013-17.

Likewise, in a Bank of America account maintained after the time period relevant to her claims, Plaintiff made unsupported deposits within a month of opening her account in April 2007. This time, Plaintiff wrote checks from her JP Morgan Chase account, which had been closed for over a year, and again withdrew cash immediately after making her phony deposits. *See* Ex. 11, at BOA-0010, BOA-0014, BOA-0020-23.

## IV. PLAINTIFF'S DISCLOSURE REQUESTS

It is within this context of serial check kiting that Plaintiff requested SCAN disclosures on three occasions: (1) January 18, 2005, (2) September 13, 2005, and (3) October 26, 2006. Plaintiff has provided testimony in this action regarding the circumstances of these requests, but that testimony is contradicted by the documentary evidence.

### A. January 18, 2005 SCAN Disclosure Request

Plaintiff has testified, through a declaration and in her deposition, that she requested her SCAN disclosure on January 18, 2005 in response to a merchant's near-contemporaneous decline of her check. *See* Ex. 12, Searcy Decl. ¶ 3; Ex. 13, Searcy Dep. at 90, 94-95. Significant evidence contradicts this testimony. First, Plaintiff did not have an active checking account at the time she claimed her check was declined and had not had an active checking account for the previous eight months. In January 2005, Plaintiff had only recently opened an account with U.S. Employees Credit Union and had not yet made an initial deposit. *See* Ex. 7, at USEMP-000004

9

(noting new "share draft" account opened on January 3 and a zero balance as of January 31). Second, the SCAN disclosure Order Form Plaintiff completed in January 2005 clearly requested that she provide her bank routing and account numbers and, if a check had been declined, information about the declining retailer. *See* Ex. 14, completed Order Form. Plaintiff's January 2005 Order Form lists the Citibank checking account that was closed some eight months earlier.[5] *Id.* Moreover, the portion of the Order Form that asked for the identity of the declining merchant was left conspicuously blank. Further, in January 2005, none of Plaintiff's identifiers were on the SCAN negative file. *See* Ex. 21, Raju Dep. at 24-25. Thus, she could not have been declined check-writing privileges based on SCAN information.

      **B.**    <u>September 13, 2005 Disclosure Request</u>

Plaintiff testified that, in September 2005, a merchant again declined her check based on SCAN information and that this decline prompted another SCAN disclosure request. *See* Ex. 12, Searcy Decl. ¶ 10; Ex. 13, Searcy Dep. at 99-100. Prior to September 13, 2005, Plaintiff had not had an open checking account since her U.S. Employees Credit Union account had been closed months earlier. While it is true that Plaintiff made an initial deposit into her Washington Mutual account on September 13, 2005, there is a serious question as to whether that account could have been the source of any decline the very same day. Unless Plaintiff made her initial deposit, wrote a check, had that check declined, printed and completed her SCAN disclosure Order Form, and faxed the form to SCAN, all before 1:00 p.m. on September 13, it is difficult to conceive how she could have had a check declined in September 2005. *See* Ex. 15, completed Order Form (containing fax header demonstrating it was sent to SCAN at approximately 1:00 p.m.). Furthermore, the completed Order Form did not identify a declining merchant and, bizarrely,

---

[5] In her deposition, Plaintiff explained the use of an outdated account number as follows: "I provided you with an account number. It doesn't say that it had to be the same account that I wrote a check for." Ex. 13, Searcy Dep. at 91.

listed a bank account from which checks could not even be issued. *Id.*; Ex. 13, Searcy Dep. at 101-02. Finally, even if a decline took place on September 13, 2005, that decline cannot be traced to SCAN because none of Plaintiff's identifiers were included on the SCAN negative database distributed to merchants as of September 2005.

> C.      October 26, 2006 Disclosure Request

Plaintiff also testified she called and requested a SCAN disclosure by phone in October 2006 after a merchant declined a check that month based on information provided by SCAN. *See* Ex. 12, Searcy Decl. ¶ 15; Ex. 13, Searcy Dep. at 110-11. Plaintiff, however, did not have a checking account open in October 2006. Her previous checking account with JP Morgan Chase had been closed by the bank in February 2006, and she would not open another checking account until April 2007. *See* Ex. 9, at JPMorgan-000025; Ex. 11, at BOA-0015. In any event, no decline could have been based on SCAN information for the simple reason that none of Plaintiff's identifiers were listed on the SCAN negative database at that time.[6]

## ARGUMENT

## I.      PLAINTIFF'S CLAIMS ARE LIMITED TO ALLEGED VIOLATIONS OF 15 U.S.C. § 1681g(a)(3).

Plaintiff alleges SCAN's consumer disclosures violated three subsections of 15 U.S.C. § 1681g(a) by failing to include: (1) all information in the consumer's file [§ 1681g(a)(1)]; (2) the sources of that information [§ 1681g(a)(2)]; and (3) the identity of each person that procured a consumer report from SCAN during the year preceding the consumer's request for disclosure [§ 1681g(a)(3)]. Under unambiguous Seventh Circuit precedent, however, only the final category of information is implicated by the Amended Complaint and the facts in the record. In *Gillespie*

---

[6] One of Plaintiff's closed checking accounts, the Washington Mutual account, was listed on the SCAN negative database beginning in February 2006, but that account was not linked to Plaintiff's driver's license. As a result, in October 2006, Plaintiff only could have been declined based on information from SCAN if she had presented a merchant with a check from her closed Washington Mutual account.

*v. TransUnion Corp.*, 482 F.3d 907 (7th Cir. 2007), the Seventh Circuit held that the FCRA requirement under § 1681g(a)(1) to disclose "all information in the consumer's file" does not require the disclosure of every bit of information contained within the databases of a consumer reporting agency. Instead, the term "file" means only the information "included in a consumer report issued to third parties." *Id.* at 910.

Plaintiff concedes, as she must, that SCAN disclosures included all the information contained in SCAN's negative database and the sources of that information. Pl.'s Mot. at 6. The information contained in the negative database is the only information SCAN "issued to third parties." Under *Gillespie*, therefore, regardless of how one defines the term "consumer report," it is undisputed that the SCAN disclosures have always provided "all the information in the consumer's file," and there is no merit to Plaintiff's allegations that SCAN's disclosures violated either § 1681g(a)(1) or § 1681g(a)(2). As a result, for purposes of assessing the motion for class certification, the ultimate legal issue to be determined in this case is whether Defendants are liable for a willful violation of § 1681g(a)(3) – the obligation that consumer disclosures identify the merchants that procured a "consumer report" from SCAN in the twelve months preceding each consumer's request for a disclosure.

Obviously, to the extent no "consumer reports" were procured by merchants regarding a consumer, there can be no liability to that consumer under § 1681g(a)(3). A "consumer report" is defined as:

> any written, oral, or other *communication of information* by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . credit.

15 U.S.C. § 1681a(d)(1) (emphasis added). Under the express language of this definition, there can be no consumer report if SCAN *communicated no information* to a merchant about a consumer that presents a check for payment.

Plaintiff maintains (and certification of the proposed class requires) that a consumer report was issued each time a merchant utilized SCAN to process a consumer's check, regardless of whether information about the consumer was ever communicated to the merchant by SCAN. *See* Pl.'s Mem. at 5-6. Plaintiff's view of the law, however, is contrary to the plain language of the FCRA and any reasonable interpretation of what constitutes a "report" about a consumer. Indeed, Kimberly Sammons, a plaintiff in the predecessor action in the Middle District of Tennessee, testified that she would expect her disclosure to include "any information [provided to] anyone on me." Ex. 16, Sammons Dep. at 56.

Furthermore, adopting Plaintiff's view would lead to absurdities. For example, until August 2008, Wal-Mart was a SCAN customer. Under Plaintiff's proposed definition of a consumer report, SCAN would have issued a consumer report about every single consumer who ever wrote a check to Wal-Mart, regardless of whether that consumer was in the SCAN negative database. Even more absurdly, under Plaintiff's theory, SCAN was required to force Wal-Mart (and every other merchant that received a distributed file) to gather the identifiers for every check it was presented and report them to SCAN. Acquiring such information would have required enormous technological resources to obtain information that SCAN neither needed nor wanted and would have resulted in SCAN unnecessarily and inappropriately retaining consumer information.

The Court is required to "make a preliminary inquiry into the merits" when a question of suitability for class treatment overlaps with a merits question. *Szabo v. Bridgeport Machs., Inc.*,

249 F.3d 672, 676 (7th Cir. 2001); *Reed v. Advocate Health Care*, 2009 U.S. Dist. LEXIS 89576, at *8 (N.D. Ill. 2009). To the extent they are implicated by Plaintiff's Motion, these threshold, legal questions should be addressed by the Court and, ultimately, require that the Motion be denied because it is based on untenable legal claims.

## II. CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFF'S PROPOSED CLASS DEFINITION IS OVERBROAD.

Prior to considering the requirements for class certification mandated by Rules 23(a) and 23(b)(3), a proposed class must be defined in a sufficiently precise manner. *Williams-Ellis v. MT Hair Salons & Day Spas*, 2008 U.S. Dist. LEXIS 24408, at *3-4 (N.D. Ill. 2008). The class definition serves the essential functions of identifying individuals who are "(1) entitled to relief, (2) bound by the judgment, and (3) entitled to notice." *Gustafson v. Polk County*, 226 F.R.D. 601, 607 (W.D. Wis. 2005). In contrast, Plaintiff's proposed class definition sweeps in a great number of individuals that unquestionably have no viable cause of action and an even larger number of individuals whose disclosures very likely did not violate the FCRA, the ultimate determination of which could only be made after individualized, fact-specific inquiries. For these reasons, the proposed class is overbroad and cannot be certified.

A. The proposed class includes a great number of people whose disclosures could not conceivably have violated the FCRA because they did not maintain checking accounts.

Overbreadth of class definition presents an insurmountable obstacle to class certification. As the Seventh Circuit recently held, "a class should not be certified if it is apparent that it contains a great many persons who have suffered no injury at the hands of the defendant." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (citing *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 514 (7th Cir. 2006)). If such a class were to receive a favorable

judgment or settlement, individuals without a right to relief would recover unjustly. *Gustafson*, 226 F.R.D. at 607.

The proposed class includes every person that received a SCAN consumer disclosure over a three-year period. That class definition guarantees the inclusion of a substantial number of individuals whose SCAN disclosures complied with the FCRA, even though, as Plaintiff repeatedly stresses, those disclosures were generated by a uniform procedure. Plaintiff alleges that all SCAN disclosures were deficient for failing to include the identity of merchants that procured consumer reports during the preceding twelve-month period. By no means, however, did every consumer requesting a disclosure have a consumer report issued to a retailer in the twelve months preceding their disclosure request. For example, a great number of people who requested a disclosure did not have a checking account. Obviously, those individuals could not have suffered the FCRA violation alleged by Plaintiff because no merchant could have conceivably procured a consumer report from SCAN in connection with their presentation of a check as payment. For those individuals, SCAN's uniform disclosure process generated a blank report, and properly so, even under the allegations raised by Plaintiff's complaint.

In discovery, SCAN produced approximately 6,400 Order Forms that were completed by consumers requesting a SCAN consumer disclosure. *See* Ex. 17, Harb Aff. ¶ 3. These Order Forms asked consumers to identify their checking account information. Over one third (2,270) of the disclosure requests failed to include any checking account information whatsoever. *Id.* at ¶ 6; *see also* Ex. 18 (sample of Order Forms where the checking account fields were left blank). Over 5% (419) of consumers that submitted Order Forms *expressly disclaimed* having a checking account at all. *See* Ex. 17, Harb Aff ¶ 5 ; *see also* Ex. 19 (sample of Order Forms

where consumers disclaimed having a checking account).  Obviously, these individuals had not

had consumer reports issued in relation to non-existent checking accounts.

Assuming the class includes approximately 180,000 SCAN disclosure recipients, and

extrapolating from the 5% of proposed class members who expressly disclaimed having

checking accounts in the available sample of Order Forms, approximately 9,000 people would be

members of the proposed class who could not possibly have received disclosures that violated

the FCRA in the manner alleged in Plaintiff's complaint.  This overbreadth in the class definition

would subject Defendants to potential liability of at least $9,000,000 in improper statutory

damages, in addition to Plaintiff's claim for punitive damages.  In fact, this is the most

conservative estimate of the impact of including class members whose disclosures were in full

compliance with the law.  One-third of the available sample of Order Forms did not include any

checking account information, calling into question whether those individuals had checking

accounts at all.  Class certification, therefore, risks putting Defendants in the position of paying

tens of millions of dollars in damages to individuals with no checking accounts and no check

writing history, who obviously could not have suffered Plaintiff's alleged FCRA violation.

Because the class includes such a significant number of people who demonstrably have no claim

under the FCRA, the class should not be certified.

B. <u>Without individualized fact inquiries, the proposed class would likely include a significant number of people whose disclosures did not violate the FCRA.</u>

On the facts and the claim alleged by Plaintiff, there is no way to distinguish those

individuals whose disclosures were allegedly deficient from those whose disclosures were

unquestionably proper without engaging in a highly individualized factual inquiry.  Because the

proposed class may contain consumers with no grievance under the FCRA – who can only be

identified after individualized factual inquiry – the class definition is improperly overbroad and certification should be denied.

A recent decision from the Sixth Circuit is instructive. In *Romberio v. UnumProvident Corp.*, 2009 U.S. App. LEXIS 695, at *8 (6th Cir. 2009), the court reversed certification of a class of ERISA plan participants denied coverage where that class would have included customers whose claims were *properly* denied in addition to those whose claims were *improperly* denied. The Court reasoned that "the only way to distinguish between the two sets of individuals is to engage in individualized fact-finding, and the need for such individualized fact-finding makes the district court's class definition unsatisfactory." *Id.* at *23. Similarly, in this case, Plaintiff's proposed class likely includes both consumers who did not receive information allegedly required under § 1681g(a)(3) and consumers for whom there simply was not any information to disclose, even under Plaintiff's view of what § 1681g(a)(3) requires.

An indicator of whether a consumer report was issued, and therefore whether any information was even conceivably missing from a class member's SCAN disclosure, is evidence of a check decline by a merchant. SCAN's Order Form asked consumers to identify, "if your check-writing privileges were declined by a retailer," the name of the retailer and the location. *See* Ex. 6. More than 70% of the people who requested a disclosure in the available sample of Order Forms either left that section blank (4,099 of approximately 6,400) or *expressly disclaimed* having any checks declined (563). *See* Ex. 17, Harb Aff. ¶¶ 8-10; Ex. 20 (sample of Order Forms expressly disclaiming a check decline by indicating "n/a" or "none").

Consistent with this sample, a "large portion" of SCAN disclosure requests are received from consumers concerned about identity theft. Ex. 3, R. 30(b)(6) Dep. at 198-200. For these individuals who may have received SCAN disclosures "as a precautionary measure," there is no

indication that they presented any checks to SCAN merchants. *Id.* at 199. Instead, they were referred to SCAN by law enforcement or identity theft protection agencies. *Id.* at 199-200. During discovery Defendants produced over 133,000 records of letters sent by SCAN to individuals. In support of Plaintiff's numerosity argument, Plaintiff correctly excluded the over 18,000 Identity Theft Summary of Rights letters ("ID theft letters") that were sent to consumers because the ID theft letters were not automatically accompanied by a consumer disclosure. *See* Burson Decl. ¶ 7 (copy filed with Pl.'s Mem.). Yet it stands to reason, because of the nature of the inquiry by an identity theft victim, that many of these 18,000 individuals also requested SCAN consumer disclosures under separate cover. *See* Ex. 5, Weber Dep. at 96, 150. This large number of potential identity theft victims demonstrates the need for individualized consideration to determine if they even potentially could have suffered the FCRA violation alleged in the Amended Complaint.

Because the class definition is overbroad, there is a substantial question whether SCAN in fact issued a consumer report about a large number of the proposed class members in the year preceding their request. Only an individualized factual inquiry would reveal whether those consumers could have even potentially received a disclosure in violation of the FCRA as alleged by Plaintiff.

Plaintiff herself presents the perfect example of a consumer who received a SCAN disclosure that appears to have complied with § 1681g(a)(3) in every particular. When Plaintiff requested her SCAN disclosure in September 2005, she had not written a check to a merchant at any point in the prior year. *See* Ex. 13, Searcy Dep. at 142-143; Ex. 7, at USEMP-000001. In addition, Plaintiff was never listed in the SCAN negative database and thus never had any information communicated to merchants about her. *See* Ex. 21, Raju Dep. at 24-25.

Accordingly, in September 2005, there was no information that could possibly have been included in Plaintiff's SCAN consumer disclosure regarding consumer reports issued to merchants in the prior year. It is therefore beyond dispute that the generation of Plaintiff's SCAN disclosure in September 2005 resulted in a disclosure containing all the information required by the FCRA.

Nevertheless, Plaintiff asks the Court to certify a class that potentially would award millions of dollars in damages to her and thousands of other consumers who unquestionably did not suffer the FCRA violation she alleges. With regard to the other individuals in the proposed class, an individualized inquiry is needed to reveal whether the disclosures they received did, in fact, violate the FCRA as Plaintiff alleges. Because of the "high percentage" of proposed class members who likely have no viable claim that their FCRA rights were violated, certifying the proposed class would be improper. *See Kohen*, 571 F.3d at 679.

## III.  CLASS CERTIFICATION SHOULD BE DENIED BECAUSE INDIVIDUAL ISSUES PREDOMINATE OVER COMMON ISSUES.

As the discussion of overbreadth makes clear, the tens of thousands of claims Plaintiff proposes to handle in a single action involve a wide variety of individual questions that need to be answered before Defendants can be found liable to each consumer for willfully violating the FCRA. Highly individualized questions would be the focus of this litigation, and as such, it is inappropriate for class treatment. *Williams-Ellis*, 2008 U.S. Dist. LEXIS 24408, at *14-16. Examples of the individual questions that must be answered to assess liability with regard to each member of the proposed class include:

- whether the consumer had a checking account
- whether the consumer wrote checks to merchants from a checking account
- whether the consumer presented checks to merchants with the capacity to utilize SCAN services

- whether the merchant actually relied on information from SCAN in the process of accepting or declining the consumer's check
- whether information related to the consumer was received from a merchant's internal source or a competing check verification company
- which SCAN platform (SCAN or SCAN On-Line) the merchant used in processing the consumer's transaction
- whether the merchant accepted or declined a particular check

These questions "can only be answered by first looking at the circumstances surrounding each individual class member's experience" writing checks and requesting SCAN disclosures. *Williams-Ellis*, 2008 U.S. Dist. LEXIS 24408, at *15.

Plaintiff oversimplifies the case by suggesting Defendants will "automatically be liable" to all disclosure recipients. *See Webb v. Local 73*, 2003 U.S. Dist. LEXIS 3662, at *7 (N.D. Ill. 2003). Even if it were possible to identify from classwide proof the recipients of consumer disclosures who actually could have suffered the FCRA violation Plaintiff alleges, sharp divisions would still exist within the group of potentially injured consumers that make it unfeasible to determine liability on a classwide basis. Different individuals within the class would have widely divergent theories as to liability, even as to definitional questions under the FCRA, such as when a consumer report has issued. Accordingly, the Court would face the burden of assessing the claims of various class members using different measures of liability and having to take account of their particular circumstances. *Id.*; *see also Rose v. Saginaw County*, 232 F.R.D. 267, 271-72 (E.D. Mich. 2005).

By way of illustration, numerous individuals in the proposed class (including Plaintiff) must convince the Court to go beyond any credible definition of a "consumer report." The FCRA defines a consumer report as "a *communication of any information* by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living." 15 U.S.C. §

1681a(d)(1) (emphasis added).  Many individuals within the proposed class never had negative information associated with their driver's license or MICR identifiers in the SCAN negative database, and thus never had any information communicated to a single merchant anytime, anywhere.  For these individuals to establish that a consumer report was ever issued, they would need to convince the Court that the *absence* of information on SCAN's database constituted a "consumer report" within the meaning of the FCRA.  The proof and arguments required to assert that claim are far different from the proof and arguments required to assert the claims of the proposed class members whose identifiers were contained in the negative database.

Even for those individuals whose identifiers were in the SCAN negative database at some point, an additional individualized issue is whether those individuals tendered checks to merchants that used the SCAN service while the identifiers were listed in the database.  This question is important because individuals who never presented checks to SCAN merchants have far different claims regarding whether a consumer report issued as compared to those individuals who did present checks for payment.  Further, with respect to individuals who were on the SCAN negative database and presented a check to a merchant that was a SCAN customer, there still exist individualized issues whether the particular merchant's distributed file (which could be limited by region, for example) contained the consumer's information from the negative database and whether the merchant relied on the SCAN distributed file (as opposed to a competitor's service or an internal process) with respect to that particular transaction.

Similarly, individualized issues arise related to which technology platform was used to process an individual's checks.  When merchants used the distributed file, SCAN had no knowledge whether (a) a particular consumer attempted to make a purchase by check, (b) had one or more of his identifiers run against the SCAN negative database (or some portion thereof),

(c) the inquiry resulted in a match, or (d) the merchant decided to accept the check. Accordingly, with respect to the SCAN distributed file (which comprised the vast majority of SCAN's customers and revenues), SCAN never possessed the information Plaintiff alleges is missing from the disclosures. Proposed class members whose checks were processed through SCAN On-Line, however, have different proof and arguments because SCAN did capture their transaction information.

In addition to these sharp divisions among individuals in the proposed class, there are a large number of other individualized issues that will come into play. For example, many individuals requested disclosures from SCAN totally unrelated to their check-writing for purposes of submitting to background checks, guarding against identity theft, or procuring a free credit report. *See* Ex. 17, Harb Aff. ¶ 11 (noting that approximately 114 consumers in the available sample of Order Forms requested a free annual disclosure); Ex. 22 (sample of Order Forms requesting a free annual disclosure). Further, a significant number of individuals requested disclosures after trying and failing to cash checks written by others, such as employer payroll checks. Many of those declines were based on the inclusion of the employer's MICR identifier on the SCAN negative database, which had nothing to do with the consumer who requested a SCAN disclosure. Those declines would not constitute consumer reports. *See* Ex. 23, FTC Official Staff Commentary § 603(d), Item 3(B) ("Reports about corporations, associations, and other collective entities are not consumer reports, and the Act does not apply to them.").

In short, the numerous factual differences between the proposed class members requires those class members to assert and prove divergent theories, which precludes any viable presentation of common proof and argument. A person who had a check declined after it was

processed via SCAN On-Line, for instance, has a far different case than a person whose identifiers were on the negative database but never presented a check to a SCAN merchant, a person who successfully paid with a check and was never included on the SCAN negative database, or a person who had a payroll check declined based on his employer's checking account information. Because these individual issues predominate over any questions common to Plaintiff's proposed class, the motion for class certification should be denied.

## IV. CLASS CERTIFICATION SHOULD BE DENIED BECAUSE PLAINTIFF IS AN INADEQUATE REPRESENTATIVE.

Plaintiff has presented highly dubious testimony concerning her check-writing and requests for SCAN disclosures, and it appears she engaged in systematic checking account abuse against the financial institutions where she maintained accounts. These are not tangential matters, but go directly to the heart of this dispute. The unique defenses Defendants have against Plaintiff will be a key focus in this litigation. Accordingly, Plaintiff is an inadequate representative for a class.

"Adequacy of representation is the key to the integrity of class action litigation, not only in pragmatic terms of the efficiency and thoroughness of the proceedings, but far more importantly in relation to the fair and just resolution of the dispute." *Folding Cartons, Inc. v. American Can Co.*, 79 F.R.D. 698, 701 (N.D. Ill. 1978); *see also Davidson v. Citizens Gas & Coke Utility*, 238 F.R.D. 225, 228 (S.D. Ind. 2006) ("Because the rights of absent class members may be preclusively affected by the action at bar, adequacy of representation is an important linchpin in securing class certification.").

Plaintiff seeks to serve as a fiduciary and guardian of the interests of the class, which requires the Court to examine her credibility to determine whether she is a suitable representative. *Pope v. Harvard Banc-Shares, Inc.*, 240 F.R.D. 383, 390 (N.D. Ill. 2006). "The

lead plaintiff must be trustworthy enough to protect the interests of the class by working to pursue a remedy or settlement that benefits the class as much as it does [her]self or [her] counsel." *Id.* Accordingly, questions about Plaintiff's honesty and integrity are essential considerations in determining whether she can adequately represent a class. *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990).

     A.    <ins>Plaintiff's lack of credibility regarding her interactions with SCAN and her checking account abuse render her an inadequate class representative</ins>.

Plaintiff's testimony, taken in light of the facts revealed in discovery, "reflects a deliberate attempt to conceal information." *Kaplan v. Pomerantz*, 132 F.R.D. 504, 510 (N.D. Ill. 1990). As such, the Court should not allow this case to proceed as a class action. *Id.* "Incredulous prior testimony by a class representative poses a problem for a class when the case goes to trial." *Brider v. Nationwide Credit, Inc.*, 1998 U.S. Dist. LEXIS 16532, at *7 (N.D. Ill. 1998); *see also Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 397 (D.N.J. 1998) ("Problems of credibility, when sufficiently serious, can prevent a named plaintiff from being certified as a class representative.").

Plaintiff appears to have made demonstrably false statements related to the basic circumstances surrounding her requests for SCAN disclosures. Both in a declaration submitted to this Court and in deposition testimony, Searcy has maintained that she requested SCAN disclosures after having checks declined based on SCAN information in January 2005, September 2005, and October 2006. *See* Ex. 12, Searcy Decl. ¶¶ 3, 10, 15; Ex. 13, Searcy Dep. at 90, 94-95, 99-100, 110-111. The documentary evidence contradicts this testimony. The evidence is clear that Plaintiff did not even have active checking accounts at the times she claims her checks were declined. The evidence is also clear that Searcy's relevant identifiers were

never listed on the SCAN negative database, and thus she could not have had a check declined based on SCAN information.

Plaintiff provided similarly suspect testimony related to her checking account abuse. When confronted with the evidence of her fraudulent deposits, Plaintiff maintained they were made inadvertently: "I think I had some checks in my wallet, which I am accustomed to just tearing them out of the – the – the carbon copy thing and sticking them in my wallet, and I think I inadvertently maybe had some checks from Chase left over, and I wrote them in error." *See* Ex. 13, Searcy Dep. at 180. In other words, Plaintiff testified that she carried "loose checks" from her JP Morgan Chase account in her wallet for 15 months after that account was closed, and that the attempt to deposit money using those checks made out to "Cash" was merely "done in error." *Id.* at 180-84.

When confronted with the fraudulent deposits made from her Washington Mutual account into her JP Morgan Chase account, Plaintiff insisted those deposits were also simply a mistake:

> Q. . . . Since that time have you had occasion to reflect and understand why it was that you were writing checks off your WaMu account when there was no money in it?
> A. That I did it in error.
> Q. Okay. Did you do it five times in error?
> A. Apparently.
> Q. And each time that you wrote it, you thought you had money in the WaMu account?
> A. Apparently.

*Id.* at 201-02. There is no reasonable explanation, aside from intentional misconduct, why Plaintiff deposited into her Washington Mutual account four checks made out to "Cash" from an account that had been closed with a negative balance more than four years earlier. *See* Ex. 8, at WashMut-000103-106.

Each of Plaintiff's bank accounts from 2004 to 2007 demonstrates a pattern of ATM deposits from closed or overdrawn checking accounts and accompanying withdrawals. Even when confronted with the documentary proof of her multi-year, multi-bank pattern of check fraud, Plaintiff testified that her conduct was inadvertent. Plaintiff's testimony, taken in light of all available evidence, leaves "no conclusion other than that plaintiff gave false answers to rather clear questions." *Brider*, 1998 U.S. Dist. LEXIS 16532, at \*10. Such seeming lack of honesty in her testimony calls into question Plaintiff's ability to represent a class, "especially because her lack of credibility will make her vulnerable to attack at trial." *Id.* at \*10, \*12. Plaintiff's testimony contains not just minor inconsistencies about tangential matters, but erroneous statements that go to the heart of the circumstances surrounding this dispute. *Cf. Kaplan*, 132 F.R.D. at 510. In light of her implausible testimony, allowing Searcy to prosecute this case as a class action "would not be fair to the Court, to the defendants, or to the other individuals whose interests plaintiff purports to represent." *Id.*

    B.    <u>Plaintiff's checking account abuse demonstrates that she would be an inadequate representative</u>.

The evidence demonstrates that Plaintiff engaged in serial check fraud. This conduct makes her subject to unique defenses that should render her unable to bring her claims on behalf of a class.

This case is focused on whether SCAN provided sufficient information regarding consumer check-writing in its consumer disclosures. During the alleged class period, Plaintiff disguised and manipulated information related to her checking accounts to allow her to make phony deposits and fraudulent withdrawals from financial institutions. Likewise, in her written requests for disclosures from SCAN, Plaintiff provided misleading information. Despite SCAN's clear request to identify pertinent checking accounts in her consumer disclosure Order

Forms, Plaintiff provided account numbers associated with closed accounts or accounts from which she could not write checks.

Plaintiff's attempts to shield true account-related information from SCAN and her banks make her subject to unique defenses. As a representative plaintiff, Searcy would be subject to defenses unlikely to be at issue for the many consumers who were honest with SCAN in trying to determine what, if any, negative information was in their file. At the very least, the evidence is "sufficient to find that [Searcy] is not the best choice for a fiduciary who must honestly look out for the best interests of the absent class members instead of attempting to maximize [her] own." *Pope*, 240 F.R.D. at 390.

Plaintiff's apparent check fraud and dubious testimony will be important issues in this lawsuit. These unique defenses, and the questions regarding Plaintiff's credibility raised by these defenses, render her unable to proceed on behalf of a class. Any testimony she would give in trial would be subject to attack on multiple grounds and would work toward the prejudice of the absent class members bound by any judgment.

## CONCLUSION

For all these reasons, the Court should deny Plaintiff's motion for class certification.

Respectfully submitted,

eFUNDS CORPORATION and DEPOSIT
PAYMENT PROTECTION SERVICES, INC.

By: ____/s/ David Esquivel_____

David R. Esquivel (pro hac vice)
Jeffrey P. Yarbro (pro hac vice)
BASS, BERRY & SIMS PLC
315 Deaderick Street, Suite 2700
Nashville, Tennessee 37238
(615) 742-6285 Phone
(615) 742-0405 Fax

David M. Schultz (Ill. Bar No. 6197596)
Peter A. Walsh (Ill. Bar No. 6186464)
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street, Suite 300
Chicago, Illinois 60601-1081
(312) 704-3000 Phone
(312) 704-3001 Fax
dschultz@hinshawlaw.com
pwalsh@hinshawlaw.com

## CERTIFICATE OF SERVICE

I do hereby certify I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system on this 14th day of October 2009, which will send a notice of electronic filing to the following:

Edward H. Nielson, Esq. (IL Bar #0252296)
Scott L. Anderson, Esq. (IL Bar #6269332)
PRETZEL & STOUFFER, CHARTERED
One South Wacker Drive
Suite 2500
Chicago, IL 60606

M. Reid Estes, Jr., Esq.
Martin D. Holmes, Esq.
DICKINSON WRIGHT PLLC
Fifth Third Center
424 Church Street
Suite 1401
Nashville, TN 37219

*Lead Attorneys for Plaintiff*

/s/ David R. Esquivel
David R. Esquivel