UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GLADYS SEARCY, individually, and ELIZABETH KRECH and RUSSELL HORNBECK, individually and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | 08 C 985 |
| vs. | ) ) | |
| eFUNDS CORPORATION, et al., | ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

CHARLES P. KOCORAS, District Judge:

This case comes before the court on two motions filed by Defendants eFunds Corporation and Deposit Payment Protection Services, Inc. The first is a motion for summary judgment on all claims asserted by Plaintiff Gladys Searcy pursuant to Fed. R. Civ. P. 56. The second is a motion for sanctions against Searcy, her lead counsel, and her lead counsel's law firm.[1] For the reasons set forth below, the motion for summary judgment is denied and the motion for sanctions is granted in part and denied in part.

---

[1] Defendants have not asked that any sanctions be imposed against Searcy's local counsel in this case. Any references in this opinion to Searcy's counsel denote her lead counsel only.

# BACKGROUND

Defendant Deposit Payment Protection Services, Inc. ("DPPS") provides a service called the Shared Check Authorization Network, or SCAN, to a number of retailers throughout the United States. SCAN is designed to assist retailers in deciding whether or not to accept a personal check from a customer. To provide this service, DPPS collects information about individuals who have presented bad checks, compiles the information into a data file, and then distributes that file electronically to each of its merchant-subscribers. Retailers could then run a search for a particular consumer's information in the file and accept or decline a check from that consumer based on the results of that search.

The SCAN data file contains a list of driver's license numbers and bank account numbers. These numbers are associated with individuals who have either presented checks that have been returned unpaid or have had their bank accounts closed for cause. Upon initiating its subscription to SCAN, a merchant receives an initial SCAN file with the most current list of numerical identifiers linked to unpaid, returned checks and closed bank accounts. Each day thereafter, DPPS disseminates an updated list that reflects the addition of numbers belonging to persons who recently passed bad checks and the deletion of identifiers associated with persons who have made good on their unpaid checks.

On February 6, 2006, DPPS first incorporated a bank account number associated with Plaintiff Gladys Searcy into the SCAN file sent to all of its retailer customers. On that day and for each subsequent day, every retailer that subscribed to SCAN received the SCAN file containing Searcy's bank account number. Sometime in October 2006, Searcy requested that DPPS provide her with a report disclosing whether DPPS possessed any of her financial information and, if so, how the company used that information. DPPS, as a consumer reporting agency subject to the Fair Credit Reporting Act ("FCRA"), was obligated to provide Searcy with such a report upon her request.[2] 15 U.S.C. § 1681g(a). The FCRA also required that the report contain certain information including the identity of each person that "procured a consumer report [about the person requesting the disclosure]. . . during the 1-year period preceding the date on which the request [for the report] is made." 15 U.S.C. § 1681g(a)(3)(A)(ii). Sometime after Searcy made her request, DPPS mailed her a consumer file disclosure report. The report did not include the names of retailers who had received the SCAN data file containing her bank account number.

---

[2] Defendants maintain that eFunds Corporation is only a holding company that does not function as a consumer reporting agency and, as a result, is not subject to liability under the FCRA. Because the resolution of this issue is unnecessary to decide the present motion, we decline to address it at this time.

On February 15, 2008, Searcy filed suit against DPPS and eFunds Corporation, asserting multiple claims under the FCRA. After a substantial amount of discovery and class certification litigation, Searcy amended her complaint to assert only one claim against Defendants. In her only cause of action, she alleges that Defendants wilfully violated 15 U.S.C. § 1681g(a)(3)(A)(ii) by failing to include in her consumer file disclosure report the names of the retailers who received the SCAN data file containing her bank account number. Defendants now move for summary judgment as to Searcy's remaining claim. Defendants also request we impose sanctions against Searcy, her lead counsel, and her lead counsel's law firm in connection with the submission of a declaration during an earlier stage of the case.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the

nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). With these principles in mind, we turn to Defendants' motion.

## DISCUSSION

We will discuss the merits of Defendants' motion for summary judgment first before turning our attention to Defendants' motion for sanctions.

## I. Defendants' Motion For Summary Judgment

Defendants argue that they are entitled to summary judgment on Searcy's claim because (1) DPPS did not violate 15 U.S.C. § 1681g(a)(3)(A)(ii); or, in the alternative (2) DPPS did not violate the FCRA willfully. We address each argument separately below.

## A. DPPS' Compliance with 15 U.S.C. § 1681g(a)(3)(A)(ii)

Defendants contend they are entitled to judgment as a matter of law because the data file sent to SCAN member retailers which included Searcy's bank account number did not constitute a consumer report under the FCRA. Under the FCRA, when an individual consumer requests a file disclosure report from a consumer reporting agency,

the report must include the names of all persons that "procured a consumer report" regarding the consumer during the one-year period before the request is made. 15 U.S.C. § 1681g(a)(3)(A)(ii). The parties do not dispute that Searcy's report did not name the retailers that received the SCAN file containing her bank account number during the relevant time period. As a result, the question of whether DPPS complied with the FCRA depends on whether the SCAN electronic data file may be characterized as a consumer report.

Under 15 U.S.C. § 1681a(d)(1)(C), a consumer report is defined as:

> any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for . . . any other purpose authorized under section 1681b of this title.

Section 1681b provides that a consumer reporting agency may disclose financial information "[t]o a person which it has reason to believe . . . has a legitimate business need for the information in connection with a business transaction that is initiated by the consumer." 15 U.S.C. § 1681b(a)(3)(F)(I).

Congress entrusted the Federal Trade Commission ("FTC") with the power to enforce the FCRA but did not furnish the agency with the authority to pass substantive rules for private litigation. 15 U.S.C. §1681s(a); *see also Murray v. New Cingular Wireless Servs., Inc.*, 523 F.3d 719, 725 (7th Cir. 2008). When an executive agency has

enforcement power for a particular statute but not rule-making authority, the agency's interpretations of the relevant statutory provisions are characterized as interpretive rules. *Atchison, Topeka & Santa Fe Ry. Co. v. Pena*, 44 F.3d 437, 442 (7th Cir. 1994). Though the FTC's interpretive rules are not entitled to the same level of deference as regulations authored pursuant to explicit Congressional delegation, courts nevertheless should defer to the FTC's interpretation to the extent its reasoning is valid, thorough, and consistent with earlier and later pronouncements by the agency. *Id.*

The FTC has interpreted the FCRA's definition of a consumer report to include lists which indicate that a consumer has had personal checks dishonored in the past:

> Bad Check Lists. A report indicating that an individual has issued bad checks, provided by printed list or otherwise, to a business for use in determining whether to accept consumers' checks tendered in transactions primarily for personal, family or household purposes, is a consumer report. The information furnished bears on consumers' character, general reputation and personal characteristics, and it is used or expected to be used in connection with business transactions involving consumers.

16 C.F.R. 600, app. (2010); *see also Estiverne v. Sak's Fifth Avenue*, 9 F.3d 1171, 1173 (5th Cir. 1993).

Based on the FTC commentary and the text of the statute, the SCAN file would appear to fit comfortably within the confines of the FCRA's definition of a consumer report. The driver's license and checking account numbers contained therein indicate that the individuals associated with those numbers have previously presented bad

checks. This information is obviously pertinent to both the character and general reputation of those consumers. Furthermore, the list is distributed to SCAN member retailers with the expectation that it will be used in the process of determining whether to complete a business transaction initiated by the consumer.

Despite indications to the contrary in both the FCRA language and the FTC commentary, Defendants nevertheless contend that the SCAN file is not a consumer report. Recall that the FCRA defines a consumer report as any dissemination of information bearing on certain consumer characteristics that is used or expected to be used as a factor in establishing the consumer's eligibility for one of the purposes listed in 15 U.S.C. § 1681b. *See* 15 U.S.C. § 1681a(d)(1)(C). The pertinent section of 1681b states that a consumer report may be issued "[t]o a person which [a consumer reporting agency] has reason to believe . . . has a legitimate business need for the information in connection with a business transaction that is initiated by the consumer." 15 U.S.C. § 1681b(a)(3)(F)(I). Defendants construe this portion of section 1681b to require that a consumer initiate a transaction with a merchant (i.e., present a check) before the merchant can have a legitimate need for the consumer's personal checking information. Based on their interpretation of section 1681b(a)(3)(F)(I), they also argue that a consumer reporting agency only has a permissible purpose for issuing a consumer report after the consumer has presented a check. Because DPPS distributed the SCAN file to

retailers before the consumers listed presented a check, they conclude that their communication of consumer information must not have been a consumer report.

Defendants' argument rests upon an unreasonable interpretation of the definition of consumer report which relies solely on section 1681b while completely ignoring the language of section 1681a. Under section 1681a, a transmission of information is not a consumer report unless: (1) the information relates to a consumer's characteristics or reputation; and (2) the information is used or expected to be used for particular purposes. 15 U.S.C. § 1581a(d)(1)(C). Defendants eliminate the nature of the information sent from their statutory analysis; for them, the purpose for which the information in the communication is employed and the timing of its transmission control the inquiry. No reasonable interpretation of the statutory definition could omit one of the essential features of a consumer report. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) (statutes must be interpreted so as to give meaning to every word Congress used). As a result, we decline to adopt Defendants' contention that the SCAN file is not a consumer report because it relies upon an interpretation of only half the relevant text.

Additionally, we find no textual support for Defendants' construction of section 1681b(a)(3)(F)(I) as imposing a chronological limitation on the issuance of consumer reports. That portion of the statute authorizes a consumer report to be issued "[t]o a person which [a consumer reporting agency] has reason to believe . . . has a legitimate

business need for the information in connection with a business transaction that is initiated by the consumer." 15 U.S.C § 1681b(a)(3)(F)(I). We see nothing in the text to suggest that the legitimacy of a retailer's need for information depends upon the occurrence of an event such as the presentation of a check. The "initiated by the consumer" language does not impose a chronological restriction on the legitimacy of a merchant's receipt of a consumer report. Rather, the text merely describes the type of the transaction that an agency has reason to believe the information will be used for before issuing the consumer report at issue. For these reasons, we decline to adopt Defendants' interpretation of section 1681b(a)(3)(F)(I).

Defendants also contend that other sections of the FTC commentary, FTC administrative decisions, and FTC informal opinions demonstrate that the SCAN file does not constitute a consumer report. Defendants highlight a different section of the FTC commentary related to a product similar to a bad check list as evidence that a bad check list without personal names is not a consumer report. In discussing the status of this product under the FCRA, the FTC commentary states:

> Credit guides. Credit guides are listings, furnished by credit bureaus to credit grantors, that rate how well consumers pay their bills. Such guides are a series of "consumer reports," because they contain information which is used for the purpose of serving as a factor in establishing the consumers' eligibility for credit. However, if they are coded (by identification such as social security number, driver's license number, or bank account number) so that the consumer's identity is not disclosed, they are not "consumer reports" until decoded.

16 C.F.R. § 600 app. (2010).

Though the commentary suggests that the two products share certain similarities, we see no reason to import the FTC's distinction between coded and uncoded credit guides into the bad check list context. The FTC did not differentiate between bad check lists that use personal names and those that employ other identifying information such as driver's license or bank account numbers in concluding that bad check lists are consumer reports. The commentary states only that any "report indicating that an individual has issued bad checks" is a consumer report. 16 C.F.R. § 600 app. (2010). We presume that the FTC acted deliberately in choosing to include the distinction in the credit guide section of their FCRA commentary and omit it in the portion related to bad check lists. *See Russello v. United States*, 464 U.S. 16, 23 (1983). Because the FTC elected not to differentiate between coded and uncoded bad check lists in concluding that all such lists are consumer reports, we decline to add such a qualification to their interpretation.

Defendants also argue that a number of FTC administrative decisions and informal opinion letters support their contention that the SCAN file does not constitute a consumer report. *See, e.g., Howard Enterprises., Inc.*, 93 F.T.C. 909 (1979); *Interstate Check Sys., Inc.*, 88 F.T.C. 984 (1976). The materials cited by Defendants do not refer to a coded bad check list in the context of assessing whether the product should be

considered a consumer report under § 1681a. Instead, the documents submitted address the legality of a coded bad check list under the rules governing the permissible uses of consumer reports found in § 1681b.

For example, in *Howard Enterprises*, the Commission assessed whether Howard had violated § 1681b in disseminating a bad check list to its retailer customers. *Howard Enterprises, Inc.*, 93 F.T.C. 909 (1979). At the time the FTC issued its opinion, the relevant portion of section 1681b granted permission to issue a consumer report "[t]o a person which it has reason to believe . . . has a legitimate business need for the information in connection with a business transaction involving the consumer[.]" 15 U.S.C. § 1681b(a)(3)(E) (1979). The FTC found that the list contained the names of a number of persons with whom the retailer recipients would never come into contact. *Id*. Based on this finding, the FTC concluded that Howard violated section 1681b by furnishing the list to stores that had no legitimate business need for many of the names on the list at issue. *Id*. In the context of finding the § 1681b violation, the Commission also noted that Howard could have avoided liability under § 1681b had it encoded its bad check list using driver's license numbers or bank account numbers. *Id*. The FTC apparently reasoned that distributing the list in that format would ensure that retailers would only receive the consumer information they legitimately needed to process a personal check transaction while omitting other unnecessary sensitive information. *See*

*id*. The discussion in *Howard Enterprises* assumes that the encoded bad check list is still a consumer report but one that is presented in a format designed to guarantee that retailers would only receive the information they absolutely needed to process a personal check and nothing else. Nothing in the *Howard Enterprise* opinion nor any of the other FTC decisions and opinions submitted by Defendants suggests that encoding a bad check list removes that communication from the scope of the FCRA's definition of a consumer report under section 1681a.

We find that the FTC commentary's conclusion that bad check lists are consumer reports applies to the SCAN file and is predicated upon a thorough and valid analysis grounded in the language of the statute; therefore, we defer to its interpretation in deciding that the SCAN file constitutes a consumer report under 15 U.S.C. § 1681(a). Consequently, the retailers who received the SCAN file containing Searcy's bank account number "procured a consumer report" about her; DPPS violated 15 U.S.C. § 1681g(a)(3)(A)(ii) by failing to include the names of those retailers in Searcy's consumer file disclosure report.

## B.    Purported Willfulness of DPPS' Violation

Defendants maintain they are still entitled to judgment as a matter of law on Searcy's claim because DPPS did not violate the statute willfully. Searcy requests only statutory damages from Defendants; the FCRA provides for such relief for violations

of the statute and permits a plaintiff to receive anywhere from $100 to $1,000 per violation. 15 U.S.C. § 1681n(a). Statutory damages are only available for willful violations of the FCRA. *Id*. In *Safeco Ins. Co. v. Burr*, 551 U.S. 47 (2007), the Supreme Court held that a willful violation of the FCRA may be established by proving that the defendant acted recklessly. The Court defined a reckless violation as one that "is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." *Id*. at 69.

Defendants contend no juror could find that they acted negligently, much less recklessly, in interpreting the FCRA to exclude the SCAN file from the consumer report definition because they predicated their conduct upon a reasonable interpretation of the statute. In *Safeco*, the Court concluded that no willful violation may be found when a Defendant based his conduct upon an interpretation of the statute which, though erroneous, was not objectively unreasonable. *Id*. at 69-70. The court reasoned that a defendant who acted on the basis of a reasonable interpretation of the statute could not be said to have acted negligently, much less recklessly, and therefore was entitled to judgment as a matter of law on the willfulness issue. *See id*. We have already concluded that Defendants have not provided us with a plausible interpretation of 15 U.S.C. § 1681a(d)(1)(C) under which the SCAN file they distributed would not be considered

a consumer report. The only question remaining is whether the violation at issue occurred negligently or recklessly. Various courts have held that this issue is a matter for the jury. *See, e.g., Whitfield v. Radian Guar.*, 501 F.3d 262, 270-71 (whether or not defendant willfully violated FCRA "is a factual issue, not a question of law, and it therefore cannot be decided by [the court] as a matter of law); *Ashby v. Farmer's Ins. Co.*, 565 F. Supp. 1188, 1205 (D. Or. 2008); (same); *Edwards v. Toys "R" Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007) (willfulness under FCRA generally a question for the jury). We agree; accordingly, we find that Defendants are not entitled to summary judgment on the willfulness issue.

Because Defendants have not demonstrated they are entitled to judgment as a matter of law with respect to their compliance with the FCRA or the willfulness of their violation, we deny their motion for summary judgment.

## II.    Motion For Sanctions[3]

Defendants request that we sanction Searcy, her counsel, and her counsel's law firm pursuant to the court's inherent power and 28 U.S.C. § 1927 in connection with the submission of a declaration during the class certification phase of this litigation.

---

[3] Searcy has requested sanctions against Defendants arising out of mistaken deposition testimony given by Defendants' Fed. R. Civ. P. 30(b)(6) designee. We find nothing sanctionable in Defendants' conduct. Defendants notified Searcy of their corporate deponent's error in a timely fashion and made every effort to correct the designee's error. Searcy's motion is denied.

On September 14, 2009, Searcy filed a motion for class certification. In her motion, Searcy sought to establish her qualifications as a representative for the so-called Check Presenter Class. As relevant here, this class consisted of all persons who presented a check at a SCAN member retailer, requested a consumer file disclosure from SCAN, and received a disclosure report that omitted the name of the retailer at which the consumer had presented the check. In support of her efforts to serve as representative for this class, Searcy cited a portion of her sworn statement in which she asserted that sometime in September 2005 she presented a check for payment at a merchant, requested a consumer disclosure report from SCAN, and received a report without the name of that retailer included.

In their memorandum opposing class certification, Defendants challenged Searcy's credibility generally and specifically disputed the veracity of her account of the events of September 2005. With regard to Searcy's credibility in a global sense, Defendants highlighted her history of repeatedly authoring checks from her other overdrawn accounts and then depositing those checks into an active checking account. Defendants also argued that Searcy's description of having a check declined in September 2005 did not square with information produced during discovery. Defendants noted that Searcy's checking records showed that the only bank account Searcy would have had access to in September 2005 was a Washington Mutual account opened on

September 12, 2005. Though the account statement listed an opening date of September 12, no funds were deposited in the account until September 13, 2005. Additionally, a copy of Searcy's request for a consumer disclosure report showed that she faxed her request at approximately 1:00 PM on September 13. Based on this evidence, Defendants contended that "[u]nless Plaintiff made her initial deposit, wrote a check, had that check declined, printed and completed her SCAN disclosure Order Form, and faxed the form to SCAN, all before 1:00 p.m. on September 13, it is difficult to conceive how she could have had a check declined in September 2005." Defs. Resp. in Opp. to Pl. Mot. for Class Cert. at 10.

In response to Defendants' arguments concerning her veracity, Searcy dismissed her past checking practices as irrelevant to the litigation and submitted a new sworn statement regarding her September 2005 check request. In her new declaration filed in November 2009, Searcy asserted that she opened a checking account with Washington Mutual Bank on September 12, 2005, and received a book of starter checks from the bank that same day. She also asserted that she presented one of those starter checks at a SCAN member retailer either during the evening of September 12 or the morning of September 13, 2005. Based on her statements, we made a factual finding that Searcy presented a check to a SCAN member retailer on or about September 12 and concluded that Searcy could adequately represent the interests of the Check Presenter Class.

Defendants then asked us to reconsider our grant of class certification in light of additional evidence that undercut the credibility of Searcy's statement. They submitted a sworn declaration from Steven Dickinson, a representative of Washington Mutual Bank. Dickinson stated that notations on Searcy's Washington Mutual account agreement indicated that she had opened an account with the bank online or via telephone on September 12. Dickinson further stated that Washington Mutual did not provide starter checks to individuals who opened their accounts online. Searcy offered no evidence to rebut Dickinson's statements. Based on Dickinson's declaration, we concluded that Searcy suffered from credibility concerns that prevented her from serving as an adequate class representative and decertified the Check Presenter Class.

Defendants ask that we impose sanctions against Searcy's lead counsel under 28 U.S.C. § 1927 as a consequence of their failure to independently corroborate the facts asserted in Searcy's November 2009 declaration before submitting the document to the court. Specifically, Defendants request that we require counsel to pay attorneys' fees and costs associated with procuring Steven Dickinson's declaration. Section 1927 provides that any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." A court may impose

sanctions under section 1927 upon an attorney who engaged in extremely negligent conduct. *Kotsilieris v. Chalmers*, 966 F.2d 1181, 1184 (7th Cir. 1992).

Searcy's counsel argue that they acted reasonably in merely consulting with their client before filing her November 2009 declaration because documentary evidence and counsel's own experience suggested that her statement was credible. Counsel contend that certain aspects of Searcy's Washington Mutual Account Agreement lent support to her statement. The account agreement stated that the account had been opened on September 12, 2005, which was consistent with the events described in Searcy's statement. The agreement also included Searcy's signature which indicated to counsel that Searcy had visited a Washington Mutual Bank location to open the account. In addition to the agreement itself, Searcy's counsel's own experience suggested that being provided with starter checks upon opening an account at a bank is a common practice.

In assessing the reasonableness of their choice to forego independent confirmation of Searcy's statement, counsel neglect to incorporate other important facts within their knowledge at the time they submitted their client's declaration. First, counsel were made aware during class discovery that Searcy had engaged in numerous questionable checking transactions that cast doubt on her credibility as a general matter. Second, the fact that Searcy's recollection tracked so closely to the hypothetical time line described in Defendants' opposition brief should have aroused counsel's suspicions

with regard to its veracity. Finally, the importance of the declaration to the class certification litigation should have suggested the need to seek confirmation of Searcy's account from an outside source before presenting the document to the court.

Under these unique circumstances, we find that Searcy's counsel were extraordinarily negligent in choosing to rely solely on their client's representations before submitting the declaration at issue. Searcy's prior conduct, the substance of her statement, and the use of her declaration to establish her adequacy as a representative of a putative class should have alerted any reasonable counsel of the need for independent verification before submitting a sworn statement to the court. We therefore grant Defendants' motion for attorney's fees and costs associated with procuring the declaration of Steven Dickinson.

Additionally, Defendants request that we impose sanctions against Searcy and her counsel's law firm under the inherent power of the court. We do not entertain such requests lightly; "[b]ecause of their potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991). In this instance, we decline to sanction either Searcy or her counsel's law firm under our inherent power. We have already penalized Searcy for submitting the November 2009 declaration by denying her the opportunity to serve as representative for any putative class. With regard to Searcy's counsel's law firm, we see no reason why we should hold

them accountable for the conduct of Searcy's lead counsel in this case. We therefore deny Defendants' motion for sanctions against Searcy and Searcy's counsel's law firm.

## CONCLUSION

Defendants' motion for summary judgment is denied. Defendants' motion for sanctions against Searcy and her lead counsel's law firm is denied. Defendants' motion for sanctions against Searcy's lead counsel is granted. Defendants must present a detailed account of the costs and fees incurred in procuring Steven Dickinson's declaration within 30 days of the date upon which this opinion issues.

_Charles P. Kocoras_
Charles P. Kocoras
United States District Judge

Dated:   September 30, 2010