# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GLADYS SEARCY, | ) | |
| individually and on behalf of all | ) | NO. 08 C 00985 |
| others similarly situated, | ) | |
| | ) | **JUDGE KOCORAS** |
| **Plaintiff,** | ) | |
| | ) | **MAGISTRATE JUDGE FINNEGAN** |
| vs. | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| eFUNDS CORPORATION et al., | ) | |
| | ) | **JURY DEMAND** |
| **Defendants.** | ) | |

---

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION

---

David R. Esquivel
Wendy M. Warren
Jeffrey P. Yarbro
Allyn R. Gibson
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, Tennessee 37201
Telephone: (615) 742-6285

David L. Hartsell
Brian P. O'Meara
McGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, Illinois 60601-1818
Telephone: (312) 750-8898

*Attorneys for eFUNDS CORPORATION and*
*DEPOSIT PAYMENT PROTECTION*
*SERVICES, INC.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iv

INDEX OF EXHIBITS AND ABBREVIATIONS ................................................................ vii

INDEX OF FILED DOCUMENTS AND ABBREVIATIONS ................................................ ix

INTRODUCTION ....................................................................................................................1

PROCEDURAL BACKGROUND............................................................................................2

ARGUMENT ............................................................................................................................4

I.   As defined by Plaintiffs, the proposed classes are overbroad and cannot be certified. .............4

II.  The representative plaintiffs cannot establish the amount of damages on a class-wide
     basis...................................................................................................................................7

III. Each of the proposed class definitions independently suffers from overbreadth or fails
     to meet the requirements of Rule 23(b)(3)................................................................11

     A.  Proposed SCAN On-Line Class........................................................................11

     B.  Proposed Bad Check List Class ........................................................................16

     C.  Proposed Check Presenter Class .......................................................................18

         1.  Defendants Have Obtained Proof From Retailers That the Check Presenter
             Class Cannot Meet the Requirements of Rule 23(b)(3)................................18

         2.  A Questionnaire Is Not a Proper Methodology to Ascertain Members of the
             Check Presenter Class....................................................................................21

         3.  Based Upon This Court's Summary Judgment Ruling, if the Court Certifies a
             Check Presenter Class, the Class Members Cannot Include Consumers Who
             Are Also Bad Check List Class Members. .....................................................23

IV.  The Court should deny certification because Plaintiffs and Counsel are inadequate
     representatives under Rule 23(a)(4)............................................................................24

     A.  Pattern of False Testimony and Obstructed Discovery by Plaintiffs and Plaintiffs'
         Counsel ..............................................................................................................25

         1.  Gladys Searcy .................................................................................................25

             a.  Plaintiffs' counsel improperly resisted basic discovery...........................25

      b.   Even after discovery was compelled, Plaintiffs' counsel misled Defendants as to production, resisted production in contravention of court order, and redacted relevant information. .............................................26

      c.   Plaintiffs' counsel repeatedly allowed Searcy to provide false, misleading, and inaccurate testimony.............................................................................26

      d.   With at least "extraordinary negligence," Plaintiffs' counsel urged the Court to rely on false testimony in granting class certification. ...........................27

  2.  The Pattern of Improper Discovery and Inaccurate Testimony Has Been Repeated with Hornbeck..........................................................................28

      a.   With knowledge of Hornbeck's potential adequacy problems, Plaintiffs' counsel again resisted basic discovery.................................................28

      b.   Plaintiffs' counsel redacted information directly relevant to this action, including redactions inconsistent with the Court's discovery order.....................29

      c.   Plaintiffs' counsel knowingly allowed Hornbeck to provide misleading and inaccurate testimony at his deposition. ..........................................30

B.  Pattern of Improper Recruitment of Class Representatives...............................32

  1.  Sammons and Beaudry in Tennessee.........................................................32

  2.  Identification and Recruitment of Searcy ..................................................33

      a.   Plaintiffs' counsel used confidential discovery to identify potential clients in a more favorable forum.......................................................................33

      b.   In response to Searcy submitting a questionnaire, Plaintiffs' counsel contacted her directly by telephone. ......................................................34

  3.  Identification and Recruitment of Krech ..................................................34

      a.   Krech did not become a client until after Plaintiffs' counsel learned that she had a potential SCAN On-Line claim...........................................34

      b.   Plaintiffs' counsel targeted Krech and other Illinois putative class members for misleading communications. ........................................35

      c.   Plaintiffs' counsel initiated a telephone call to Krech before she became a client.....................................................................................37

  4.  Consistency of Candidate Recruitment in January 2008 and October 2009 ..............38

C.  Counsel's Conduct in This Action Renders Him Inadequate to Serve as a Fiduciary for the Proposed Classes...................................................................39

1.   Counsel is Responsible for the Submission of False, Inaccurate, and Misleading Testimony. ...............................................................................................40

2.   Counsel Has Improperly Used Discovery to Identify Potential Clients and Engaged in a Sustained Campaign to Unethically Solicit Clients for Pecuniary Gain.......................................................................................................................42

D.  Hornbeck and Krech Are Inadequate Class Representatives.............................................45

V.  Plaintiffs and Plaintiffs' counsel have abused the equitable tolling doctrine. ........................48

A.  The Application of American Pipe Tolling in This Action is Inequitable........................49

B.  Class Actions That Are Voluntarily Dismissed Pursuant to Rule 41(a)(1)(A)(i) Do Not Toll the Statute of Limitations. ..................................................................................51

CONCLUSION....................................................................................................................53

# TABLE OF AUTHORITIES

Page(s)

Cases

*Anweiler v. Am. Elec. Power Svc. Corp.*,
  3 F.3d 986 (7th Cir. 1993) ................................................................................51

*Baker v. TransUnion*,
  2010 WL 2104622 ...............................................................................................6

*Beck v. Caterpillar, Inc.*,
  50 F.3d 405 (1995).............................................................................................52

*Cork, Crown & Seal, Inc. v. Parker*,
  462 U.S. 345 (1983) (Powell, J., concurring) ...................................................49

*Duchardt v. Midland Nat'l Life Ins. Co.*,
  265 F.R.D. 436 (S.D. Iowa 2009) .....................................................................18

*Eovaldi v. First Nat'l Bank of Chicago*,
  71 F.R.D. 334 (N.D. Ill. 1976)..........................................................................21

*Feltner v. Columbia Pictures Television, Inc.*,
  523 U.S. 340 (1998).......................................................................................8, 10

*Flanigan v. Am. Fin. Sys. of Ga.*,
  72 F.R.D. 563 (M.D.Ga.1976) ..........................................................................42

*Friedman-Katz v. Lindt & Sprungli, Inc.*,
  270 F.R.D. 150 (S..D.N.Y. 2010) ................................................................40, 42

*Great Plains Trust Co. v. Union Pacific Ry. Co.*,
  492 F.3d 986 (8th Cir. 2007) ............................................................................52

*In re Elscint Sec. Litig.*,
  674 F. Supp. 374 (D. Mass. 1987) ....................................................................50

*In re IndyMac Mortgage-Backed Securities Litig.*,
  718 F. Supp. 2d 495 (S.D.N.Y. 2010)...............................................................52

*In re Toys R Us FACTA Litigation*,
  2010 WL 5071073 (C.D. Cal. Aug. 17, 2010)..................................................42

*In re Wells Fargo Mortgage-Backed Certificates Litig.*,
  2010 WL 4117477 (N.D. Cal. 2010) .................................................................51

*Kruse v. Wells Fargo Home Mortg, Inc.*,
  2006 WL 1212512 (E.D.N.Y. 2006)..................................................................50

*Nelson v. Napolitano*,
  657 F.3d 586 (7th Cir. 2011) ...........................................................................52

*Nunnally v. Equifax Info. Servs.*,
  451 F.3d 768 (11th Cir. 2006) ...........................................................................6

*Oshana v. Coca-Cola Co.*,
  472 F.3d 506 (7th Cir.2006) ...........................................................................21

*Sawyer v. Atlas Heating and Sheet Metal Works, Inc.*,
  642 F.3d 560 (7th Cir. 2011) ...........................................................................53

*Searcy v. eFunds*,
  No. 08 C 985, 2010 WL 183362 (N.D. Ill. Jan. 20, 2010) ...................................21

*Taub v. Glickman*,
  14 Fed.R.Serv.2d 847 ...........................................................................40

*Wagner v. Lehman Bros. Kuhn Loeb, Inc.*,
  646 F. Supp. 643 (N.D. Ill. 1986) ...........................................................................40

*Warden v. Crown American Realty Trust*,
  1998 WL 725946 (W.D. Pa. 1998) ...........................................................................51

*Williams v. Balcor Pension Investors,* 150 F.R.D. 109, 118 (N.D.Ill.1993) ...............................42

STATUTES

15 U.S.C. § 1681g(a)(3).........................................................................................23

15 U.S.C. § 1681i(a)(1)(A) .....................................................................................5

15 U.S.C. § 1681i(a)(6)(B)(i-vi) .............................................................................5

15 U.S.C. § 1681i(a)(6)(B)(ii) ...............................................................................5

OTHER AUTHORITIES

27 C.J.S., *Dismissal and Nonsuit* § 12 (2012) ..........................................................51

Fed. R. Civ. P. 23(a) .........................................................................................4, 24, 25, 39

Fed. R. Civ. P. 23(a)(4) ......................................................................................23, 45

Fed. R. Civ. P. 23(b)(3) ..................................................................................... passim

Fed. R. Civ. P. 23(e) .........................................................................................51

Fed. R. Civ. P. Rule 41 ......................................................................................51, 52, 53

Fed. R. Civ. P. 41(a) ...........................................................................................51, 52

Fed. R. Civ. P. 41(a)(1)(A) ........................................................................................51

Fed. R. Civ. P. 41(a)(1)(A)(i) ...............................................................................51, 52

Fed. R. Civ. P. 41(b) ...................................................................................................52

Federal Reserve Payment Studies, *at*
    *http://www.frbservices.org/fedfocus/archive_general/general_0311_01.html.* ......................22

Rule 7.3 of the Rules of Professional Conduct ...............................................1, 38, 42, 43

Seventh Amendment to the U.S. Constitution ....................................................8, 9, 10

## INDEX OF EXHIBITS AND ABBREVIATIONS

| # | EXHIBIT TITLE | ABBREVIATION |
|---|---|---|
| **1** | Letter from D. Esquivel to M. Holmes (May 2, 2011) | Esquivel Ltr. (May 2011) |
| **2** | Letter from M. Holmes to D. Esquivel (July 5, 2011) | Holmes Ltr. (July 2011) |
| **3** | SCAN On-Line Data Related to Select Putative Class Members | SCAN On-Line Data |
| **4** | Transcript of Proceedings – Status and Motion (March 22, 2011) | Mar. 22, 2011 Hearing Transcript |
| **5** | SCAN Disclosure Report and Comments Field Related to Consumer Lucretia R. | Lucretia R. SCAN Data |
| **6** | Declaration of Timothy Guastaferro (May 31, 2011) | Guastaferro Decl. |
| **7** | Selected Prospective Class Member Questionnaire Responses | Questionnaire Responses |
| **8** | Transcript of Proceedings – Motion to Compel (November 26, 2008) | Nov. 26, 2008 Hearing Transcript |
| **9** | Plaintiff's Supplemental Responses to Defendants' First Set of Requests for Production of Documents (Dec. 8, 2008) | Supp. Resp. |
| **10** | Redacted vs. Unredacted Bank of America Records for Gladys Searcy | Searcy Records Comparison |
| **11** | Letter from J. Yarbro to M. Holmes (Feb. 21, 2009) | Yarbro Ltr. (Feb. 2009) |
| **12** | Transcript Excerpts from Deposition of Gladys Searcy (Mar. 6, 2009) | Searcy Dep. |
| **13** | Plaintiff's Supplemental Answers to Defendants' First Set of Interrogatories (Dec. 8, 2008) | Supp. Interrog. Answers |
| **14** | Russell Hornbeck Questionnaire (Jan. 21, 2008) | Hornbeck Questionnaire |
| **15** | Letter from J. Yarbro to M. Holmes (Apr. 5, 2010) | Yarbro Ltr. (Apr. 2010) |
| **16** | Letter from M. Holmes to J. Yarbro (Apr. 15, 2010) | Holmes Ltr. (Apr. 2010) |
| **17** | Redacted vs. Unredacted U.S. Bank Records for Russell Hornbeck | Hornbeck Records Comparison |
| **18** | Letter from C. Lieberman, Legal Records Coordinator for U.S. Bank, to J. Yarbro (Dec. 27, 2011) | Lieberman Ltr. (Dec. 2011) |
| **19** | U.S. Bank's ChexSystems Screenshot | U.S. Bank Screenshot |
| **20** | Transcript Excerpts from Deposition of Russell Hornbeck (Oct. 24, 2011) | Hornbeck Dep. |
| **21** | Transcript Excerpts from Deposition of Kimberly Sammons (Mar. 10, 2009) | Sammons Dep. |
| **22** | Transcript Excerpts from Deposition of Cheryl Beaudry (Mar. 10, 2009) | Beaudry Dep. |
| **23** | Letter from M. Holmes to E. Krech (Oct. 12, 2009) | Holmes Ltr. (Oct. 12, 2009) |
| **24** | Letter from M. Holmes to E. Krech (Oct. 13, 2009) | Holmes Ltr. (Oct. 13, 2009) |
| **25** | Transcript Excerpts from Deposition of Elizabeth Krech (May 11, 2011) | Krech Dep. |

| 26 | Declaration of Elizabeth Krech (Dec. 19, 2011) | Krech Decl. |
|---|---|---|
| 27 | Notes from M. Holmes' Communications with Putative Class Members (Bates Nos. Searcy517, 519, 524, 530, 549, 701, 762, 794, 843) | Holmes Call Notes |
| 28 | Plaintiffs' Supplemental Privilege Log (May 20, 2011) | Privilege Log |
| 29 | Emails from M. Holmes to Putative Class Members following responses to his October 2009 Letter (Bates Nos. Searcy557, 705, 716, 754, 756, 757, 777, 779, 780, 843) | Holmes Emails |
| 30 | Follow-up Emails from Holmes to Putative Class Members sent when initial email received no response (Bates Nos. Searcy657, 658, 766) | Holmes Follow-Up Emails |
| 31 | Letter from M. Holmes to G. Searcy (Jan. 10, 2008) | Holmes Ltr. (Jan. 2008) |
| 32 | Report of William Freivogel (Aug. 19, 2011) | Freivogel Report |
| 33 | Declaration of Andrew M. Perlman (Dec. 29, 2011) | Perlman Report |
| 34A | Transcript from Deposition of Andrew Perlman (Feb. 20, 2012) (Part 1 of 2) | Perlman Dep. |
| 34B | Transcript from Deposition of Andrew Perlman (Feb. 20, 2012) (Part 2 of 2) | Perlman Dep. |

**INDEX OF FILED DOCUMENTS AND ABBREVIATIONS**

| TITLE | DOCKET NUMBER | DATE FILED | ABBREVIATION |
|---|---|---|---|
| Plaintiff's Motion for Class Certification | 142 | Sept. 14, 2009 | Initial Certification Motion |
| Memorandum Opinion Granting in Part and Denying in Part Class Certification | 188 | Jan. 20, 2010 | Certification Order |
| Plaintiff's Reply Brief in Support of Plaintiff's Motion for Class Certification | 157 | Nov. 11, 2009 | Reply Brief |
| Defendants' Motion to Reconsider Class Certification Order | 196 | Feb. 3, 2010 | Motion to Reconsider |
| Memorandum Opinion  Decertifying Check Presenter and Bad Check List Classes | 227 | Mar. 31, 2010 | Decertification Order |
| Second Amended Class Action Complaint | 190-1 | Jan. 29, 2010 | Second Am. Compl. |
| Third Amended Class Action Complaint | 236-4 | Apr. 4, 2010 | Third Am. Compl. |
| Plaintiffs' Renewed Motion for Class Certification | 399 | Mar. 1, 2010 | Renewed Certification Motion |
| Plaintiffs' Memorandum in Support of Plaintiffs' Renewed Motion for Class Certification | 400 | Mar. 1, 2010 | Renewed Certification Memo. |
| Declaration of Tonya Weber | 170-2 | Nov. 24, 2009 | Weber Decl. |
| Declaration of Scott Sandlin | 196-1 | Feb. 3, 2010 | Sandlin Decl. |
| Memorandum Opinion Denying Defendants' Motion for Summary Judgment | 299 | Sept. 30, 2010 | Order (Sept. 30, 2010) |
| Declaration of Gladys Searcy | 153-13 | June 24, 2008 | Searcy Decl. (June 2008) |
| Declaration of Gladys Searcy | 159 | Nov. 9, 2009 | Searcy Decl. (Nov. 2009) |
| Plaintiff Elizabeth Krech's Motion for Protective Order to Strike Defendants' First Set of Interrogatories and Requests for Production of Documents | 243 | Apr. 22, 2010 | Mot. for Protective Order |
| Order Granting in Part and Denying in Part Plaintiffs' Motion for Protective Order | 278 | July 22, 2010 | Order (July22, 2010) |
| Initial Case Management Order in Sammons Case | 18-4 | May 5, 2008 | Sammons CMO |
| SCAN Letter to Elizabeth Krech (Oct. 21, 2005) | 160-2 | Nov. 11, 2009 | Krech SCAN Ltr. |
| Plaintiff's Motion to Amend Complaint | 190 | Jan. 29, 2010 | Motion to Amend |
| Plaintiffs' Notice of Voluntary Dismissal Without Prejudice in Sammons Case | 18-5 | May 5, 2008 | Notice of Dismissal |
| Defendants' Memoranda in Opposition to Plaintiff's Motions to Amend Complaint | 208<br>240 | Feb. 24, 2010<br>Apr. 21, 2010 | Memoranda in Opposition |

## **INTRODUCTION**

In the first motion for class certification, the plaintiff sought to certify a class that would have included every person who received a SCAN Disclosure Report, regardless of circumstance. The Initial Certification Motion ignored the existence of over two years of discovery that demonstrated such a class definition was fatally overbroad. The Court denied this unified class, determining that a great number of the proposed class members received SCAN Disclosure Reports that could not have violated the FCRA. The class initially proposed by the plaintiff was both superficial and undermined by the facts.

History repeats itself. In this second attempt at certification, Plaintiffs once again propose class definitions that pretend that the individual circumstances of each SCAN Disclosure Report are irrelevant to the claims being asserted. Plaintiffs once again ignore the extensive data that has been produced in discovery that demonstrates that proof of FCRA violations cannot be established in the overly simplified class definitions put forward. A review of the actual circumstances of individual consumers demonstrate, for a variety of both intuitive and complicated reasons, that a great number of putative class members either lack standing to assert a claim altogether or present individualized issues that make class-wide treatment unmanageable.

In addition, since the filing of the Initial Certification Motion, a serious question has arisen concerning the adequacy of Plaintiffs' counsel to represent the proposed class. Record facts demonstrate that Plaintiffs' counsel has obstructed discovery, allowed his clients to submit false testimony under oath on several occasions, and solicited clients in violation of Rule 7.3 of the Rules of Professional Conduct. This conduct, in light of recent Seventh Circuit authority, renders Plaintiffs' counsel inadequate and class certification inappropriate.

1

## **PROCEDURAL BACKGROUND**

The parties originally briefed class certification in the fall of 2009. The sole plaintiff at the time, Gladys Searcy, sought certification for a unified class of all recipients of a 'SCAN Consumer File Disclosure Report' ("SCAN Disclosure Report") during the alleged class period. *See* Initial Certification Motion, at 1. This Court ruled that the class put forward in the motion was overbroad and could not be certified. Certification Order, at 8.

In her reply brief, however, Searcy argued that the Court should consider certification of three newly defined classes that had not been pled or disclosed in discovery. *See* Reply Brief, at 5-6. Plaintiff argued that the Court should create classes based on alleged legal deficiencies that certain groups of consumers could purportedly use to attack the sufficiency of the SCAN Disclosure Reports under the FCRA. Defendants had only fourteen days to file a surreply and thus, the supplemental briefing focused primarily on the weaknesses of the newly defined legal theories and on Searcy's inadequacy to serve as a class representative.

The Court certified two of the three classes proposed in the Reply Brief – the Bad Check List and Check Presenter classes. The Court did not certify a SCAN On-Line class and did not address whether the requirements of Rule 23(b)(3) could be met because Searcy had no standing to bring a SCAN On-Line claim. The Court noted two issues in its certification decision that might warrant further review, depending on new facts. One was Searcy's credibility, including whether she had, in fact, presented a check to a SCAN merchant. Certification Order, at 13-14. The second issue was whether every merchant that received the negative distributed file used the file every time a consumer presented a check for payment. *Id*. at 20-21.

On February 3, 2010, Defendants filed a motion to reconsider class certification based on these two issues. First, Defendants presented sworn testimony from a representative of Searcy's

2

bank that proved she had lied in a sworn declaration. *See* Motion to Reconsider, at 7. Second, Defendants presented sworn testimony from Scott Sandlin, the Senior Director of Financial Services for Wal-Mart. Sandlin testified that Wal-Mart did not use the SCAN negative database in every consumer check transaction. Wal-Mart relied on its own internal, negative database first, and did not "hit" other check verification services if it received a "hit" on its own internal file. *See id*. at 3-4.

The Court granted the Motion to Reconsider and decertified the Check Presenter and Bad Check List classes. Emphasizing that Searcy's "failure to provide any evidence in support of her declaration cast significant doubt on the veracity of her sworn statement," the Court held that this lack of credibility rendered her inadequate to serve as the representative for any class. Decertification Order, at 13. Accordingly, the Court did not address Defendants' argument that the Check Presenter class should be decertified based on the additional evidence from Wal-Mart.

In the same order, the Court allowed Plaintiff's counsel to file an amended complaint and bring in Elizabeth Krech as a putative class representative. Krech asserted the filing of the *Sammons/Beaudry* lawsuit (in June 2007) and the *Searcy* lawsuit (in February 2008) should toll the FCRA's two-year statute of limitations, not only for her individual claims, but for the three putative classes, which were being pled for the first time. Second Am. Compl., ¶ 90; s*ee also* Third Am. Compl., ¶ 99 (adding Hornbeck as a proposed representative).

In the two years since the initial round of class certification briefing, the parties have continued to engage in extensive discovery, which has included the production of hundreds of thousands of additional documents. The record now includes detailed records related to each of the 150,000 separate SCAN Disclosure Reports, including the text of the reports and their accompanying cover letters. These individual letters and SCAN Disclosure Reports makes

previously produced materials, such as the notes taken by SCAN representatives during phone calls with putative class members, even more instructive.

A number of pertinent facts have emerged that render the Rule 23(a) and 23(b)(3) analyses ripe for appropriate consideration by the Court with respect to all three classes. Indeed, these developments bolster Defendants' previous opposition to certification and make clear that none of the proposed classes meets the requirements for certification under Rule 23.

## ARGUMENT

Plaintiffs' Renewed Certification Motion utterly fails to address intervening events since decertification and only cursorily addresses the adequacy of the new Plaintiffs and the Rule 23(b)(3) requirements for SCAN On-Line. Defendants expect that Plaintiffs will argue that the Court is precluded from considering the effect on class certification of intervening events and discovery regarding the three classes at issue. Such notion is belied by the fact that the Court has already certified and decertified classes in this case based upon subsequently discovered evidence. Further, because Searcy engaged in what can only be considered sandbagging during the initial class certification briefing, Plaintiffs had a mere 14 days to respond to completely new theories of liability that had never before been pled. Given a reasonable amount of time to assess these class definitions and conduct discovery, Defendants have uncovered even greater deficiencies that present insurmountable hurdles to class certification.[1]

## I.    AS DEFINED BY PLAINTIFFS, THE PROPOSED CLASSES ARE OVERBROAD AND CANNOT BE CERTIFIED.

This Court has already held that certification is inappropriate where (1) the class definition includes persons that "would have no claim akin to that of other class members," or

---

[1] Defendants adopt and incorporate by this reference their arguments in opposition to the Initial Certification Motion. Except where there are additional relevant facts or the Court has not already addressed an argument, Defendants will not re-iterate arguments previously made.

(2) "it is apparent that [the class] contains a great many persons who have suffered no injury at the hands of the defendant." Certification Order, at 7-8 (quoting *Kohen v. Pac. Inv. Mgmt. Co., LLC*, 571 F.3d 672, 677 (7th Cir. 2009)). Even assuming Plaintiffs' interpretation of SCAN's §1681g obligations is correct, numerous putative class members received SCAN Disclosure Reports that could not possibly violate the FCRA. Stated differently, numerous putative class members have no claim akin to that of other members and have suffered no injury – statutory or otherwise.

Each of the class definitions extends to "all persons who received a 'SCAN Consumer File Disclosure Report' from June 18, 2005 to July 20, 2008." The respective class definitions then specify alleged deficiencies in the SCAN Disclosure Reports. Differentiating class members from non-members based on the *type of claim* presupposes that everyone who received a SCAN Disclosure Report has standing to bring a claim under § 1681g. This is not true.

Thousands of putative class members received SCAN Disclosure Reports after reinvestigations. Reinvestigations were required under the FCRA whenever information on the SCAN negative distributed file was "disputed by the consumer." 15 U.S.C. § 1681i(a)(1)(A). After each and every reinvestigation, SCAN was required to provide consumers with notice of the reinvestigation results, including "a *consumer report* that is based upon the consumer's file as that file is revised as a result of the reinvestigation." *Id.* § 1681i(a)(6)(B)(ii) (emphasis added). While the FCRA requires 1681g disclosures only upon an affirmative request, SCAN was legally mandated to send these post-reinvestigation consumer reports even if not requested. *Id.*

Consumer *reports* sent after reinvestigations are not subject to the § 1681g consumer *disclosure* provisions at issue in this litigation. To be certain, post-reinvestigation consumer reports must comply with the FCRA. *Id.* § 1681i(a)(6)(B)(i-vi). These detailed, statutory

requirements, however, are notably distinct from the requirements at issue in this case (the disclosure of the entire file, the sources of information, and consumer report recipients required by § 1681g). *Nunnally v. Equifax Info. Servs.*, 451 F.3d 768, 772-76 (11th Cir. 2006). In *Nunnally,* the plaintiffs brought an action under § 1681i claiming that reinvestigation reports required the disclosure of the consumer's complete file. *Id.* at 772. The Court rejected this argument, emphasizing the textual distinction between disclosure of a *consumer report based on a consumer's revised file* under § 1681i and disclosure of *all information in the file* under § 1681g. *Id.* at 772-73; *see also Baker v. TransUnion*, 2010 WL 2104622, at *5 (D. Ariz. 2010).

Plaintiffs erroneously plead that "following a dispute by a consumer and reinvestigation by the consumer reporting agency, the consumer reporting agency is required to provide a disclosure pursuant to 15 U.S.C. § 1681i[], *the contents of which must comply with…§1681g*." Third Am. Compl., ¶ 19 (emphasis added). Undisputed case law, such as *Nunnally* and *Baker*, makes it clear that § 1681i reinvestigation consumer reports do *not* need to conform to § 1681g. The statutory text affirmatively states when disclosures required by other FCRA provisions are subject to § 1681g, but § 1681i has no such requirement.

Plaintiffs' overly broad class definitions would treat thousands who indisputably received disclosures pursuant to § 1681i as if they had requested a copy of their entire file under § 1681g. Plaintiffs cannot use class definitions to extend class membership to persons who have no cause of action for a § 1681g violation. Thus, because the class definitions are too broad (i.e. they treat recipients of § 1681g disclosures and § 1681i consumer reports uniformly), the Court should deny certification.

## II. THE REPRESENTATIVE PLAINTIFFS CANNOT ESTABLISH THE AMOUNT OF DAMAGES ON A CLASS-WIDE BASIS.

In the Initial Certification Motion, the plaintiff argued for a single class of everyone who had received a SCAN Disclosure Report. That proposed class definition separated class members from non-class members in a typical and straightforward way – separating individuals who had claims from those who did not. The plaintiff abandoned that proposed class definition in the Reply Brief and proposed, in its place, three classes that divided class members *not* by individual, but rather by the type of legal arguments available to them under the FCRA.

The proposed classes here are not distinct, separable groups so much as they are three overlapping classes, each advancing distinct legal theories for establishing the same claim. Specifically, members of the Bad Check List class are individuals who argue that their presence on the SCAN negative distributed file constituted a consumer report, thereby requiring SCAN to identify the merchants who received the negative distributed file in those consumers' disclosures. The members of the Check Presenter class are individuals who argue that their presentation of a check to a merchant who received the negative distributed file constituted a consumer report, regardless of whether the file included any information about that consumer, thereby requiring SCAN to identify the merchants who received the negative distributed file in those consumers' disclosures. The members of the SCAN On-Line class are individuals who argue that their transactions with merchants who used SCAN On-Line constituted consumer reports, thereby requiring SCAN to identify those transactions in those consumers' disclosures. The recipients of SCAN Disclosure Reports can be members of one, two, or all three classes. Current Plaintiffs illustrate that fact. As proposed, Searcy is a member of the Bad Check List class; Krech is a member of the Check Presenter and SCAN On-Line classes; and Hornbeck belongs to all three.

This shift in the manner in which class membership is defined – from individual characteristics to groupings by legal arguments – has fundamental consequences for the Court's ability to manage this case through trial as a class action. From certification through final resolution, determining class membership by the legal theories asserted will complicate class administration. Plaintiffs apparently assume that each of the three legal theories gives rise to an independent claim under the FCRA. According to Plaintiffs, because Krech is a member of the SCAN On-Line and Check Presenter classes, she would have two claims under the FCRA, which would entitle her to statutory damages ranging from $200 to $2,000. Plaintiffs' assumption, however, is incorrect. Krech received only one SCAN Disclosure Report and can bring only one claim under § 1681g. Rather than provide her with two claims, Krech's dual class membership provides her with two theories of recovery (Check Presenter and SCAN On-Line) for one claim.

As opposed to the typical class action where each class member has the same claim as the representative and wins or loses with them, the classes here include overlapping groups who have different theories of recovery to establish generally just one claim. Plaintiffs provide the Court with no explanation of how to administer such a class.

Further complications arise as a result of Defendants' Seventh Amendment right to a jury trial on a claim for statutory damages, including a right for the jury to determine the *amount* of statutory damages. *See Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998). Plaintiffs offer no explanation how the proposed class structure – based on legal arguments rather than individuals – can be managed as a class action, consistent with Defendants' Seventh Amendment right to a jury trial on damages.

An example illustrates the impossibility of conducting a class-wide trial consistent with constitutional requirements. Krech received one SCAN Disclosure Report, but she is the

proposed representative plaintiff for two classes, i.e. two different legal theories as to why her SCAN Disclosure Report could have violated the FCRA. Suppose that the jury finds both theories availing and, on liability, rules in favor of both the Check Presenter and Scan On-Line classes. The jury will then be asked to determine an amount of statutory damages (between $100 and $1,000) with respect to the *one* SCAN Disclosure Report received by Krech. How do Plaintiffs propose to use the resulting statutory damages amount to set damages for the members of the two classes? The damages assessed by the jury to Krech could arguably be used to set a statutory damage amount for a person in these same two classes, but how would that verdict amount be applied to someone who is *only* in either the Check Presenter or SCAN On-Line class? Suppose further that the jury awards Krech $150 in statutory damages. The Court could not assign $75 to the members of each class she represents because that is not within the statutory range. Similarly, it would be unfair to Defendants to award $150 to members in each of the two classes, when many class members will have only one alleged deficiency. The same problem exists with respect to Hornbeck, who has three theories of liability. [2]

In addition, Plaintiffs have failed to explain how the amount of statutory damages will be established for class members in the event the jury awards different statutory damages amounts to Krech and Hornbeck, who both allege theories as representatives of the Check Presenter and SCAN On-Line classes. Based on the trial, a jury might award $150 to Krech (representative for two classes) but only award $100 to Hornbeck (representative of three classes). Plaintiffs offer no explanation how such a verdict would be applied on a class-wide basis. In reality, these

---

[2] Furthermore, Defendants are aware of no authority to support apportionment by a jury of a damages verdict for Krech and Hornbeck based upon legal theories leading to liability. Such an apportionment would not seem to be fair to members of only one class (who have only one theory of liability) because an apportionment would likely dilute the amount of damages they would have received if they had a representative who had proven a violation with respect to that theory alone.

9

classes cannot receive jury verdicts for the amount of statutory damages that is consistent with Defendants' Seventh Amendment and overall due process rights.

This manageability problem is another instance of Plaintiffs' counsel attempting to gloss over difficult, individual issues. In their pleadings, Plaintiffs skirted the issue by erroneously alleging that "damages for each class member can be *administratively* determined." Third Am. Compl., ¶ 115 (emphasis added). Of course, under the Supreme Court's decision in *Feltner*, the amount of statutory damages cannot be administratively determined; Defendants are entitled to a jury decision on that question. Even after Defendants raised this issue with Plaintiffs' counsel in discovery, Plaintiffs continued to ignore the issue, both in their response to Defendants during discovery and in their Renewed Certification Motion. In a letter on May 2, 2011, Defendants reminded Plaintiffs' counsel it is black letter law that the Seventh Amendment provides a right to jury trial on a claim for statutory damages, including a right for the jury to determine the amount of statutory damages, and served an interrogatory on this issue. *See* Ex. 1, Esquivel Ltr. (May 2011). In response, Plaintiffs merely reiterated their erroneous argument that "the allocation of damages amongst class members will be purely an administrative function performed by the Court, awarding each class member his or her statutory damages and punitive damages based on the number of claims(s) that each class member possesses." Ex. 2, Holmes Ltr. (July 2011).

Because the award of statutory damages is subject to myriad individual distinctions and the award of such damages must be established by a jury under the Seventh Amendment, the proposed classes do not meet the Rule 23(b)(3) criteria for predominance and manageability, and therefore cannot be certified for resolution at trial.

III. **EACH OF THE PROPOSED CLASS DEFINITIONS INDEPENDENTLY SUFFERS FROM OVERBREADTH OR FAILS TO MEET THE REQUIREMENTS OF RULE 23(B)(3).**

Certification is inappropriate where (1) the class definition includes persons that "would have no claim akin to that of other class members," or (2) "it is apparent that [the class] contains a great many persons who have suffered no injury at the hands of the defendant." Certification Order, at 7-8. As this Court has already found, such overbroad classes cannot be certified.

In order to certify the proposed classes, the Court must also find that common questions predominate and class treatment is superior to another method for resolving the claims. Fed. R. Civ. P. 23(b)(3). These predominance and superiority requirements take into account four factors, Fed. R. Civ. P. 23(b)(3), the most litigated of which is "manageability." Moore's Federal Practice § 23.46(2)(e) (3d ed. 2011). A court must consider "the likely difficulties in managing a class action" among the four Rule 23(b)(3) factors. Fed. R. Civ. P. 23(b)(3)(D).

Each of the classes proposed by Plaintiffs fails to meet the overbreadth test, the "manageability" requirement of Rule 23(b)(3), or both.

A. **Proposed SCAN On-Line Class**

Plaintiffs grossly oversimplify the record in asserting that "[t]he relevant facts of *all putative SCAN On-Line Class Members are the same* and Defendants' failure to include this information . . . either violated the FCRA or it did not." Renewed Certification Memo, at 14. For just over 40,000 putative class members, SCAN does have records of SCAN On-Line transactions associated with either the bank account number or driver's license number reported by the consumers to SCAN. Because the FCRA authorizes disclosure of only a consumer's own information and not that of others, however, a significant percentage of the putative class members do not have the SCAN On-Line claim articulated in the Complaint.

Some merchants used SCAN or SCAN On-Line to cash payroll checks. Each time an employer had one of its payroll checks presented for cashing and processed through SCAN On-Line, a new SCAN On-Line transaction would be recorded and associated with that employer's bank account. Hence, an employer's bank account number could be associated with thousands of SCAN On-Line transactions depending on the number of employees cashing checks written on that account. If the *employer's* bank account had negative information in SCAN , a merchant might refuse to cash the *employee's* paycheck and refer her to SCAN.

Numerous employees were declined attempting to cash their paychecks, called SCAN, reported *their employer's* account number from the face of the check, and received blank SCAN Disclosure Reports.  These disclosures, however, were properly blank because any SCAN On-Line transactional data was associated with the employer and not the employee. Take for instance, Desiree T.[3] Desiree has 2,183 SCAN On-Line transactions associated with the checking account number she reported to SCAN. These 2,183 transactions were for more than $1 million dollars of checks processed by SCAN On-Line merchants between September 27, 2006 and September 25, 2007. The presence of these 2,183 transactions is what qualifies her for the SCAN On-Line class as defined by Plaintiffs. Similarly, Erica H. has hundreds of transactions associated with the account number she reported to SCAN, and most of these checks are for more than $1,000. The SCAN On-Line records contain a multitude of similar examples where transactions reported are obviously not linked to the consumer's bank account.

Desiree and Erica both attempted to cash payroll checks. These checks were declined by merchants using SCAN, which led to referrals to SCAN and eventually to the receipt of SCAN Disclosure Reports. An examination of the records of their calls to SCAN consumer service

---

[3] Because the putative class members are not parties, full names or other identifying information is not included. The SCAN On-Line Data related to the referenced consumers is filed under seal as Collective Ex. 3.

confirms that these individuals reported third-party account numbers to SCAN, but properly received SCAN Disclosure Reports that did not include the credit information of the third party account holder.

Desiree called to report that a Hannaford Brothers store – notably a merchant that used the traditional SCAN product rather than SCAN On-Line – declined to cash her payroll check in September 2007. She provided her employer's account number to SCAN, along with her own driver's license number. She subsequently was mailed a SCAN Disclosure Report, which included *her* driver's license number but did not include *her employer's* checking account number. This report was blank – and properly so under the FCRA due to the apparent absence of information about Desiree in SCAN's files. There is nothing in the extensive record that would suggest this class member ever had a SCAN On-Line transaction. Nor is there any indication that SCAN ever possessed or distributed credit information about her to anyone. Indeed, it is likely Desiree did not have a checking account at all given that she was attempting to cash her payroll check at a merchant rather than her own bank. Similarly, Erica was declined when attempting to cash her paycheck at a liquor store, but received what appears to be an accurate report showing nothing associated with her file and *nothing associated with her employer's checking account*.

The SCAN On-Line data demonstrates that a significant percentage of the putative class members reported third-party checking accounts to SCAN and thus had no right to the disclosure of the associated transactional data. As a sample, Defendants analyzed the SCAN On-Line transactional data for February 2007, which includes Hornbeck's SCAN On-Line transactions. This file includes a total of 737 putative SCAN On-Line class members who requested SCAN Disclosure Reports in February 2007 and allegedly have associated SCAN On-Line transactional data during the year preceding the request. More than 15% of these consumers had either 50

separate transactional entries and/or checks totaling more than $5,000 in the preceding year.[4]

Given the small number of merchants that used SCAN On-Line, it would be highly unusual for

an individual check writer to have transactions of this magnitude. As with Desiree and Erica,

Defendants will be able to establish that a large number of the proposed SCAN On-Line class

members do not have SCAN On-Line claims based upon the unusually large number of SCAN

On-Line transactions that are associated with the identifiers they reported to SCAN.

Accordingly, certification of the proposed SCAN On-Line class as currently defined is

inappropriate because it is overbroad.

   The record does not permit a simple modification of the proposed class definition. The

SCAN On-Line transactional data alone cannot be used to identify individuals with and without

viable FCRA claims. While the parties would likely notice extreme examples like Desiree and

Erica, the third-party account information is pervasive and difficult to detect. For example,

Phillip D. is a putative class member with only one (1) associated SCAN On-Line transaction.

An in-depth review of Phillip's records, however, demonstrates that he attempted to cash a check

associated with a checking account other than his own. Similar to Desiree and Erica, therefore,

the SCAN On-Line transactional data associated with the account he reported has absolutely

nothing to do with Phillip. While Phillip reported that his decline occurred on February 22, 2007

at a merchant using the traditional SCAN product, the associated SCAN On-Line transaction

occurred on December 15, 2006 in a different location. Phillip has no SCAN On-Line claim, but

that determination requires looking at four different data sources simultaneously: (1) the SCAN

On-Line transactional data; (2) the SCAN Disclosure Report, (3) the self-reported decline data,

and (4) the CCAP comment data that describes the substance of his call with the SCAN call

---

[4] This calculation excludes duplicate transactional entries and/or checks associated with each consumer.

representative. *See also* data related to Jennifer B. (attempted to cash third-party check; only 2 SCAN On-Line transactions) and Teresa B (attempted to cash paycheck; only 11 SCAN On-Line transactions), included in Collective Ex. 3.

Unlike Desiree and Erica, it is impossible to identify Phillip, Jennifer, Teresa, and other similarly situated putative class members by using the SCAN On-Line transaction data alone. Indeed, it is necessary to examine multiple data sources associated with each of the putative class members to make this determination. For each of the 40,000 individuals, the parties would need to analyze a number of the 100 individual spreadsheets of data in the record, identify which of these spreadsheets contains the applicable data, then access these spreadsheets simultaneously, as well as the text of the individual's SCAN Disclosure Report and the notes from consumer phone calls.

The process of assessing FCRA liability for the SCAN On-Line class would be utterly unmanageable for the parties and the Court. The assessment requires not only an individualized review, but a deeply complicated one. The analysis will likely require persons with knowledge of the case, including the terminology and codes utilized by SCAN's internal system. To the extent Plaintiffs and Defendants do not readily agree on these individualized assessments, it is unclear how such disputes would be resolved by the Court outside the appointment of a special master.

Plaintiffs have had the SCAN On-Line transactional data and the description of individual consumer calls to SCAN for over three years. Plaintiffs have also long had knowledge of the fact that SCAN was used to process checks presented to a merchant for check cashing. Without analyzing the actual facts in a meaningful way, Plaintiffs suggest that this class of over 40,000 people is "prototypical" for certification under Rule 23(b)(3) and that "generalized

evidence will prove liability, obviating the need to examine each class member's individual position." Renewed Certification Memo., at 14.

After almost five years of litigation, including the production of millions of pages of electronic and hard copy documents, numerous discovery motions, certification, decertification, and renewed certification briefing, it would be highly inappropriate to re-open discovery, as would be required if Plaintiffs were to propose yet another alternative class definition in their reply memo. Thus, certification of the SCAN On-Line class should be denied.

### B.    Proposed Bad Check List Class

Plaintiffs have conceded that determining membership in the Bad Check List class requires an individualized review of each of the approximately 150,000 SCAN Disclosure Reports that were produced after the Court's initial class certification decision.    Plaintiffs, however, misrepresent the manageability of such a review. *See e.g.,* Reply Brief, at 11 (suggesting review is a "purely ministerial" task). While the Court was correct in finding that "the information needed to determine class membership is in Defendants' possession and only requires a review of their records," Certification Order, at 17, subsequent discovery demonstrates that completing such a review is unmanageable.

The Court appeared to begin to recognize the absurdity of such an undertaking at the March 22, 2011 hearing in this matter:

> Mr. Holmes:    There is 180,000 [sic] of those [SCAN Disclosure] reports that need to be reviewed.
>
> The Court:    Not every one of them. You are not telling me that, are you?
>
> Mr. Holmes:    We need to determine who the class members are. They have to be reviewed in order to –
>
> The Court:    You are not going to review each of 180,000 documents are you?"
>
> Mr. Holmes:    Ultimately, we will have to in order to –

16

| The Court: | "Well, ultimately, but there must be some way to categorize things or to summarize them. You are telling me some lawyer is going to look at each one of these 180,000 documents?" |
| Mr. Holmes: | "If we have to determine who is the members of the bad check list class." |

Ex. 4, Mar. 22, 2011 Hearing Transcript, at 6:10-7:2. Plaintiffs have not suggested in their briefing a simpler way to categorize or otherwise identify Bad Check List class members.

As Defendants have pointed out previously, even a hasty one-minute review of the 150,000 different SCAN Disclosure Reports would take a person working 8-hour days a full 312.5 calendar days, including weekends. For many of the SCAN Disclosure Reports, one minute is insufficient to determine class membership. There must be individual review of each disclosure, which will oftentimes require examining numerous pages to compare the date the SCAN Disclosure Report was issued with the dates of the items listed. *See* Weber Decl. ¶ 12.

For some consumers, the analysis of the SCAN Disclosure Report alone will be insufficient without review of other records, such as the SCAN consumer database or notes from consumer phone calls. For example, consumer Lucretia R.'s received a SCAN Disclosure Report dated March 12, 2007 that contains cleared items dated March 3 and 9, 2006. At first glance, it appears that this consumer is not a member of the Bad Check List class because the negative information on her SCAN Disclosure Report falls outside the one-year period preceding March 12. The relevant date for assessing class membership, however, is the date of the consumer's request for her SCAN Disclosure Report, not the date of the disclosure itself. Because the request date is not included in the disclosure, the reviewer must look elsewhere to determine whether this consumer had information in the SCAN negative database within the year preceding her request. As evidenced by the comments field related to Lucretia's call with SCAN, she contacted SCAN on February 24, 2007. The negative items listed on her SCAN Disclosure Report – cleared on

March 3 and 9, 2006 – fall within the previous year, making her a potential member of the class after all. *See* Ex. 5, Lucretia R. SCAN Data.

As examples like this confirm, determining membership in the Bad Check List class is arguably an objective task, but it is neither a "purely ministerial" nor manageable one. The individualized review (by both parties) of hundreds of thousands of pages of SCAN Disclosure Reports and other documents related to consumers is an enormous and complicated task. There is ample opportunity not only for human error but also for differing interpretations of the documents. Defendants anticipate that there will be significant disagreement based on differing interpretations of the documents, and that court intervention will almost certainly be necessary to resolve disputes about which consumers are actually members of the class. This will require the Court to rule on the proper interpretation of hundreds (if not thousands) of documents. "The Court should not have to engage in lengthy, individualized inquiries in order to identify members of the class," but that is exactly what will be required before notice can be issued to the proposed Bad Check List class. *Duchardt v. Midland Nat'l Life Ins. Co*., 265 F.R.D. 436, 443 (S.D. Iowa 2009) (citing *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981)). Despite having had this information for years, Plaintiffs present no analysis that could provide reassurance that this will be a manageable process that justifies the utilization of class treatment.

### C.   Proposed Check Presenter Class

#### 1.   Defendants Have Obtained Proof From Retailers That the Check Presenter Class Cannot Meet the Requirements of Rule 23(b)(3).

Even if there were some way to identify the Check Presenter class members with any reliability (and there is not – *See* section III(C)(2) below), not all of the Check Presenters would have Check Presenter claims. Because many SCAN merchants did not process *every* check presented through the SCAN database, an individual inquiry would be required to determine

either class membership or liability. The record, in fact, is uncontroverted that numerous merchants, including the nation's largest retail chains, regularly processed checks without utilizing the SCAN negative distributed file.

Previously in support of this argument, Defendants offered the sworn declaration of Tonya Weber, the defendants' company representative. Weber explained that merchants do not run a consumer's identifiers against all check verification services for every consumer transaction. *See* Weber Decl. ¶ 6. SCAN's largest merchants (including Target, Wal-Mart, and J.C. Penney) analyzed their own internal databases first. Thus, if a merchant's internal database generated a decline, the consumer's identifiers were never processed through SCAN. *Id.* ¶ 8.

The Court did not reject the merits of Defendants' argument, but instead questioned the reliability of the company representative's testimony. Specifically, the Court held:

> Though Defendants' own employees make generalized statements that retailers that have purchased the SCAN service choose not to use the service in deciding to accept a consumer's check, Defendants have not presented *any evidence from retailers* to support the counterintuitive proposition that stores that pay monthly fees for SCAN do not employ it. *In the absence of such evidence*, we cannot say at this point that individualized issues will predominate over the central common legal questions of this litigation.

Certification Order, at 20-21 (emphasis added).

Defendants did not have sworn evidence from retailers at the time they filed their surreply in opposition to the first class certification motion because the Check Presenter class had been first proposed by Searcy only 14 days earlier. Since that time, however, Defendants have obtained direct evidence from retailers that confirms Weber's testimony. Specifically, Defendants have submitted the sworn declaration of Scott Sandlin, the Senior Director of Financial Services for Wal-Mart and a twenty-year employee, who explained: (1) during the relevant time, Wal-Mart relied on its internal negative file, TeleCheck, and the SCAN negative

distributed file in deciding whether to accept a check; (2) consumer identifiers were first run against Wal-Mart's internal negative file; (3) if there was a hit, the consumer's check was declined and Wal-Mart did not query the SCAN database; and (4) after a hit on its internal database, Wal-Mart considered information from other sources regarding bad checks at other retailers irrelevant. Sandlin Decl. ¶¶ 2-5.

Since the Court's initial decision on class certification, Defendants have also obtained the sworn declaration of Timothy Guastaferro, the Director of Loss Prevention and eCommerce/Pay Systems for Sears Holdings Management Corporation. *See* Ex. 6, Guastaferro Decl. ¶¶ 1-2. Guastaferro's declaration confirms that Kmart followed the same process as Wal-Mart for the same reasons. Checks were processed against Kmart's internal negative file first and, if there was a hit, the check was declined without utilizing the SCAN negative distributed file at all. *Id.* ¶¶ 2-4. The Court now has sworn testimony in support of this critical fact from three separate witnesses. Two of those witnesses are retail merchants with nationwide stores, one of whom is the largest retail chain in the world.

In the two years since the Court's initial certification decision, Plaintiffs have not even attempted to gather contrary evidence. In 2009, Plaintiffs represented to the Court that "if and when a merchant used SCAN *is easily ascertainable from the merchants themselves*" and such inquiry would result in "most, if not all" indicating "we use SCAN to process all of our checks." Reply Brief, at 20 (emphasis added). Plaintiffs, however, made no attempt to depose Sandlin, Guastaferro, or any other representative from Wal-Mart, K-Mart, Target or J.C. Penney. Neither have Plaintiffs attempted to ascertain from any other of the more than 200 SCAN merchants how they used the SCAN product to process checks. Based on the record facts, it is indisputable that SCAN's largest merchants processed consumer checks without utilizing the SCAN negative

distributed file in each instance. Likewise, it is readily apparent that individualized inquiries would be necessary to establish liability based on merchant acceptance procedures and records. Consequently, the proposed Check Presenter class cannot satisfy the predominance requirements of Rule 23(b)(3), and the Court should decline to certify the Check Presenter class.

### 2. **A Questionnaire Is Not a Proper Methodology to Ascertain Members of the Check Presenter Class.**

"It is axiomatic that for a class action to be certified a 'class' must exist." *Oshana v. Coca-Cola Co.,* 472 F.3d 506, 513 (7th Cir. 2006) (citing *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir.1981)). As this Court has recognized, "to be ascertainable, a class must be identifiable as a class and membership within it must be determined by application of precise, objective criteria." *Searcy v. eFunds*, No. 08 C 985, 2010 WL 183362, at *7 (N.D. Ill. Jan. 20, 2010). Here, discovery has established there is no such appropriate method to identify members of the proposed Check Presenter class.

In the Certification Order, the Court suggested that questionnaires or surveys be sent to prospective class members in order to establish membership in the class. Certification Order, at 19-20. Subsequent events regarding the proposed class representatives demonstrates that the use of questionnaires or surveys to establish class membership is inconsistent with the ascertainability requirement inherent in Rule 23 and the ability to manage the proceedings as a class action under Rule 23(b)(3). It is now clear from the record that such questionnaires "could only lead to speculative or perjured responses." *See Eovaldi v. First Nat'l Bank of Chicago,* 71 F.R.D. 334, 336 (N.D. Ill. 1976). Beyond the previous examples of the perils of a questionnaire submitted by Defendants,[5] discovery related to two of the three named plaintiffs has provided the

---

[5] Plaintiffs' counsel sent a letter to over 2,500 prospective class members in Tennessee and Illinois, asking that they respond with details about their interactions with SCAN. One-hundred fifty-two (152) individuals responded in writing or by telephone. Of these 152 respondents, over 20% of them (32 of 152) could not remember anything

best evidence that responses by putative class members will likely lead to speculative, or even perjured, results.

For example, Hornbeck's recollection of when and where he presented checks – whether simply inaccurate or perjured – highlights the problems with questionnaires. As discussed more fully in section IV(A)(2)(c) below, even after having the benefit of a 6-hour deposition preparation session in which he undoubtedly reviewed his bank records, Hornbeck was unable to remember basic information about those records. The parts of the information he did remember – including presenting a check to a Shell gas station – were demonstrably inaccurate. Of course, recipients of a questionnaire will likely not have the benefit of check records from four to eight years ago. Thus, the potential for faulty recollections is obvious and is further exacerbated by the dramatic shift in check usage during the relevant time period. [6]

Another example is Searcy, who testified in a sworn declaration that she had written a "starter check" to a merchant from a bank account she opened on the same day that she requested her SCAN Disclosure Report. Her bank, however, presented a declaration stating that the bank account had been opened on-line, and the bank did not issue "starter checks" for on-line account openings, demonstrating that Searcy lied in her declaration. This false declaration was made after the discovery of her complete bank account records and years of litigation about the declines. Earlier in the case, Searcy had actually presented sworn testimony that she presented checks to SCAN merchants on at least three occasions, but the records contradicted each one.

---

about their interactions with SCAN. *See* Collective Ex. 7, Questionnaire Responses ("no recollection dealing with SCAN"); ("I have no knowledge of eFunds, DPPS, or SCAN, but would be interested in knowing how I might benefit from being a member of your plaintiff class."); and ("No experience. Don't know what you are talking about.").

[6] Checks accounted for 47.6% of all noncash payments in 2003, but only 22% in 2009. *See* Federal Reserve Payment Studies, *at http://www.frbservices.org/fedfocus/archive_general/general_0311_01.html.*

In short, in the two years since this Court's Decertification Order, Plaintiffs have not identified a reliable way to identify the members of the Check Presenter class using "precise, objective criteria." The current suggested methodology – a questionnaire – is demonstrably unsatisfactory. As was the case with both Searcy and Hornbeck, Defendants have a right to prove that someone seeking statutory damages did not actually present a check to a SCAN merchant, a fact discoverable from bank account records. Plaintiffs have either presented a class that cannot satisfy the ascertainability requirements for class certification or a class that would necessitate an unmanageable, individualized review of consumer data. The Court, therefore, should decline to certify the Check Presenter class.

3. **Based Upon This Court's Summary Judgment Ruling, if the Court Certifies a Check Presenter Class, the Class Members Cannot Include Consumers Who Are Also Bad Check List Class Members.**

Plaintiffs have acknowledged that the linchpin of each of their proposed classes is a finding that Defendants issued a "consumer report." Reply Brief, at 5; *see also*, 15 U.S.C. § 1681g(a)(3). In denying Defendants' Motion for Summary Judgment, this Court ruled that the mere distribution of a coded list – i.e., the account and driver's license numbers associated with negative check data – constituted the issuance of a consumer report, irrespective of whether a customer presented a check that matched the information on the SCAN negative distributed file. Order (Sept. 30, 2010), at 13. While Defendants strongly disagree with this ruling, until appealed, this decision dictates the legal standard in this case for when a consumer report is issued.

Now that this Court has held that merchants procured a consumer report from SCAN when they received the SCAN negative distributed file, it cannot also be true that SCAN issued a second consumer report – without any further action – whenever a consumer on the distributed

file later presented a check for payment. Stated differently, the two options for when SCAN issued consumer reports – by mere distribution of the SCAN distributed file or, alternatively, when a consumer presented a check and the consumers' identifiers matched identifiers on the SCAN negative distributed file – are mutually exclusive. Because the Court has determined that the former is the issuance of a consumer report, the latter, based upon a conflicting legal conclusion, cannot be the issuance of a consumer report. Accordingly, in the event the Court certifies a Check Presenter class, its definition must at least be revised to consist only of individuals who are not also members of the Bad Check List class.

**IV. THE COURT SHOULD DENY CERTIFICATION BECAUSE PLAINTIFFS AND COUNSEL ARE INADEQUATE REPRESENTATIVES UNDER RULE 23(A)(4).**

Despite focusing their brief entirely on adequacy, Plaintiffs give the Rule 23(a) analysis short shrift. Throughout, Plaintiffs stress that Krech and Hornbeck, based on "Defendants' *own* records," have Bad Check List, Check Presenter, and SCAN On-Line claims. Renewed Certification Motion, at 4, 5, 7, 10, 12. Proving that Krech and Hornbeck are class members – that they have *standing* to raise the claims asserted – is hardly the sole focus of Rule 23(a). By Plaintiffs' logic, every member with standing to be a class member is adequate to represent the class. Distinct from standing, adequacy under Rule 23 concerns whether the putative class representative and counsel can be trusted to serve as fiduciaries for the legal rights of others.

In the pending motion (as in its predecessor), Plaintiffs' counsel essentially argues that anyone with a claim can be cut and pasted into the Complaint as a class representative. This circumscribed view of adequacy may explain Plaintiffs' resistance to basic discovery related to adequacy, the lackadaisical reaction to serial dishonesty, and the brazen recruitment of successive representatives to advance the case. The long history of this case demonstrates the dangers inherent when the class lawyer acts *only* as principal—untethered to clients (whose

claims are exchangeable), unbound by actual injury to any class member, and seemingly undisturbed by lack of candor to the tribunal.

**A.** **Pattern of False Testimony and Obstructed Discovery by Plaintiffs and Plaintiffs' Counsel**

The Court has already found that Plaintiffs' counsel was "extraordinarily negligent" in his submission of a false declaration that was relied upon by the Court in its Certification Order. Order (Sept. 30, 2010), at 20. The full history of this action demonstrates that Plaintiffs' counsel has been extraordinarily negligent at best (or complicit at worst) in the consistent submission of false, misleading, and inaccurate testimony, not just by Searcy but by Hornbeck as well. A comparison of Plaintiffs' counsel's actions and representations to this Court regarding Searcy and his actions and representations regarding Hornbeck demonstrate a troubling pattern.

**1. Gladys Searcy**

After filing suit on February 15, 2008, Searcy maintained this action for over two years despite having no standing to raise two of the three claims currently pending. Beyond her standing problems, Searcy was also found to be an inadequate class representative under Rule 23(a). Decertification Order, at 13-14. Plaintiffs' counsel did not learn of these problems for the first time when Searcy's declaration was proven untrue at decertification. Throughout the proceedings, counsel resisted discovery related to standing and adequacy, allowed Searcy to provide false testimony numerous times, and relied upon this false testimony in asserting her standing and adequacy as a class representative.

**a. Plaintiffs' counsel improperly resisted basic discovery.**

Plaintiffs have not produced one piece of paper in this case without first litigating a discovery motion. Defendants were forced to file a motion to compel Searcy to respond to the initial discovery requests because Plaintiffs' counsel insisted that her check-writing was entirely

irrelevant. The Court granted the motion to compel, reasoning "it occurs to me that it is important to get the full panoply of the check-writing business so you have an intact analysis of what was done and what was not done." Ex. 8, Nov. 26, 2008 Hearing Transcript, at 6:21-23.

> **b. Even after discovery was compelled, Plaintiffs' counsel misled Defendants as to production, resisted production in contravention of court order, and redacted relevant information.**

Following the order compelling production, Plaintiffs' counsel served a supplemental response producing documents from one account and stating that "Plaintiff has requested copies of her banking records from January 1, 2005" and she would supplement this response upon receipt. Ex. 9, Supp. Resp., at 3. Despite agreeing to produce the compelled bank records, Plaintiffs' counsel took no genuine efforts to obtain the documents and waited until January 22, 2009 – less than two months before the March 19, 2009 discovery deadline – to inform Defendants that no further records would be forthcoming. Notably, until then the only documents that had been produced were for an account from which no checks were ever written that post-dated her purported SCAN declines.

In anticipation of Defendants' second motion to compel (filed February 6), Plaintiffs' counsel began providing Defendants with *some* of Searcy's checking account information. Critically, even then, Plaintiffs' counsel ***redacted*** Searcy's bank records in a manner that masked her check-kiting. *See* Ex. 10, Searcy Records Comparison. Similarly, while Plaintiffs' counsel produced a list of bank account numbers used by Searcy, there was no disclosure of the one account that proved essential to revealing her check fraud. *See* Ex. 11, Yarbro Ltr. (Feb. 2009).

> **c. Plaintiffs' counsel repeatedly allowed Searcy to provide false, misleading, and inaccurate testimony.**

Throughout her deposition, verified discovery responses, and declarations to the Court, Searcy provided demonstrably false testimony contradicted by bank records in counsel's

possession. She testified that she had presented checks to SCAN merchants on three separate occasions: January 2005, September 2005, and October of 2006. Ex. 12, Searcy Dep., at 90:2-111:2.[7] Plaintiffs' own records – in the possession of Plaintiffs' counsel at the time of the deposition – confirmed that Searcy did not have active checking accounts in January 2005 or October 2006. The records also confirmed that she did not have an active account in September 2005 except for one single day. When Defendants' counsel began questioning Searcy about her check fraud at the deposition, Plaintiffs' counsel instructed Searcy not to answer. Searcy Dep., at 174:6-175:21. After local counsel intervened and the instruction was withdrawn, Searcy proceeded to testify implausibly that this fraud had been merely accidental – testimony that would have been subject to even greater impeachment were it not for the discovery delays described above.

    d.  **With at least "extraordinary negligence," Plaintiffs' counsel urged the Court to rely on false testimony in granting class certification.**

In the initial certification briefing, Defendants highlighted that "it is difficult to conceive" how Searcy could qualify as a Check Presenter. In response, Plaintiffs' counsel prepared a Declaration for Searcy's signature that falsely and for the first time asserted an implausible sequence of events – opening an account, obtaining starter checks, having a check declined, and requesting a SCAN Disclosure Report in a 24-hour period. Searcy Decl. (Nov. 2009). Searcy's bank documents facially showed that the account was "opened by Telephone and On-Line Banking," – a fact later confirmed by the bank's own sworn testimony. Still, Plaintiffs' counsel insisted that the Court should rely on the declaration. After exhaustive briefing, the Court sanctioned Plaintiffs' counsel for submitting this false declaration given the numerous red flags

---

[7] *See also* Searcy Decl. (June 2008), at ¶¶ 3, 4, 6, 8, 10, 15, 16, 18, 21 (additional sworn testimony proven false by her records); Ex. 13, Supp. Interrog. Answers, at 2 ("I recall having at least three (3) checks declined shortly before contacting SCAN to request my file disclosure in January 2005, September 2005, and October 2006.").

related to Searcy's credibility, the conflict with the documents, and the implausibility of the testimony itself.

### 2. The Pattern of Improper Discovery and Inaccurate Testimony Has Been Repeated with Hornbeck.

Hornbeck, like Searcy before him, has provided testimony about his check-writing and interactions with SCAN that are utterly contradicted by SCAN's records, his bank's records, and his own records. As with Searcy, Plaintiffs' counsel redacted critical information relevant to his claims – and did so in violation of this Court's discovery order. In the pending motion, however, Plaintiffs' counsel urges this Court to once again rely on inaccurate testimony and certify another inadequate proposed representative.

### a. With knowledge of Hornbeck's potential adequacy problems, Plaintiffs' counsel again resisted basic discovery.

Plaintiffs' counsel has always known that Hornbeck presented potential adequacy concerns. The initial questionnaire completed by counsel's paralegal when Hornbeck first called counsel's office revealed that Hornbeck was "previously prosecuted" for check fraud. *See* Ex. 14, Hornbeck Questionnaire. Shortly after discovery was recommenced with Krech and Hornbeck as the named plaintiffs, Plaintiffs' counsel filed a motion for protective order to prohibit entirely any Rule 34 requests or Rule 33 interrogatories to Searcy's substitute plaintiffs, insisting that the Court had held that "future discovery was limited to the depositions" of Krech and Hornbeck. Mot. for Protective Order, at 1.[8] The Magistrate Court rejected this attempt to

---

[8] Upon decertification on March 31, 2010, the Court ruled that discovery concerning adequacy should take place expeditiously and that the parties should report back by May 13, 2010. On April 5, 2010, three business days after the ruling, Defendants served discovery requests on Krech. Defendants asked that Krech provide her bank account information on an expedited basis so that subpoenas could issue "[i]n order to facilitate the timely close of discovery in line with the Court's guidance." Ex. 15, Yarbro Ltr. (Apr. 2010). Ten days later, Plaintiffs' counsel responded suggesting that Defendants were engaging in "vexatious discovery tactics, which will inevitably result in more delay." Ex. 16, Holmes Ltr. (Apr. 2010). A week after that, on April 22, Plaintiff filed a Motion for Protective Order. It was noticed for April 27, but then noticed for May 4 after a reassignment to a different Magistrate Judge. After briefing, the Magistrate Judge ruled on the Motion on July 22, 2010.

block discovery entirely, providing Defendants leave to obtain relevant bank records. Order (Jul. 22, 2010), at 7-8. The Court, however, did authorize Plaintiffs' counsel to obtain the bank records directly and redact information unrelated to SCAN transactions and disclosures. *See id.*

### b. Plaintiffs' counsel redacted information directly relevant to this action, including redactions inconsistent with the Court's discovery order.

Plaintiffs' counsel redacted information from the bank records that related to transactions with SCAN merchants or to dealings with SCAN. It is impossible for Defendants to know the extent of this over-redaction because Defendants still do not have complete records. Nevertheless, it is indisputable that checks written to SCAN merchants were returned to them unpaid or were associated with overdrafts, but the initial redactions obscured bank account information related to these returns and overdrafts. *See* Ex. 17, Hornbeck Records Comparison. The Court's discovery order clearly did not allow Plaintiffs' counsel to redact this information. *See* Order (July 22, 2010), at 8 (holding Plaintiffs must provide "cancelled checks and other check writing documents that relate to transactions with SCAN merchants between June 2004 and July 2008 or relate to dealings with SCAN during this period.").

The unredacted records – for just three months – demonstrate that Hornbeck wrote numerous bad checks in the weeks preceding his decline to the very same SCAN merchant (Highlander) that declined his check on February 15, 2007. Due to these and other bad checks, his account at U.S. Bank had a $360.13 deficit on January 2, 2007, went positive for no more than six days, and had returned to a $503.56 deficit by January 31, 2007. *See* Hornbeck Records Comparison. Hornbeck received multiple notices from his bank that his account was significantly overdrawn, none of which were produced by Plaintiffs' counsel in discovery. On January 31, 2007, a balance of over $500 was written off and transferred to a repayment plan and "the account number was reported to Chexsystems [on] January 31, 2007." *See* Ex. 18,

Lieberman Ltr. (Dec. 2011). When U.S. Bank reported Hornbeck's account as closed to ChexSystems, ChexSystems in turn provided that information to SCAN, which led to its inclusion on the SCAN negative database. U.S. Bank reported to ChexSystems that the reason for closing Hornbeck's account was "account abuse." *See* Ex. 19, U.S. Bank Screenshot.[9]

Based on the redacted records provided by Plaintiffs' counsel prior to Hornbeck's deposition, however, it appeared that Hornbeck's account was in good standing and that he had sufficient funds in his account to cover the checks he claimed to write to SCAN merchants.

### c. **Plaintiffs' counsel knowingly allowed Hornbeck to provide misleading and inaccurate testimony at his deposition.**

Plaintiffs' counsel, Martin Holmes, spent a full day preparing Hornbeck to testify at his deposition. *See* Ex. 20, Hornbeck Dep., at 36:9-15. The preparation took place the day before the deposition. At that time, Holmes had copies of Hornbeck's unredacted bank records, including the bank records from the critical time period (January and February 2007) when Hornbeck was first declined the opportunity to write a check at a SCAN merchant. As described above, the bank records available to Holmes and Hornbeck the day before the deposition showed that his account was overdrawn throughout almost the entirety of January 2007, the bank transferred a $500 negative balance from the account on January 31, 2007, as well as numerous other problems with his ability to validly write checks in early 2007. Holmes and Hornbeck also knew that most of that information had been redacted from the materials provided to Defendants in discovery.

---

[9] Consistent with Plaintiffs' counsel's willingness to resist basic discovery and maintain positions long after they have proven demonstrably false, Plaintiffs will undoubtedly continue to argue that U.S. Bank did not report Hornbeck's account as closed despite this clear evidence to the contrary. Indeed, Plaintiffs will undoubtedly rely on the testimony of Audrey McBride, the Branch Manager of Hornbeck's bank, who submitted testimony that the account was "continuously open" based upon her review of various bank system screens, but who also testified that the corporate office, not the branch, handles reports of account closings to ChexSystems. Indeed, the testimony elicited from Ms. McBride simply indicates Defendants did not depose the right U.S. Bank representative. It does not contradict the subpoenaed documents received from U.S. Bank, which are consistent with SCAN's own records, that demonstrate U.S. Bank reported his account as closed due to account abuse.

Yet Plaintiffs' counsel sat silent as Hornbeck testified at his deposition to facts that squarely contradicted the very bank records that Plaintiffs' counsel had in his possession. Hornbeck testified that he was "surprised" when he was declined in February 2007. *Id*. at 94:5-6. According to his testimony, when a SCAN representative informed him that his bank account had been reported as closed, he replied that he was "out of his ever loving mind because I had just come from the bank and my account was open and I had money in there." *Id*. at 96:20-22. In reality, if Highlander had not declined his check on February 15, 2007, Hornbeck would not have had the funds in his account to cover the check. While Hornbeck could not be questioned on this topic during his deposition due to the improper redactions made to his bank records, a check written long before February 15 brought his balance down to $12.94 – less than the $22.88 of the attempted Highlander transaction. Hornbeck then testified that he went to the bank and the branch manager told him that the notion that his account was reported as closed was not just inaccurate but "ridiculous." *Id*. at 99:17-22.

During his deposition, Hornbeck was asked, "Did you have money in your account during that whole time period?," which had been defined as January 11 to February 15, 2007. Hornbeck replied, "Oh, I am sure I did." *Id*. at 232:7-9. When asked about problems with his account, Hornbeck testified as follows:

> Q    Could you validly write checks on January 31st of 2007?
> A    Yes.
> Q    You had money in the account to cover a check on January 31, 2007?
> A    I'd have to go look. I am not aware of there being a negative balance, no.

*Id.* at 234:10-16.

The inaccuracies do not end there. The record – at least the unredacted record – undermines Hornbeck's testimony of a SCAN decline at a Shell station on February 20, 2007. Based on the records, Hornbeck wrote checks numbered 1476-1492 in chronological sequence

31

between December 2006 and February 15, 2007. There is a missing check (1493) that would account for the first decline at Highlander on February 15. Check 1494 was accepted, and Check 1495 was not written until February 22, 2007 – two days after the supposed Shell decline. Hornbeck testified he was informed by SCAN that it would take 30-40 days to clear the negative information, but SCAN had sent him a letter on February 19 indicating it had already been cleared. Finally, Defendants' records do demonstrate a second decline by a SCAN merchant, but not at a Shell station and not due to information active on the SCAN negative distributed file.

The records show that Hornbeck called SCAN about a second decline at the same Highlander store on February 22, 2007. During the call, SCAN informed him that the information had already been cleared and then contacted Highlander's parent company to inquire into the decline. SCAN then worked to ensure that such information – removed from SCAN a week earlier – was removed from Highlander's internal system to the extent attributable to SCAN.[10] Hornbeck was advised that he would be able to write checks to Highlander that same day, and his own records confirm that he did indeed write a check to Highlander successfully at approximately 5:00 p.m. on February 22, 2007. Plaintiffs' counsel has now submitted Hornbeck's inaccurate testimony to the Court and urged the Court find him an adequate class representative.

### B. Pattern of Improper Recruitment of Class Representatives

#### 1. Sammons and Beaudry in Tennessee

The original Tennessee plaintiffs appear to have requested SCAN Disclosure Reports for the purpose of becoming class action plaintiffs. Over a two-week period in May 2007, Sammons

---

[10] Highlander arguably had numerous reasons to decline Hornbeck's checks. He had written numerous bad checks that were returned unpaid in the preceding months. Indeed, after SCAN's intervention on his behalf, Hornbeck wrote more bad checks to Highlander that very week (February 26 and February 28). After Highlander collected return fees from Hornbeck for these bad checks in March 2007, it appears he did not write – or was not permitted to write – another check to Highlander until August 2007.

and Beaudry both requested disclosures from SCAN as well as from TeleCheck, despite neither having received a check decline. Within weeks, Plaintiffs' counsel used the responses to file FCRA class actions against SCAN in June 2007 and against TeleCheck in August 2007. While the antisolicitation rules do not apply to friends and family of Plaintiffs' counsel like Sammons and Beaudry, the circumstances suggest Plaintiffs' counsel had a cause of action that was in need of a client.[11]

### 2. Identification and Recruitment of Searcy

#### a. Plaintiffs' counsel used confidential discovery to identify potential clients in a more favorable forum.

In effect, the Tennessee action was a mere placeholder lawsuit. The case management order in the Tennessee action required Plaintiffs Sammons and Beaudry to file their motion for class certification by January 25, 2008. *See* Sammons CMO, at 6. During discovery in the Tennessee action, Plaintiffs' counsel obtained a list of the names and addresses of SCAN Disclosure Report recipients. Importantly, this information was provided pursuant to a protective order that limited its usage to the Tennessee action. On January 10, 2008, just fifteen days before the class certification deadline, Plaintiffs' counsel sent a targeted mailing to putative class members in just two states, Tennessee and Illinois. While Plaintiffs' counsel asserts this mailing was merely investigatory and that the focus on Illinois consumers was solely to lower mailing costs, the timing and targeting undermine these claims.[12] Especially given the uniquely favorable

---

[11] Sammons and Beaudry maintained in depositions that they had neither considered filing suit nor consulted with Plaintiffs' counsel before requesting their SCAN Disclosure Reports. *See* Ex. 21, Sammons Dep. 53:21-54:7; Ex. 22, Beaudry Dep. 46:10-49:19. It is, however, absurd to suggest that these two individuals with pre-existing relationships to Holmes independently opted to obtain SCAN and TeleCheck disclosures when neither suffered a check decline immediately before requesting the disclosure. It is equally implausible that each of them independently opted to seek out representation by counsel because of the "deficient" reports, happened to select the same counsel, and then file class actions. It would require the willful suspension of disbelief to conclude that Plaintiffs' counsel had no involvement in their attempts to incur claims.

[12] According to a sworn declaration submitted by Holmes, the purpose of the January 2008 letter was to identify consumers who could describe the circumstances leading up to their request for disclosures and who may have

law related to FCRA class actions in the Northern District of Illinois, and the immediate, unilateral dismissal of the Tennessee action on February 1, 2008 in favor of this action filed on February 15, 2008, it is highly likely that these letters were written with the objective of recruiting a new client.

> b. **In response to Searcy submitting a questionnaire, Plaintiffs' counsel contacted her directly by telephone.**

Searcy was one of the 2,500 recipients of the January 10, 2008 letter. She returned a questionnaire to Plaintiffs' counsel on January 18, 2008. About a week later, she received a phone call from Plaintiffs' counsel:

Q      Did you hear back from anyone after you sent in the questionnaire?
A      Yes, I heard back from counsel.
Q      Do you know approximately when that was?
A      Maybe a week or so after I sent in the questionnaire.
Q      All right. So approximately two weeks after you received the letter, you had a phone call with counsel; is that right?
A      Yes.
Q      And that was your first communication, was a telephone call, other than sending in the questionnaire?
A      Right.

Searcy Dep., at 60:20-61:17. When Defendants inquired as to the substance of the telephone call, Plaintiffs' counsel instructed her not to answer because it was a privileged communication. *Id.*

> 3. **Identification and Recruitment of Krech**

> a. **Krech did not become a client until after Plaintiffs' counsel learned that she had a potential SCAN On-Line claim.**

Krech responded to the same January 18, 2008 letter, but did not form an attorney-client relationship with Plaintiffs' counsel in 2008. The Searcy action was already underway when

---

retained copies of their SCAN Disclosure Reports. Obviously, consumers who most recently received their disclosures would be the most likely to be able to provide this information. Holmes had the ability to sort the list of putative class members by date of receipt. Instead of sending letters to those consumers who most recently received disclosures, however, Holmes targeted consumers in a particular jurisdiction (Illinois), a selection wholly inconsistent with the purported justification for the "investigatory" letter.

Krech responded to the letter in February 2008. At that time, Krech provided extensive information about her interactions with SCAN to Plaintiffs' counsel, including details and documents related to her decline at a Target store in October 2005. At the request of Plaintiffs' counsel, Krech also provided her e-mail address, home phone number, and cell phone number, which was not previously information in the possession of Plaintiffs' counsel.

It was obvious by the spring of 2009 that Defendants would challenge the adequacy of Searcy. To the extent Plaintiffs' counsel had considered the possibility of the three legal-theory classes, it was also obvious that Searcy did not have standing to represent a SCAN On-Line or Check Presenter class. Plaintiffs' counsel successfully moved to compel production of the identities of consumers with SCAN On-Line transactional data, and it is hardly coincidental that the fourth and fifth plaintiffs (Krech and Hornbeck) were put forward as representatives of that class while the previous three plaintiffs (Searcy, Sammons, and Beaudry) had no SCAN On-Line activity.[13]

b. **Plaintiffs' counsel targeted Krech and other Illinois putative class members for misleading communications.**

In the fall of 2009 – after Searcy's initial motion for certification was filed – Holmes commenced a series of communications with putative class members in Illinois. On October 12, 2009, Krech received a letter from Holmes that directly led to Krech's attempted entry into the suit on November 11, 2009. This letter misleadingly implied that Plaintiffs' counsel already had an attorney-client relationship with Krech. The implication was not subtle: the letter included an

---

[13] It is important to highlight the central role played by the SCAN On-Line data. There was a March 19, 2009 discovery deadline and a March 30, 2009 deadline for the initial class certification motion. At the time, Defendants had agreed to produce consumer data related to SCAN On-Line, though it was obviously unrelated to the unitary class proffered by Searcy. On February 27, 2009, Plaintiffs' counsel filed a motion to set a briefing schedule. On March 2, 2009, Defendants produced the SCAN On-Line data, but not the names and addresses of the class members with SCAN On-Line history. Plaintiffs filed a motion to compel the next day. At the notice hearing on that motion, the class certification deadline was struck.

"Attorney-Client Communication" legend in bold type at the top of the letter. The suggestion by Plaintiffs' counsel that the legend was a mere oversight, and that the true purpose of the letter was to conduct a fact investigation, is unpersuasive.

First, Plaintiffs' counsel sent a separate letter that very day to approximately 1,000 other putative class members in Illinois and it did not include such a legend. Moreover, the text of this letter – sent to fewer than 100 putative class members that had responded to previous form letters – suggests that there is an ongoing lawyer-client relationship. *See* Ex. 23, Holmes Ltr. (Oct. 12, 2009) ("In our communications you also inquired about what potential rights…you may have.").

Second, the letter misrepresented that Krech was already a class member, exactly the type of misleading statement found improper in *Creative Montessori Learning Centers v Ashford Gear, LLC* , 662 F.3d 913 (7th Cir. 2011). The letter began: "Dear Class Member." *See id.* Krech received a second letter dated October 13, 2009, which stated that the "class member" language was included erroneously and explained that Plaintiffs' counsel had not yet succeeded in certifying a class. This letter included a revised copy of the letter sent the previous day, replacing "Dear Class Member" with "Dear Elizabeth." But both the revised letter and the explanatory cover letter continued to include the erroneous "Attorney-Client Communication" legend. *See* Ex. 24, Holmes Ltr. (Oct. 13, 2009).

Third, the letter – especially as it pertained to Krech – had no investigative purpose. The letter stated that Plaintiffs' counsel was "in the process of determining whether you wrote a check to a SCAN merchant" and provided a list of SCAN merchants for her to review. Plaintiffs' counsel, however, already knew that Krech had written checks to SCAN merchants – she had already provided Plaintiffs' counsel with records in February 2008 that demonstrated she had presented a check to Target. In fact, none of these October 2009 letters were necessary for the

investigation claimed as necessary by Plaintiffs' counsel. In March and April of 2009, Plaintiffs' counsel had sent two form letters to a different group of putative class members. Like the letters sent in October, these letters included lists of merchants for review. Indeed, there were numerous responses to these March and April letters. The investigation of the identical information seven months earlier makes any purported investigatory purpose in the midst of class certification briefing implausible.

> **c. Plaintiffs' counsel initiated a telephone call to Krech before she became a client.**

Beyond the misleading letters received by Krech, the record of sworn testimony is uncontroverted that Plaintiffs' counsel initiated a telephone call to her before she became a client. At her deposition, Krech unambiguously testified that she was not Holmes' client at the time he initiated a phone call to her in the summer of 2009. *See* Ex. 25, Krech Dep., at 228:8-20. This phone call from Holmes to Krech was a plain violation of the ethical rule against direct solicitation.

By the summer of 2009, Plaintiffs' counsel had already engaged in extensive communications with Ms. Krech as a fact witness regarding her interactions with Target and SCAN. According to Ms. Krech's declaration and deposition testimony, no further information was sought or obtained in the 2009 telephone call. *See* Ex. 26, Krech Decl. ¶ 11; Krech Dep., at 207:16-24; 208:22-209:3; 209:17-21. Only willful blindness would allow characterizing this telephone conversation as investigatory. In light of Searcy's lack of standing to bring a SCAN On-Line or Check Presenter claim and the inevitable briefing regarding her general credibility, Plaintiffs' counsel needed a new plaintiff. This direct telephone conversation was part of a campaign to identify a new named plaintiff. Notably, just such a telephone solicitation was at issue in the improper recruitment efforts of the counsel in *Creative Montessori*. 2011 WL

3273078, at *6 (N.D. Ill. 2011) (finding that deposition testimony "suggest counsel might have initially solicited employment from plaintiff by telephone" in violation of Rule 7.3).

The records produced by Plaintiffs' counsel also include memoranda of dozens of telephone calls and e-mails between Plaintiffs' counsel and Illinois putative class members that received the October 2009 letter. Plaintiffs' counsel or his paralegal spoke on the phone to a number of putative class members in Illinois. Plaintiffs' counsel himself had phone conversations with class members on October 21, 23, 26, 28, 29, November 3, and Nov. 5, 2009 (in addition to the 9 listed on the privilege log where the initial communications occurred on October 17, 19, 26, 28, 30 and November 2, 2009.) *See* Ex. 27, Holmes Call Notes; Ex. 28, Privilege Log.

When class members responded to the October 2009 letter by email, Plaintiffs' counsel replied, indicating a desire to talk further by phone. *See* Ex. 29, Holmes Emails. There is even evidence that when a consumer did not respond to this request for a telephone conversation, counsel would send an additional email to arrange a conversation. *See* Ex. 30, Holmes Follow-Up Emails. This flurry of telephone conversations and emails following the October 2009 letter and preceding the filing of Searcy's Reply Memo on November 11, 2009, reveals a fervent attempt to recruit one or more plaintiffs to replace Searcy. These records confirm that Plaintiffs' counsel used the October 2009 letter in connection with attorney-initiated calls to unrepresented parties to attempt to recruit new plaintiffs.

### 4. Consistency of Candidate Recruitment in January 2008 and October 2009

Notably, none of the written communications made to putative class members were filed with the Tennessee Board of Professional Responsibility or contained disclosures required by Tennessee Rule of Professional Conduct 7.3 when lawyers are advertising for new clients.

Instead, these recruitment efforts were made under the guise of investigation. But the facts set out in the table below demonstrate that Plaintiffs' counsel utilized these letters to obtain new clients at times when there was a significant need for new class representatives.

|  | January 10, 2008 Letter (Ex. 31) | October 12-13, 2009 Letter |
|---|---|---|
| Recipients | Illinois and Tennessee putative class members | Illinois putative class members that had responded to the January 10, 2008 letter |
| Necessity | Plaintiffs were unable to file class certification motion on the timeline established by the Court. | Searcy could not represent Check Presenter or SCAN On-Line class and was being challenged as inadequate generally due to credibility problems. |
| Timing | 15 days before Class Certification Motion Deadline | 1 day before Defendants' Response in Opposition to Class Certification |
| Response | Searcy responds on January 18, 2008 | Krech responds on October 19, 2009 |
| Attorney Initiated Phone Call | Searcy receives telephone call from Martin Holmes a week later | Krech receives telephone call from Martin Holmes before receiving the letter |
| Result | Searcy files this lawsuit on February 15, 2008, after the January 31, 2008 dismissal of the Tennessee action | Krech signs Declaration that she is willing to serve as Plaintiff and Class Representative on November 8, 2009 |

## C.    Counsel's Conduct in This Action Renders Him Inadequate to Serve as a Fiduciary for the Proposed Classes.

Counsel has allowed two proposed representatives to provide demonstrably inaccurate and misleading testimony. Counsel has flouted discovery and court orders in important ways both to identify potential clients and to prevent Defendants from accurately assessing the adequacy of proposed representatives. Counsel has also violated the ethical rules to improperly solicit clients at critical junctures where the case might otherwise have been dismissed. Because of his conduct, Holmes and his law firm should not be certified as class counsel.

While courts in this district have, at times, found that such behavior by counsel should not be a factor in class certification, the Court of Appeals recently rejected this approach. Instead, there must be "a rigorous analysis" of the Rule 23(a) prerequisites including the adequacy of proposed class counsel. *Creative Montessori*, 662 F.3d at 916 (quoting *Wal-Mart*

*Stores, Inc. v. Dukes*, ___ U.S. ___, 131 S.Ct. 2541, 2551 (2011)). In *Creative Montessori*, the district court had found that "[o]nly the most egregious misconduct on the part of [a plaintiff's] lawyer could ever arguably justify denial of class status." The Court of Appeals reversed, instructing that such a limitation "would if taken literally condone, and by condoning invite, unethical conduct." *Id*. at 918. "When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class." *Id*.

1. **Counsel is Responsible for the Submission of False, Inaccurate, and Misleading Testimony.**

Courts have consistently found that counsel's responsibility for the giving and submission of false testimony is grounds for finding counsel inadequate under Rule 23(a).[14] Similar to other decisions finding class counsel inadequate, "this is not simply a case where an attorney negligently allowed a client to testify falsely." *Friedman-Katz v. Lindt & Sprungli, Inc.*, 270 F.R.D. 150, 160 (S..D.N.Y. 2010). In *Friedman-Katz*, an FCRA class action, the court found that class counsel was inadequate because they were "complicit" in the Plaintiff's misleading deposition testimony: "At the least, her attorneys allowed false testimony to be given; while at the worst, the testimony was actually encouraged and counseled." *Id*.

Here, the Court has already found (after extensive briefing) that Plaintiffs' counsel was grossly negligent in submitting a false declaration by Searcy in connection with the initial class certification motion. Despite substantial evidence of Searcy's lack of credibility and her history of check-kiting, Plaintiffs' counsel submitted a declaration that was facially inconsistent with her bank records – testimony upon which the Court relied in certifying a class. Class counsel has

---

[14] *See e.g., Kaplan v. Pomerantz* , 132 F.R.D. 504, 509-10 (N.D. Ill. 1990) (decertifying a class after finding that the class representative and class counsel intentionally made misrepresentations regarding prior lawsuits in which they were involved); *Wagner v. Lehman Bros. Kuhn Loeb, Inc.*, 646 F. Supp. 643, 661 (N.D. Ill. 1986) (denying class certification where proposed class counsel was a silent accomplice in false testimony at deposition); *see also Taub v. Glickman,* 14 Fed.R.Serv.2d 847, 849 (S.D.N.Y.1970) (court denied class certification because of attorney's improper conduct without even finding an actual violation of any disciplinary rule).

now allowed a second proposed representative to provide misleading testimony and has done so after attempting to block the discovery of true information by Defendants that would have helped prove the deposition testimony misleading, if not untrue. This consistent presentation of inaccurate testimony by his clients demonstrates, at the very least, a sustained pattern of gross negligence by counsel.

After the Court sanctioned counsel's conduct in connection with the Searcy testimony, the reoccurrence of this same problem with one of Searcy's replacements, Hornbeck, compels a finding that Plaintiffs' counsel is inadequate. Plaintiffs' counsel successfully sought a protective order to limit the checking account information that was subject to discovery by Defendants. As such, Plaintiffs' counsel obtained Hornbeck's records and redacted them before production to Defendants. Plaintiffs' counsel knew about Hornbeck's checking account abuse leading up to the January 31, 2007 report of account closure and the February 15, 2007 decline. Indeed, the documents in the possession of Plaintiffs' counsel demonstrated that a significant negative balance was written off the account and placed into a repayment plan on January 31, 2007. Nevertheless, Plaintiffs' counsel sat silently as Hornbeck repeatedly provided misleading or downright false testimony about his checking account. Despite preparing for his deposition with Plaintiffs' counsel for six hours the preceding day, Hornbeck testified that he could write checks on January 31 and that he was unaware of any problems with his account. *See* Hornbeck Dep., at 141:19-142:1; 234:10-16. Hornbeck reported being surprised and angry about his check decline, while the records make any such indignation implausible. *See* Hornbeck Dep., at 95:3-13.

Here, the factual information presented by Hornbeck "was information that . . . [his] attorneys undoubtedly knew was false." *Friedman-Katz*, 270 F.R.D. at 160. Indeed, Plaintiffs' counsel went to absurd lengths and even violated the Court's discovery order to ensure that

Defendants did not learn the true information. In light of this pattern of false testimony where diligent counsel would have known of the falsity, this Court should not allow Hornbeck or Plaintiffs' counsel "to manage a class action that will determine the legal rights of potentially thousands of others." *Id.* at 161.

> 2. **Counsel Has Improperly Used Discovery to Identify Potential Clients and Engaged in a Sustained Campaign to Unethically Solicit Clients for Pecuniary Gain.**

In this litigation against SCAN, "Rule 23(b)(3) is being used as a device for the solicitation of litigation," which is "an undesirable result" that "cannot be tolerated." *See In re Toys R Us FACTA Litigation*, 2010 WL 5071073, at *8 (C.D. Cal. Aug. 17, 2010) (internal citations and quotations omitted); *see also Flanigan v. Am. Fin. Sys. of Ga.,* 72 F.R.D. 563, 563 (M.D.Ga.1976) ("Rule 23 should not be used as a device to enable client solicitation"). Even recognizing that "class actions are inevitably the child of the lawyer rather than the client," *Williams v. Balcor Pension Investors,* 150 F.R.D. 109, 118 (N.D.Ill.1993), certification is improper where counsel has stirred up the litigation for his own pecuniary gain.

Here, none of the five attempted representative plaintiffs sought out counsel independently. All five learned of their potential cause of action and potential financial recovery from Holmes. During Krech's deposition, it became abundantly clear that Plaintiffs' counsel had been engaged in a sustained effort to recruit clients to serve as class representatives. Plaintiffs' counsel not only sent her four targeted letters, but also initiated a direct telephone call to her before she agreed to become a client in this action. Counsel's decision to initiate a telephone call to Krech – after it was apparent that additional representative plaintiffs were needed – is especially troubling given the absolute prohibition against attorneys initiating direct telephone communication to solicit clients.

After the Krech deposition, Defendants believed that there was significant evidence of a violation of Rule 7.3 of the Rules of Professional Conduct. To ensure that such a charge was not raised without a sound basis, Defendants retained an expert to independently assess the record and determine whether such a violation had occurred. William Freivogel, a recognized authority on questions of legal ethics, issued a report that confirmed that Holmes had engaged in a pattern of conduct that constituted the solicitation of Krech in violation of Tennessee Rule of Professional Conduct 7.3. *See* Ex. 32, Freivogel Report. In response, Plaintiffs' counsel retained an expert who also prepared a report. *See* Ex. 33, Perlman Report.

Plaintiffs' expert made two arguments that bear only brief mention. First, Plaintiffs' expert asserted that anti-solicitation rules did not apply to Holmes or any other lawyers litigating in the Northern District of Illinois due to this Court's local rules. If Plaintiffs' expert is correct, this is likely the only jurisdiction in the country where solicitation was permissible. Second, Plaintiffs' expert claimed that even if there had been unethical solicitation, it should not affect the adequacy determination. Even if this Court needed expert assistance in interpreting its own local rules or the adequacy prong of Rule 23(a), the Court of Appeals decision in *Creative Montessori* makes these opinions untenable.

As to solicitation, Plaintiffs' and Defendants' experts agree that whether a communication constitutes a solicitation in violation of Rule 7.3 depends on the *purpose* of the attorney making the communication. While Defendants' experts examined all the relevant facts in the record, Plaintiffs' expert relied entirely on Declarations by Holmes and Krech – declarations that were prepared months after the receipt of the report of Defendants' expert and submitted for the sole purpose of rebutting the allegation of improper solicitation. Holmes's sworn declaration was plainly dispositive to his expert's conclusion that there was no

solicitation. Plaintiffs' expert explained his analysis as follows: "Let me put it more bluntly and specifically. If a lawyer puts in an affidavit what his objective was, I would put a lot of weight on that . . . . Because the lawyer has a professional obligation not to lie in a sworn affidavit." Ex. 34, Perlman Dep., at 86:12-24.

Here the overwhelming evidence of Plaintiffs' counsel's intent to recruit clients and potential class representatives is simply too clear to ignore. Notably, the 20-page Declaration prepared by Plaintiffs' counsel omitted numerous facts critical to the analysis. *See* Perlman Dep., at 189:23-191:11. While Krech's declaration affirmed her testimony that Plaintiffs' counsel initiated a telephone call to her before she became a client, the Holmes Declaration is entirely silent on that point.

Even more troubling, Plaintiffs' counsel told Professor Perlman before he prepared his opinion that he did not actually initiate a telephone call to Krech. When asked about the omission of the telephone call to Krech in the Holmes Declaration, Perlman testified as follows:

Q    [T]here is no mention in [Holmes'] declaration of his purpose for initiating a telephone call with a person not his client in 2009?

A    That's correct.

Q    How did that figure into your analysis of whether a solicitation may have occurred?

A    I asked him about it.

Q    What did he say?

A    He said he hadn't remembered ever making that phone call.

Q    And where does he say that in his declaration?

A    He doesn't.

Q    He omits from his declaration information about a telephone call that his client has testified to under oath twice?

A    He didn't put it in here.

Perlman Dep. , at 190:19-191:11.[15] The record of sworn testimony is undisputed that Plaintiffs' counsel initiated a phone call to Krech before she became a client. Plaintiffs' counsel filed an extensive declaration *under oath* regarding his communications without mentioning the phone call, but nevertheless assured his expert, during a phone call and not under oath, that his client's sworn testimony on two occasions was inaccurate.

The facts and circumstances taken together preclude Plaintiffs' counsel from submitting reliable testimony that recruiting new clients and new class representatives was not a significant purpose for his communications with putative class members in Illinois in both January 2008 and October 2009. Defendants take no pleasure in raising this argument, but given the overwhelming record in this action and in the predecessor action in Tennessee, this Court cannot find that Plaintiffs' counsel meets the adequacy requirements set out by Rule 23(a).

### D. <u>Hornbeck and Krech Are Inadequate Class Representatives.</u>

The recruitment efforts by Plaintiffs' counsel have resulted in class representatives that do not meet the standards of Rule 23(a)(4). Two of the three proposed class representatives have proven histories of check fraud. The Court has already held Searcy to be an inadequate representative based on her lack of credibility. For Hornbeck, the credibility evidence is far simpler: Hornbeck has actually entered a guilty plea to check fraud. *See* Hornbeck Dep., at

---

[15] This unsworn information communicated to the expert is critically important, because Professor Perlman acknowledges the dangers of direct solicitation via telephone calls:

> Q    What is the reason for the antisolicitation provisions in Rule 7.3?
> A    There are a couple of reasons for it. Number one is to prevent lawyers from engaging in overreaching in terms of dealings with potential clients. And the other one is to ensure that a lawyer's communications with potential clients are recorded so that to the extent there is overreaching, we can know that fact. In-person solicitations, for example, you don't know what a lawyer said to somebody, so we're particularly restrictive in terms of prohibiting that kind of conduct both because of the concern about overreaching and because we don't know what was said.
> Q    And does the same fear about not knowing what is said in direct contact apply to telephone calls?
> A    Yes.

Perlman Dep., at 68:21-69:15.

75:18-79:1. Hornbeck has also been convicted of numerous other "crimes of dishonesty" that are admissible under Rule 609 of the Federal Rules of Evidence. *See* Hornbeck Dep., at 73:15-74:1; 84:10-85:22; 86:4-87:15.

Hornbeck's check fraud conviction related to the very same Highlander store where he suffered his February 15 and 22, 2007 check declines. This is not a case where Hornbeck's credibility can be characterized as irrelevant to the facts at the center of the dispute.

This Court has distinguished between "petty" and "legitimate" credibility concerns: "Typically where courts have denied class certification, they have done so because the class representative generally lacked credibility (i.e., criminal conviction for a crime of dishonesty) or the class representative's credibility was severely strained with respect to the claims in the lawsuit." Curry v. Kraft Foods Global, Inc. 2011 WL 4036129, at *4 (N.D. Ill. 2011); *see also Schleicher v. Wendt*, 2009 WL 761157, 3 (S.D. Ind. 2009) (rejecting "remarkable suggestion" that representative convicted of fraud was fit to serve as class fiduciary for class challenging allegedly fraudulent scheme); *Ross v. RBS Citizens, N.A.*, 2010 WL 3980113, at *4 (N.D. Ill. 2010) (describing such convictions as "confirmed examples of dishonesty").

Not all of the putative class members intentionally wrote bad checks. Certainly, not all of the putative class members have been convicted of check fraud or have records of check kiting. Yet Plaintiffs' counsel has now put forward two such individuals to serve as class fiduciaries.

Plaintiff Krech also presents significant adequacy concerns. Representatives must have "a sufficient stake in the outcome of the litigation so that the Court is confident that they will zealously advocate on behalf of the class." Here it is apparent that whatever small stake Krech has is premised on a fundamental misunderstanding of her case, the operations of SCAN, and what happened to her – a misunderstanding facilitated and perpetuated by Plaintiffs' counsel.

It is undisputed that Krech has never had negative information in SCAN's files and her identifiers have never been distributed to merchants. It is likewise undisputed that her decline stemmed from an error in Target's system that linked her to an entirely different consumer. SCAN investigated the linkage and wrote Ms. Krech – *within two days of her decline* – explaining that she was "declined due to an internal association at Target" and that "SCAN has requested that Target Stores remove their internal association linking you to the reported check." *See* Krech SCAN Ltr. Prior to her telephone call in 2005, SCAN did not know her name, her address, her account number, her drivers' license or anything else about her.[16]

Nevertheless, Krech testified to her belief that the negative association had been communicated from SCAN to a large number of merchants. Krech Dep., at 105:24-117:16. Indeed, she testified that she needed a list of SCAN merchants so that she would know "where can I shop for Christmas, where can't I shop for Christmas?" Krech Dep., at 96:8-9. Despite having been represented by counsel for years, Krech has a fundamental misunderstanding of the facts of the case that relate to her and maintains this lawsuit under the misperception that SCAN distributed erroneous, negative credit information about her to merchants.

Certifying Krech and Hornbeck as class representatives can provide no comfort that they would be anything more than pawns of attorneys who seek a large fee award. *See Greene v. Brown*, 451 F. Supp. 1266 (E.D. Va. 1978). At the very least, their small stake and inability to manage the litigation require even greater focus on the adequacy of proposed class counsel. *See Creative Montessori,* 662 F.3d at 917 ("Class counsel owe a fiduciary obligation of particular significance to their clients when the class members are consumers, who ordinarily lack both the monetary stake and the sophistication in legal and commercial matters that would motivate and

---

[16] Her bank account number was present in SCAN records in connection with one transaction at Casual Corner, a SCAN On-Line merchant, in August 2005, but this account number was neither associated with Krech nor maintained on an active server when Krech called.

47

enable them to monitor the efforts of class counsel on their behalf."). For these reasons, Krech and Hornbeck cannot adequately represent the proposed classes.

## V. PLAINTIFFS AND PLAINTIFFS' COUNSEL HAVE ABUSED THE EQUITABLE TOLLING DOCTRINE.

The FCRA has a two-year statute of limitations. Plaintiffs, however, propose to include in the three classes individuals who received a SCAN Disclosure Report from June 18, 2005 to July 20, 2008. This means that a person whose cause of action was extinguished by the statute of limitations in June 2007 may nonetheless bring her claim in this proceeding, based solely on principles of equity. In order to certify a class of this duration, the Court must conclude that the statute of limitations for the causes of action asserted here was tolled not only by the pendency of this action by Searcy from February 15, 2008 to January 20, 2010, but also by the pendency of the *Sammons* action in Tennessee from June 2007 to February 2008.

Plaintiffs moved to amend the Complaint on January 29, 2010 to add Krech as a putative class representative and to raise the class claims of the SCAN On-Line class, which the Court did not certify. *See* Motion to Amend; Certification Order, at 11. Defendants opposed this Motion, arguing, in part, that there should be no tolling of the statute of limitations for Krech to bring a successive class action. The Court recognized that there was a division of authority among the federal courts of appeals, but ultimately concluded that the statute of limitations for the "putative class claim was tolled during the pendency of the *Sammons* action as well as the instant suit filed by Searcy." Decertification Order, at 10.

Based on the facts that have been developed since 2010, however, this conclusion warrants reconsideration of whether tolling should apply for the stacking of successive class actions. The Supreme Court has always recognized the risk of abuse in equitable tolling of class action claims and warned: "Our decision…must not be regarded as encouragement to lawyers in

48

a case of this kind to frame their pleadings as a class action, intentionally, to attract and save members of the purported class who have slept on their rights." *American Pipe*, 414 U.S. at 561; *see also Cork, Crown & Seal, Inc. v. Parker*, 462 U.S. 345, 354 (1983) (Powell, J., concurring) ("The tolling rule of *American Pipe* is a generous one, inviting abuse."). This case presents a textbook example of such abuse and courts are not commanded to apply *American Pipe* tolling where it would be unjust.

### A.     The Application of *American Pipe* Tolling in This Action is Inequitable.

The Court's decision in *American Pipe* was grounded on the judicial power to provide equitable tolling of statutes of limitations. *See American Pipe,* 414 U.S. at 556-59. As briefed earlier in this memorandum and previously by Defendants,[17] Plaintiffs and Plaintiffs' counsel have misused the discovery process and the principle of equitable tolling repeatedly, in a manner fundamentally inconsistent with *American Pipe* and its progeny.

During the entire pendency of the *Sammons* action and until January 2010, Plaintiffs' counsel had "frame[d] [his] pleadings as a class action, intentionally, to attract and save members of the purported class who have slept on their rights" by alleging the broadest possible class definition (one that discovery quickly proved to be overbroad), as well as all possible claims under § 1681g. While discovery made it abundantly clear that this class was fatally overbroad, there was never an amendment of the complaint until after the proposed class was already denied. Plaintiffs' counsel should not be allowed to abuse equitable tolling to provide limitless opportunities to amend the complaint and cure deficiencies in class definitions.

Here, Plaintiffs' counsel relies on *American Pipe* to protect the viability of stale claims during the pendency of *two* placeholder lawsuits. The contrived claims of Sammons and Beaudry

---

[17] For purposes of this argument, Defendants incorporate by reference their Memoranda in Opposition to Plaintiff's motions to amend complaint.

preserved the bogus claims of Searcy, which permit the prosecution now by Hornbeck and Krech. All five representative plaintiffs were sought out by counsel rather than vice-versa. The Complaint does not allege that anyone in these classes was damaged – indeed, it is virtually impossible for someone to have suffered damages in any way due to the alleged deficiencies in the SCAN Disclosure Reports. Plaintiffs' counsel has played the central role in this action and will unquestionably be its most significant beneficiary.

While Plaintiffs' counsel could have moved for class certification on the class that was pleaded in January 2008 (as required by the *Sammons* CMO) or within six months of commencing discovery (as promised in the Joint Report in this case), the result would have been the same – the unitary class would have been denied. No such motion was filed because Plaintiffs' counsel had not yet determined which classes might survive and which putative class members might have standing. Class action tolling, however, is not intended to provide a fishing license to identify classes and clients.

Federal courts have rejected tolling where it would "condone or encourage attempts to circumvent the statute of limitations by filing a lawsuit without an appropriate plaintiff and then searching for one who can later intervene with the benefit of the tolling rule." *E.g., In re Elscint Sec. Litig.*, 674 F. Supp. 374, 378 (D. Mass. 1987) (holding inappropriate to allow filing of class action by nominal plaintiff "wholly inadequate" to represent the asserted class to toll limitation to permit otherwise untimely intervention of proper representatives); *see also Kruse v. Wells Fargo Home Mortg., Inc.*, 2006 WL 1212512, at *5 (E.D.N.Y. 2006) ("Plaintiffs' position is, in essence, a means of manufacturing jurisdiction to continue the lawsuit . . . As a form of procedural arbitrage, it is prejudicial."); *Warden v. Crown American Realty Trust*, 1998 WL

725946, at *5 (W.D. Pa. 1998); *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 2010 WL 4117477, at *5 (N.D. Cal. 2010).

Equity – the very principle upon which *American Pipe* is based – compels rejection of the equitable tolling protections with regard to Plaintiffs' request to serve as representatives for the claims of tens of thousands of others. "A party coming before a court in equity must have clean hands." *Anweiler v. Am. Elec. Power Svc. Corp.*, 3 F.3d 986, 993 (7th Cir. 1993). The sequence of events related to the search for a representative plaintiff in this case – including the factual developments since Defendants' last briefing of this issue – makes clear that Plaintiffs and Plaintiffs' counsel have unclean hands and have intentionally abused the equitable tolling doctrine.

### B.   Class Actions That Are Voluntarily Dismissed Pursuant to Rule 41(a)(1)(A)(i) Do Not Toll the Statute of Limitations.

Plaintiffs cannot rely upon the pendency of the *Sammons* action to toll the statute of limitations under the equitable tolling doctrine of *American Pipe*. It is hornbook law that "[a] voluntarily dismissal under Rule 41 does not toll the statute of limitations because the law regards a voluntarily dismissed complaint as if it never had been filed." 1 McLaughlin on Class Actions § 3:15, *Effect of Class Action Filing on Limitations Period Governing Individual Claims* (8th ed. 2011).[18]

Rule 41 makes voluntary dismissals expressly "subject to Rule[] 23(e)." Fed. R. Civ. P. 41(a)(1)(A). Thus, most voluntary dismissals of class action complaints must be approved by the Court. *See* Fed. R. Civ. P. 23(e). In *Sammons*, however, the class action complaint was dismissed

---

[18] *See* Wright & Miller, 9 Fed. Practice & Procedure § 2367 & n.17 (3d ed. 2012) ("[M]ost importantly, it seems well settled in the case law that the statute of limitations is not tolled by bringing an action that later is dismissed voluntarily under Rule 41(a)."); 8 Moore's Fed. Practice § 41.33[6][d] (3d ed. 2012) ("The statute of limitations is not tolled by the commencement of an action that is later voluntarily dismissed without prejudice."); *see also* 27 C.J.S., *Dismissal and Nonsuit* § 12 (2012) ("The termination of the suit has the effect of an absolute withdrawal of the claim and leaves the defendant as though he or she has never been a party.").

pursuant to a unilateral notice by Plaintiffs' counsel. *See* Rule 41(a)(1)(A)(i). As opposed to voluntary dismissals subject to Rule 23(e), a Rule 41(a) notice of dismissal is not subject to any court review at all. *Id.*; *see also* Rule 41(b) (barring dismissal without court approval after litigation is engaged by both sides). The termination of the case is automatic upon the filing and requires no action by the court. For that reason, voluntary dismissal by notice is available only early in the proceedings (before the defendant has filed an answer or motion for summary judgment). *Id.*

The Court of Appeals has consistently recognized that when a suit is voluntarily dismissed under Rule 41(a), it "is treated as if it had never been filed" and the "statute of limitations accordingly continued to run during the pendency of that case." *Beck v. Caterpillar, Inc.*, 50 F.3d 405, 407 (1995); *accord Nelson v. Napolitano*, 657 F.3d 586, 587 (7th Cir. 2011). When considering unilaterally dismissed class actions – like *Sammons* – Rule 41 applies no differently. *See In re IndyMac Mortgage-Backed Securities Litig.*, 718 F. Supp. 2d 495, 504 (S.D.N.Y. 2010). The *IndyMac* plaintiffs argued that a previous class action complaint should toll the statute of limitations for the plaintiffs. The court rejected this argument, holding that a "voluntarily dismissed complaint does not toll the statute of limitations." *Id*; *see also Great Plains Trust Co. v. Union Pacific Ry. Co.*, 492 F.3d 986, 997 n.3 (8th Cir. 2007) ("observing that a dismissal without prejudice and a voluntary dismissal . . . does not include the typical circumstances that trigger the *American Pipe* rule.").

While the Court of Appeals recently found that *American Pipe* tolling was applicable despite the voluntary dismissal of an earlier class action, the circumstances were critically different than those here. *Sawyer v. Atlas Heating and Sheet Metal Works, Inc.*, 642 F.3d 560, 561 (7th Cir. 2011). In *Sawyer*, the court distinguished its decision from cases involving

52

"sequential suits filed by the same person, who could have continued the original suit and can't use his own maneuvers or errors to extend a period of limitations." *Id.* From the beginning, this case has been a lawsuit in search of a plaintiff, orchestrated by counsel who has hand-picked plaintiffs at various stages of the proceedings when it became necessary to do so. Thus, as the court noted in *Sawyer*, the traditional application of Rule 41 should be applied here because the *Sammons* and *Searcy* cases were essentially "filed by the same person, who could have continued the original suit" and who ought not to be allowed to "use his own maneuvers…to extend a period of limitations."

Allowing class actions to be unilaterally dismissed for tactical advantage under Rule 41(a)(1), then re-filed by the same lawyer on behalf of a recruited plaintiff in a newly filed case in a different jurisdiction would be inconsistent with this circuit's precedent and the Federal Rules of Civil Procedure. As a consequence, the *Sammons* filing in Tennessee cannot serve to toll the claims brought by Searcy in her complaint filed February 15, 2008, and the two-year statute of limitations bars claims before February 15, 2006. If the Court certifies a class or classes in this case, the start of the liability period should be no earlier than February 15, 2006.

## CONCLUSION

For all these reasons, the Court should deny Plaintiff's motion for class certification.

Respectfully submitted,

eFUNDS CORPORATION and DEPOSIT
PAYMENT PROTECTION SERVICES, INC.

By: /s/ David R. Esquivel

    David R. Esquivel
    Wendy M. Warren
    Jeffrey P. Yarbro
    Allyn R. Gibson
    BASS, BERRY & SIMS PLC
    150 Third Avenue South, Suite 2800
    Nashville, Tennessee 37201
    Telephone: (615) 742-6285

    David L. Hartsell
    Brian P. O'Meara
    McGUIREWOODS LLP
    77 West Wacker Drive, Suite 4100
    Chicago, Illinois  60601-1818
    Telephone: (312) 750-8898

    *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I do hereby certify I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system on this 2nd day of April, 2012, which will send a notice of electronic filing to the following:

Edward H. Nielson, Esq. (IL Bar #0252296)
Scott L. Anderson, Esq. (IL Bar #6269332)
PRETZEL & STOUFFER, CHARTERED
One South Wacker Drive
Suite 2500
Chicago, IL 60606

M. Reid Estes, Jr., Esq.
Martin D. Holmes, Esq.
DICKINSON WRIGHT PLLC
Fifth Third Center
424 Church Street
Suite 1401
Nashville, TN 37219

*Lead Attorneys for Plaintiffs*

/s/ David R. Esquivel
David R. Esquivel

10680390.1